1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     NORFOLK DIVISION

 3

 4   MORPHO DETECTION, INC.,        )
                                    )
 5             Plaintiff,           )
                                    )
 6   v.                             )   Civil Action No.:
                                    )      2:11cv498
 7   SMITHS DETECTION, INC.,        )
                                    )
 8             Defendant.           )

 9

10

11           TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12                      Volume 1
                      Pages 1-208
13

14                   Norfolk, Virginia
                    December 4, 2012
15

16

17

18   BEFORE:      THE HONORABLE MARK S. DAVIS
                  United States District Judge, and a Jury.
19

20

21

22

23

24

25
```

```
 1   Appearances:

 2        ARMSTRONG TEASDALE LLP
                  By: JENNIFER E. HOEKEL, ESQUIRE
 3                    RICHARD L. BROPHY, ESQUIRE
          -- and --
 4        KAUFMAN & CANOLES, P.C.
                  By: STEPHEN E. NOONA, ESQUIRE
 5                    Counsel for Plaintiff

 6        KENYON & KENYON LLP
                  By: JOHN HUTCHINS, ESQUIRE
 7                    EDWARD T. COLBERT, ESQUIRE
                      ZAED BILLAH, ESQUIRE
 8        -- and --
          WILLCOX & SAVAGE
 9                By: CONRAD M. SHUMADINE, ESQUIRE
                      Counsel for Defendant
10

11   ALSO PRESENT:  Nathan Grebasch, IP Counsel, Smiths
                    Richard Stoddard, Dir. of Prod. Mgmt, Morpho
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                        I N D E X

 2   WITNESS ON BEHALF OF
     PLAINTIFF:                                      Page
 3
     RICHARD STODDARD
 4   Direct Examination by Ms. Hoekel...............    145
     Cross-Examination by Ms. Wu....................    190
 5

 6                      E X H I B I T S

 7   Plaintiff's Exhibit Nos.                     Received

 8            1                                      156
             6                                      160
 9          63                                      171
           142                                      177
10         139                                      184

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

<u>P R O C E E D I N G S</u>

      (Proceedings commenced at 9:32 a.m. as follows.)

      COURTROOM DEPUTY:  In Case No. 2:11cv498, Morpho Detection, Inc. v. Smiths Detection, Inc.  Counsel for the plaintiff, are you ready to proceed?

      MR. NOONA:  We are.

      THE COURT:  Good morning, Mr. Noona.

      MR. NOONA:  Good morning, Your Honor.

      COURTROOM DEPUTY:  Counsel for the defendant, are you ready to proceed?

      MR. SHUMADINE:  We're ready to proceed, Your Honor.

      THE COURT:  Good morning, Mr. Shumadine.

      MR. SHUMADINE:  Good morning.

      THE COURT:  Well, good morning counsel.  First of all, sorry to all of you all for the lateness of some of the rulings that have come out.  It's been an unusual situation for the court recently.  I think in the past six weeks, five to six weeks, we've, this is our fourth jury trial, which is very unusual, but that means that I've been in court an awful lot and not out of court able to read motions and work on opinions.  And so a lot of the flurry of activity came in the past week.  And so I apologize to you all for that.  But we tried to get you as much as we could, and hopefully -- whether you like the answer

 1    or not -- it was helpful to get it.  So that's where we are.

 2            Now let's talk a little bit about how we're going to

 3    proceed.  I think that you all have the rulings on all but

 4    Docket No. 176, 186, 197, and 242.  You also are awaiting a

 5    ruling on the motion to determine how we're going to handle the

 6    obviousness issue with respect to jury interrogatories versus

 7    the court deciding it, that whole issue.  I don't think a

 8    response has been filed to that motion yet, so I'm going to wait

 9    for the response and then I'll consider what I want to do on

10    that.  But that's my understanding of what's out there right

11    now.  Therefore, with respect to those motions that I just

12    indicated I had reserved ruling, you're not to mention that

13    information, the disputed information in your opening argument,

14    so that that preserves to the court the ability to effectively

15    rule on that without any significant prejudice resulting from

16    the reservation of such rulings.

17            Now let's talk a little bit about how we're going to

18    proceed today.  You all have advised the clerk that this case

19    will take five trial days, and we have matters scheduled --

20    Madam Clerk.

21            (Court and courtroom deputy conferred.)

22            THE COURT:  So we'll stay on track because of other

23    matters and because that's how we plan to proceed.

24            You know that we're going to use the struck juror

25    method using the board for selecting the jury.  And because it's

1   only five days, normally I try to use about 10, but because it's

2   only five days, seemed to me that eight should be appropriate.

3   That gives us a little bit of leeway in what we're doing.

4             I've looked at your voir dire, and there are a few

5   questions that you all have suggested that I will ask.  Much of

6   it is duplicative of what I have in my standard voir dire, but

7   at the conclusion of the voir dire if there's something that you

8   absolutely believe that you have to have, and that's a high

9   standard, then you let me know and we'll talk about it.

10            The witness list.  I think I have those somewhere.

11  And I assume there's a motion to separate the witnesses by you

12  all, Mr. Noona?

13            MR. NOONA:  Yes, sir, Your Honor.

14            THE COURT:  And the court without objection will grant

15  that motion to separate the witnesses.

16            Are you all able to hear me okay?  Is that -- all

17  counsel?

18            MR. NOONA:  Yes, sir.

19            THE COURT:  Okay.  And as you all may know, I allow

20  note taking by the jurors.  I do not allow -- let's put it this

21  way:  I don't advise the jurors the way I used to, that they can

22  ask questions by passing me a note.  And you will be

23  particularly happy of that, probably, in a patent case.  But if

24  for some reason we get an unsolicited question, then we'll talk

25  about it.

 1            Has there been any press coverage about this case?

 2            MS. HOEKEL:  Not to date, Your Honor, no.

 3            MR. HUTCHINS:  Not of which I'm aware.

 4            THE COURT:  Okay.  I do have preliminary instructions

 5    that I typically give the jury.  I know that you all -- I think

 6    you're in agreement you want to show the patent video; is that

 7    right?

 8            MS. HOEKEL:  Yes, Your Honor.

 9            MR. HUTCHINS:  Yes, Your Honor.

10            THE COURT:  And you want to do that, of course, after

11    the jury is selected as one of the first things that we do?

12            MS. HOEKEL:  Yes, Your Honor.

13            MR. HUTCHINS:  Yes, Your Honor.

14            THE COURT:  Okay.  So I think that's a great idea.

15            Please do remember that we require all counsel to

16    stand at the podium.  If somebody's at the podium and you stand

17    up to make an objection, you know, speak up loudly.  I prefer

18    not to have argumentative objections, but sometimes, you know, I

19    may draw you out in front of the jury just to get a little bit

20    more.  But we'll have to be careful about how far we go down

21    that road, and I may call you up here if I need to hear more.

22    But stay at the podium, because the -- for one thing, it's the

23    rule here in the court.  It's a long-standing tradition.  And

24    there's a microphone you'll see that's there at the podium and

25    so we want to keep you there close.

1              You're not to approach witnesses.  The court security

2      officer, Officer Connolly, will hand any documents back and

3      forth to the witnesses.

4              And once the jury is selected, I always have everyone

5      in the courtroom from the bench out stand up when the jury comes

6      in and leaves out of respect for them.  So once they're

7      selected, that's the way we'll handle that.

8              I think you all have been before me enough to know

9      that I, I don't like a lot of drama.  I expect the trial to be

10     handled in a dignified, professional and fairly low-key manner.

11     I do not tolerate attacks on opposing counsel.  And I'm hesitant

12     in front of the jury to let you know if that happens that you

13     have incurred my displeasure.  And I don't expect that at all

14     from you all because I haven't seen anything to suggest that you

15     do that, but I want to be clear about it.

16             Ms. Hoekel, how long do you expect your opening to be?

17     How long would you like?  Let me put it that way.

18             MS. HOEKEL:  We believe 45 minutes will be sufficient,

19     Your Honor.

20             THE COURT:  Okay.  Who is going to be handling the

21     opening for the defendant?

22             MS. HOEKEL:  Actually for the plaintiff it will be

23     Mr. Brophy.

24             THE COURT:  Mr. Brophy.  I'm sorry.

25             MS. HOEKEL:  That's all right.

```
 1              THE COURT:  Okay.  And for defendant who will be

 2   handling?

 3              MR. HUTCHINS:  I will, Your Honor.  John Hutchins.

 4              THE COURT:  All right.  Then how long would you like?

 5              MR. HUTCHINS:  For the opening statement?

 6              THE COURT:  Yes, sir.

 7              MR. HUTCHINS:  I imagine 45 minutes would be

 8   sufficient.

 9              THE COURT:  Okay.  Madam Clerk?

10              (Court and courtroom deputy conferred.)

11              THE COURT:  Now counsel, the witness list that I would

12   plan to use -- I think I need a bigger bench -- the witness list

13   that I would plan to use are the witness lists that are in the

14   final pretrial order.  That's from Page 6 and 7 of the final

15   pretrial order.  Is that -- let's see.  With respect to Morpho,

16   Patterson, Stoddard, Kinrich and Bell, and may call Perry,

17   DeBono, Gabowicz, Gibson.  Then by deposition may call DeBono,

18   Elliott, Gabowicz, is that the same -- okay.  Link, McGann,

19   Nacson, Viscardi and Zaleski.

20              Is that still the Morpho list?

21              MS. HOEKEL:  Your Honor, I can take that list down to

22   what we've now decided we're going to do, if that's helpful to

23   the court?

24              THE COURT:  Yes, ma'am.

25              MS. HOEKEL:  All right.  Your Honor, we intend to call
```

1    the four witnesses that are on the will-call list.

2           THE COURT:  Okay.

3           MS. HOEKEL:  We do not intend to call any of the

4    may-call witnesses.

5           THE COURT:  Okay.

6           MS. HOEKEL:  With respect to Mr. Gabowicz, we

7    understand that he's unavailable.  He's a Smiths employee, he's

8    unavailable for the duration of the trial, so we have come to an

9    agreement with the defendant to stipulate to a number of

10   exhibits that will not -- that we would have placed in evidence

11   through Mr. Gabowicz that will now come in through no supporting

12   witness, if that's acceptable to the court.

13          THE COURT:  Okay.

14          MS. HOEKEL:  And as far as the depositions, we will be

15   playing the deposition of Mr. McGann and Mr. Zaleski, and we

16   will not be playing any of the other depositions in our case in

17   chief.

18          It's possible that we'll play -- likely that we'll

19   play Mr. Nacson, Dr. Nacson's deposition in our rebuttal case.

20          THE COURT:  Okay.  From the standpoint of listing the

21   names for the jury, to make sure nobody knows anyone then,

22   Elliott is not one?

23          MS. HOEKEL:  Correct.

24          THE COURT:  Mark him off.  Link?

25          MS. HOEKEL:  Correct.  He was on Smiths may-call, but

```
1   he is -- we will not be calling him or showing his deposition.

2            THE COURT:  Okay.  And then McGann and Zaleski are --

3   do I need to list those names?  Nacson may be called.  Rebuttal,

4   Viscardi?

5            MS. HOEKEL:  Not in our case, Your Honor.

6            THE COURT:  Okay.  Thank you.

7            Mr. Hutchins, do you have that list in front of you

8   now?

9            MR. HUTCHINS:  I do now, Your Honor.

10           THE COURT:  Why don't you go through that for me.

11           MR. HUTCHINS:  Certainly.  The will-call list remains

12  the same, but for Mr. Gabowicz who is -- I apologize.

13           THE COURT:  Thank you.

14           MR. HUTCHINS:  Okay.

15           THE COURT:  So the will call list?

16           MR. HUTCHINS:  Remains the same, but for Mr. Gabowicz

17  who will not be testifying live, he's in Poland at the moment.

18           THE COURT:  Okay.

19           MR. HUTCHINS:  Mr. Link, include.  Mr. Viscardi will

20  not be testifying live.

21           THE COURT:  And the deposition?

22           MR. HUTCHINS:  The depositions, you should include all

23  those names.

24           THE COURT:  Okay.  Very good.

25           I assume you all will waive your client being present
```

```
 1   at bench conferences.  Without any further comment I'll assume

 2   that.

 3          And Ms. Hoekel, will you sort of be my primary go-to

 4   person throughout the trial?

 5          MS. HOEKEL:  Yes, Your Honor.

 6          THE COURT:  Mr. Hutchins, same for you?

 7          MR. HUTCHINS:  Yes.

 8          THE COURT:  Okay.  Well, Ms. Hoekel, anything that we

 9   need to address before we bring the jury down from your

10   standpoint?

11          MS. HOEKEL:  Your Honor, I think we had a couple of

12   questions.  The first one was with respect to the witness

13   sequestration issue.  I think we have an agreement with

14   defendant that our expert who will be in our case in chief on

15   infringement will be attending the trial for purposes of putting

16   on any invalidity rebuttal evidence, and I think we have an

17   agreement that once she leaves the stand in our case in chief

18   and is done speaking about infringement issues, that she would

19   not be sequestered for the remainder of the trial until such

20   time as she retakes the stand in our rebuttal case, if at all.

21          THE COURT:  Okay.  That's fine.  If that's the

22   agreement.

23          MR. HUTCHINS:  Yes, Your Honor.  We have -- of course

24   any of the witnesses can observe the testimony in court, but

25   they can certainly talk outside court on an ex-parte basis with
```

```
1   their expert in between her two testimonies.

2          THE COURT:  All right.

3          MS. HOEKEL:  Then the next issue we already addressed,

4   Your Honor, which was the stipulation of a few documents in

5   light of Mr. Gabowicz' trial unavailability.

6          I guess the other two major issues, or minorly major

7   issues we have are we had asked the defendants to supplement

8   their sales figures at least through the end of discovery, if

9   not through trial, and they have refused to so supplement.  So

10  we don't have a, the complete picture of sales.  That's one

11  issue.

12         THE COURT:  Sales figures did you say through, through

13  end of discovery if not through the beginning of trial?

14         MS. HOEKEL:  Right.  They have refused to supplement

15  beyond what they gave us in June.

16         THE COURT:  What was the end of discovery date?

17  November.

18         MS. HOEKEL:  I meant to look that up last night, Your

19  Honor.  I'd have to look it up.  I think it was --

20         THE COURT:  Well, there was a date for supplementation

21  through November 2nd, I think.

22         MS. HOEKEL:  Fact discovery cutoff, fact discovery

23  original cutoff on September 5th, 2012.  And I think we have

24  documents going through May or June.  Now, it would be our

25  position that they have a duty to supplement at least through
```

14

```
 1   discovery, if not through some reasonable time in advance of

 2   trial.

 3         THE COURT:  We don't need to deal with that before we

 4   select the jury though?

 5         MS. HOEKEL:  No, Your Honor.

 6         THE COURT:  Okay.  So that's an issue that you want to

 7   have addressed perhaps at some point today?

 8         MS. HOEKEL:  Yes.  Preferably prior to opening.

 9         And then I think preferably again prior to opening

10   we'd like to get a little bit better handle on the, with your,

11   with the court's ruling excluding their non-infringement expert

12   from testifying about non-infringement, I think we need to

13   further, have further conversations maybe with the defendant

14   about the parameters of what their lay witnesses are permitted

15   to do or what they're expecting the lay witnesses to be

16   permitted to do.

17         THE COURT:  Well, I hope you all have those

18   conversations and you resolve that.

19         Okay.  Mr. Hutchins, from your standpoint?

20         MR. HUTCHINS:  On that last issue, I think we would

21   like some clarification from the court on the scope of the

22   exclusion order with respect to Dr. Harrington.  That's not an

23   issue that needs to be taken up before we select the jury, but

24   preferably today.

25         And with respect to the selection of jury, I did have
```

```
 1   one simple question:  When the venire answers in the affirmative

 2   to the various voir dire questions you ask, are they then

 3   questioned further about those at sidebar or do you follow up

 4   with them at sidebar?

 5            THE COURT:  Generally I may follow up on my own in the

 6   presence of everyone.  If I get a sense that it's going to be

 7   long or it's sort of personal, something of that nature, I just

 8   make a note, and then when we come up to sidebar we call them up

 9   one at a time in the order of the questions that I ask, not

10   necessarily in the order of the jury list.  So that's the way I

11   do it and keep the order.

12            MR. HUTCHINS:  That, I just didn't -- thank you, Your

13   Honor.

14            THE COURT:  Okay.

15            MR. HUTCHINS:  Nothing else.

16            THE COURT:  Oh, and I'm sorry, Mr. Hutchins, on this

17   issue that Ms. Hoekel raised that she asked that we perhaps

18   address before openings on the sales figures, have you all had a

19   chance to talk about that with Ms. Hoekel?

20            MR. HUTCHINS:  Yes.  About maybe two weeks ago we

21   received a request to provide additional financial information.

22   Up until that point in time and certainly through the close of

23   discovery and once discovery closed we had never received a

24   request that our financial information was lacking.  And we said

25   it's, you know, we're preparing for trial, we're not in fact
```

1   discovery anymore, and so we did not supplement beyond the

2   various fact information we had provided.

3           Now, every trial has the damages experts talk about

4   the figures they had as of a certain date.  Once there's a

5   ruling, you know, Your Honor will determine how to handle,

6   following the case or pending appeal or after appeal, an

7   accounting for the period that's missing.  And so -- and we're,

8   you know, we're not averse to dealing with that.  But as we were

9   preparing for trial we did not supplement because the request

10  was untimely and we were preparing for trial.

11          We are not saying in the event of a ruling that

12  royalties are owed, for instance, that there wouldn't be some

13  accounting for a period, you know, that's missing because of the

14  logistics of -- you know, you have certain, you have financial

15  data for this date, and then if there were sales after that date

16  they have to be accounted for.  But at this point, to reopen

17  fact discovery I would suggest is not appropriate.  And

18  certainly to not then allow further additional expert reports on

19  that.

20          THE COURT:  Okay.  Thank you, Mr. Hutchins.

21          Ms. Hoekel, on that point your response?

22          MS. HOEKEL:  Your Honor, Rule 26(e) requires that the

23  defendant supplement their financial disclosures at least

24  through the date of the close of fact discovery.  So I don't

25  believe that we had an obligation to request that.  That's

```
 1   required by the Federal Rules.  We did supplement ours

 2   significantly after the close of discovery just to make sure

 3   that everything was provided.

 4           Further, as to Mr. Hutchins' assertion that the

 5   additional sales can be dealt with post-trial if necessary, as

 6   the court is familiar, one of the factors in the obviousness

 7   analysis is commercial success, and one of the factors in that

 8   analysis is how well has the infringing product done.  And we

 9   know that in the, sometime in that time period -- first we know

10   that -- we anticipate there were additional sales between the

11   time that they gave us their last round of financials, I guess

12   that's sometime in June, and the close of discovery.  We also

13   know that in September, TSA awarded a rather significant

14   contract to Smiths of several hundred units that we think is

15   also relevant to the issue of commercial success at the very

16   least.  So it's not merely a matter of an accounting

17   post-verdict, but of numbers that should be in front of the jury

18   in making their various determinations.

19           And it wouldn't require, Your Honor, any -- in all of

20   these cases, the expert reports are typically done in advance

21   and the expert just applies the percentages and the factors to

22   the current numbers.

23           THE COURT:  Okay.  Final word on that, Mr. Hutchins?

24           MR. HUTCHINS:  On that last point, Your Honor, I don't

25   see how the expert could apply their old numbers to new sales
```

1  without taking into account all the various factors that went

2  into the new sales.  I mean, in other words, the profit margins,

3  et cetera, for the very recent sales could be different from the

4  profit margins for the sales that he already considered when he

5  was determining his royalties.  So it's really not as simple as

6  saying I thought royalties should be X based on that financial

7  data, now they have made X new sales, so just give that same

8  royalty to those.  The X new sales could have been sold with

9  half the margin.  And so it's -- what goes into a reasonable

10  royalty is this, you know, 12, 13-factor thing, it's not

11  trivial.  And so that's the last point.

12          THE COURT:  Commercial success?

13          MR. HUTCHINS:  On commercial success it is always the

14  case in any case that sales continue after discovery.  Now, if

15  they had wanted those sales information, they could have asked

16  for it months ago and when discovery was going on and we would

17  have provided that.  They said nothing.  They didn't move to

18  compel.  They didn't do anything until maybe two weeks ago.  And

19  then they sent us some spreadsheets.  I don't know what they

20  expected us to do with their spreadsheets at that point in time.

21  I think the final pretrial order was probably even in at that

22  point.  And so now is not the time to be reopening fact

23  discovery.  It is inherent in any case -- and frankly in most

24  courts, you know, the time is much greater between the close of

25  fact discovery and trial.  Here it's a relatively short period

```
 1   that there is this gap between when there's fact, when fact
 2   discovery closes and then you proceed with the record you have
 3   and matters that arose after that aren't part of the trial.
 4            THE COURT:  Okay.  Thank you.
 5            All right.  Our jurors are upstairs and they have to
 6   be brought down on an elevator.  There are only so many that can
 7   fit in the elevator, so this is a process.  Is there anything
 8   else that you all need to, need us to address before we get
 9   started?
10            MS. HOEKEL:  No, Your Honor.
11            THE COURT:  Mr. Hutchins?
12            MR. HUTCHINS:  No, Your Honor.
13            THE COURT:  Okay.
14            (Court and court security officer conferred.)
15            THE COURT:  All right.  We're going to bring the
16   jurors down now.
17            So Mr. Noona, you have you, Mr. Stoddard, Mr. Brophy,
18   Ms. Hoekel, Ms. Mendez and Mr. Petracek?  Okay.
19            And over here of course Mr. Hutchins, and is the order
20   of your list -- that doesn't go -- who is next to you?
21            MR. HUTCHINS:  This is Mr. Colbert.
22            MR. COLBERT:  I'm Edward Colbert, Your Honor.  Good
23   morning.
24            THE COURT:  Mr. Colbert.  Okay.
25            Then we have Mr. Shumadine?
```

```
 1              MR. HUTCHINS:  This is from Smiths Detection,

 2   Mr. Grebasch.

 3              THE COURT:  Mr. Grebasch.  Okay.  Yes, sir.

 4              MR. HUTCHINS:  Mr. Sobieski.

 5              THE COURT:  Is he on this list?  No.

 6              How do you spell his name?

 7              MR. SOBIESKI:  S-o-b-i-e-s-k-i.

 8              THE COURT:  Spell that again.

 9              MR. SOBIESKI:  S-o-b-i-e-s-k-i.

10              THE COURT:  Thank you.

11              MR. BILLAH:  Mr. Billah.

12              THE COURT:  Mr. Billah.

13              MR. HUTCHINS:  And Ms. Wu.

14              THE COURT:  And Ms. Wu.

15              (Pause in the record.)

16              THE COURT:  We have a process for considering jury

17   requests for excusal, and very seldom does a request meet any --

18   the criteria that we have.  So they come, any request for

19   excusal will come to me on the morning of trial.  What we handed

20   to you, Ms. Hoekel, was a request for excusal by one juror

21   because of operating a business and the difficulties in

22   operating that business.  And once you take a look at that -- I

23   see you've handed it to Mr. Hutchins.

24              MS. HOEKEL:  Thank Your Honor.

25              THE COURT:  Thank you.  That's for Mr. Owen, I
```

```
 1  believe.

 2              MS. HOEKEL:  Yes.

 3              MR. HUTCHINS:  Your Honor.  I'm not sure I heard you,

 4  is he being removed?

 5              THE COURT:  No, he's still on the list.

 6              MR. HUTCHINS:  Oh.

 7              THE COURT:  But I wanted you to be aware of what his

 8  request was, the particulars of it.

 9              MR. HUTCHINS:  Okay.  Thank you, Your Honor.

10              THE COURT:  From a planning standpoint, Counsel, I

11  plan to go to 5:00 pretty much every day, maybe a little bit

12  longer if we're in the middle of a witness.  Probably will try

13  to break a little bit early tomorrow, maybe 4:30 or so depending

14  on where we are with the witness.

15              And Mr. Hutchins, I failed to ask you, remind me --

16  maybe I should know this -- but Mr. Sobieski, is he in-house

17  counsel?

18              MR. HUTCHINS:  No, Your Honor, he's our IT person who

19  is helping us run all the stuff I can't do.

20              THE COURT:  One of the most important people in the

21  courtroom.  Thank you.

22              (Venire entered the courtroom.)

23              THE COURT:  Officer Connolly, is that everyone?

24              COURT SECURITY OFFICER:  That's everyone, Your Honor.

25              THE COURT:  Okay.  Thank you.
```

```
 1              Good morning, ladies and gentlemen.  My name is Mark
 2   Davis, I'm one of the judges here in the court, and we're going
 3   to get started this morning with the clerk calling the roll and
 4   she'll ask that you stand as you respond.  I think everyone also
 5   has a juror number.
 6              And so Madam Clerk, do you want them to call their
 7   juror number also?
 8              COURTROOM DEPUTY:  Yes, sir.
 9              THE COURT:  All right.  And for you to get used to the
10   process, because there will be times where we're going to ask
11   you questions and you'll stand up today and you'll say your
12   juror number and your name, as we do this calling of the roll,
13   we'd ask you to say your juror number and your name.
14              So Madam Clerk, you may get started.
15              COURTROOM DEPUTY:  In Case No. 2:11cv498, Morpho
16   Detection, Inc. v. Smiths Detection, Inc.  Now members of the
17   jury, when I call your name, would you please stand and answer
18   present and remain standing until the next name is called, and
19   then be seated.
20              (Jury roll called.)
21              THE COURT:  All right?  Any jurors whose names I have
22   not called?
23              There are 32 jurors present, Your Honor?
24              (Panel sworn.)
25              THE COURT:  Good morning again, ladies and gentlemen.
```

1  As I said, my name is Mark Davis, I'm one of the judges in the

2  court here.  And the case to be tried in the court today is a

3  civil case.  We try two kinds of cases here, criminal cases and

4  civil cases.  This is not a criminal case, it is a civil case.

5  It is a case that involves a patent, so it is a civil case in

6  the nature of a patent infringement suit.

7          I want to first thank you all for being here.  I know

8  that you were summoned, you didn't come here necessarily

9  voluntarily, and I know that all of you lead busy lives outside

10  the courtroom, but being here is very important, because you can

11  imagine that if you had a case that was here, you would want

12  jurors who were paying attention, you would want jurors who

13  acted professionally, you would want jurors who represented your

14  community to be here to decide that case.  And so it's very

15  important what you are here doing today, and we very much

16  appreciate your taking that seriously, as we know that you do.

17          The case that we have for trial is expected to take

18  approximately five days to try.  Five trial days.  And so the

19  very first thing I'm going to do is to ask whether any of you

20  have any compelling reason why you cannot serve on a jury that

21  lasts five days.  And the way that we're going to do this for

22  all these questions is I'll have you raise your hand, and if I

23  have one hand, that's easy enough, but if I have a few hands on

24  each row, then we will start on your left side, my right, on the

25  first row, and just go across; second row, we'll move across

1  from your left to right, and all the way back in that manner.

2  If, with respect to any of the questions that I ask you, there's

3  something of a personal nature that you do not want to discuss

4  in front of everyone else, say I'd rather discuss that in

5  private, we will make a note of that, and then we will call you

6  up here at the bench and we'll have a sidebar.  That's about as

7  private as that discussion will be, but we will be having white

8  noise playing over the loud speaker so that everyone else in the

9  courtroom doesn't hear the conversation.  There will be an

10  attorney from each side, and me, and we'll have that discussion

11  here.

12       All right.  So -- and when you stand, as I said

13  before, say your name and your number once I call on you.

14       So do any of have you any compelling reasons why you

15  cannot serve on a jury that might last five trial days?  All

16  right.  We'll start on that very first row.  I think our very

17  first juror.  Yes, sir?

18       PANEL MEMBER:  Charles Banks, Juror 1.

19       THE COURT:  Yes, sir.

20       PANEL MEMBER:  I'm the owner of a very small business

21  myself and I have a couple of cutters and basically I'm shutting

22  the business down to be here.  And I don't mind helping out

23  doing my duty, but it's also going to be detrimental to have a

24  week with no pay.

25       THE COURT:  All right.  Is your business continuing to

1  operate to some degree while you're here?

2          PANEL MEMBER:  No.  Truck is parked at the, parked

3  here with me.

4          THE COURT:  So while you're not there the other

5  individuals you indicated, they're not out there working?

6          PANEL MEMBER:  Last time I let them use my truck they

7  wrecked it.

8          THE COURT:  Okay.  All right.  Well, thank you.

9          Anyone else on that first row?  Yes, ma'am?

10         PANEL MEMBER:  Shelly Edwards, No. 8.  My only concern

11  is I need to pick up my children at 5:30 every day, so I'm

12  worried about if they're late, my husband's out of town, so I

13  have to be there by 5:30.

14         THE COURT:  Where, what neighborhood, what city is

15  that?

16         THE WITNESS:  The Witchduck area near Bayside

17  Hospital.  I can come all five days, I just have to leave at a

18  certain time.

19         THE COURT:  All right.  Thank you.

20         Anyone on the second row?

21         Third row?  Yes, sir, closest to the wall over here I

22  see a hand.

23         PANEL MEMBER:  Michael Killebrew, Juror No. 18.  I'd

24  like to speak in private.

25         THE COURT:  All right.  We will have that discussion

```
 1   later in private.

 2            Yes, sir?

 3            PANEL MEMBER:  Robert Maher.

 4            THE COURT:  What's your number?

 5            PANEL MEMBER:  No. 23.

 6            THE COURT:  23.

 7            PANEL MEMBER:  Yes?

 8            THE COURT:  Yes, sir, go ahead.

 9            PANEL MEMBER:  I have a sister, she's 87 years old and

10   she has Alzheimer's, and I'm going to get her into a facility in

11   February, but right now I'm the one that's taking care of her,

12   and I don't believe I can let her alone for those five days.

13   But after February I would be available to serve any time after

14   that.

15            THE COURT:  Okay.  And who is with her today?

16            PANEL MEMBER:  Well, right now she's by herself.  I do

17   have a person come in, you know, for lunch and that.  But she

18   usually sleeps till like 12:00 o'clock, you know.  That's her

19   schedule.  She stays up all night, sleeps all day.

20            THE COURT:  Yes, sir.  Okay.  Thank you.

21            Yes, sir.

22            PANEL MEMBER:  Matthew Lewis, Juror No. 21.  I just

23   wanted to make the court aware, Your Honor, that I'm a

24   magistrate judicial officer with Virginia Beach until the

25   spring.  I hold judicial status with the State Bar.
```

```
 1              THE COURT:  Okay.  And that's in Virginia Beach?

 2              PANEL MEMBER:  Correct.

 3              THE COURT:  So you all have quite a few -- you have

 4    more than just you serving as a magistrate down there?

 5              PANEL MEMBER:  Yes, sir, we do.

 6              THE COURT:  Thank you, sir.

 7              Anyone else on that row?  Yes, sir, the next row back

 8    I think.

 9              PANEL MEMBER:  Harold Owens, Juror No. 27.  I'm also a

10    sole proprietor, and my business does not operate unless I'm

11    there prepping and cooking.  I'm in the restaurant business, and

12    I'm the only one, with the economy the way it is, to do all

13    those things.

14              THE COURT:  We have your letter and I've shared that

15    with counsel.  So I appreciate you showing us that and calling

16    that to my attention.

17              Yes, sir?

18              PANEL MEMBER:  John Parsons, Juror 28.  I too am a

19    small business owner and request the court's blessing to be

20    excused from this so we can continue operations.

21              THE COURT:  All right.  And is someone else operating

22    the business while you're here?

23              PANEL MEMBER:  It's running without management right

24    now, yes.

25              THE COURT:  Okay.  Again, ladies and gentlemen, we try
```

 1   to get a sense of -- we have competing needs, so sometimes I

 2   have to ask questions to get a sense of what the relative need

 3   and relative urgency is compared to other needs.  So I try to

 4   draw out a little more information.  So that's why I ask.  Is it

 5   a situation where it's totally closed down while you're here or

 6   someone's sort of operating it without any supervision and

 7   you're uncomfortable, perhaps, with that?

 8           PANEL MEMBER:  My business is machining and metal

 9   fabrication and I am the only one that performs the CNC

10   programming for these machines, and my concern being away is

11   that if I make a mistake with one of the programs, then once the

12   mistake's identified, then all wheels would stop until I return

13   to take care of that issue.

14           THE COURT:  Okay.  Thank you.

15           PANEL MEMBER:  Thank you.

16           THE COURT:  Anyone else on that row?

17       I can't tell whether that's the last row or not.  I

18   think it is.  Any other jurors that need to respond to that

19   question?  Okay.

20           Now ladies and gentlemen, at this time I'm going to

21   list the names of the parties and the names of the attorneys and

22   law firms that are representing the parties in this case.  And I

23   should have told you this earlier.  You know, the parties are

24   entitled to have a fair hearing of their case.  They're entitled

25   to have a jury that's not biased, prejudiced, that doesn't have

```
 1   a financial interest in the case, that doesn't have a particular
 2   prejudicial viewpoint, for example.  So there are a number of
 3   these questions, and we're going to be doing this for a little
 4   while.  This isn't going to take 10, 15 minutes, in other words.
 5   So I just wanted to let you all know how that process is going
 6   to work and how long it's going to probably take.  So one of the
 7   things we need to do is make sure none of you have a connection
 8   to the law firm or the attorney, anything of that nature.  So I
 9   ask that you pay close attention to the names of the parties and
10   the names of the attorneys, because in a few minutes I'm going
11   to be asking you if you have had any dealings with any of the
12   parties or the attorneys involved in the case or if you've had
13   any other association with any of the parties or the attorneys
14   which would affect your service as a juror.  And you'll have to
15   bear with me, because there's a number here.
16          The plaintiff in this case is Morpho Detection, Inc.,
17   Morpho, M-o-r-p-h-o, Detection, Inc., Incorporated.  And
18   Mr. Richard Stoddard, the director of product management with
19   Morpho who is standing now and facing you is here in court today
20   as a representative of the plaintiff Smiths Detection,
21   Incorporated.  Thank you, sir.  You can have a seat.
22          And the plaintiff's attorneys, the list that I have
23   lists those who are sitting at counsel tables here.  You see
24   there are two tables there on each side.  And I'm going to call
25   those names and ask that they stand as I do.  First, Mr. Stephen
```

1  Noona with the law firm of Kaufman & Canoles.  Thank you, Mr.

2  Noona.  And Mr. Richard Brophy with the law firm of Armstrong

3  Teasdale.  Thank you, Mr. Brophy.  Ms. Jennifer Hoekel with the

4  law firm of Armstrong Teasdale.  Thank you. We also have in

5  court Mr. Jack Petracek.  We will be assisting with all the

6  visuals.  Thank you, Mr. Petracek.  And he's with the law firm

7  of Armstrong Teasdale.  There will be, as you will see today,

8  various presentations.  You'll see a video.  We have an evidence

9  presentation system in this courtroom that makes things move

10  much more quickly than it otherwise would so that at the box, in

11  the jury box there are monitors, like little computer screens

12  where you can watch the piece of evidence that the witness

13  sitting on the witness stand is looking at and that the

14  attorneys and I are looking at on our screens.  That saves time

15  because it prevents documents from having to be passed back and

16  forth and circulated throughout the jury as everybody waits and

17  looks at it one at a time.  And so we have people involved in

18  audiovisual presentation who will be helping with that.

19         And Ms. Jessica Mendez is also with Morpho Detection,

20  Inc.'s law firm, Armstrong Teasdale.  Thank you, Ms. Mendez.

21         Now the defendant in this case is Smiths, Smiths

22  Detection, Incorporated, and Mr. Nathan Grebasch, counsel with

23  Smiths Detection, Incorporated, is here present in court today

24  as a representative of Smiths Detection, Incorporated.  Thank

25  you, Mr. Grebasch.

1          The defendant's attorneys in this case are Mr. John R.

2    Hutchins with the law firm of Kenyon & Kenyon.  He's standing

3    and facing you.  Thank you.  Mr. Edward Colbert with the firm of

4    Kenyon & Kenyon, and he's standing.  Thank you, sir.  Mr. Conrad

5    Shumadine who is with the law firm of Willcox & Savage.  He's

6    facing you.  And Ms. Huiya Wu with the firm of Kenyon & Kenyon.

7    Ms. Wu is facing you.  Thank you.  And Mr. Zaed Billah, who is

8    also with the law firm of Kenyon & Kenyon, and Mr. Billah is

9    facing you.  Thank you, sir.

10          And we have also Mr. Sobieski who is handling the

11   audiovisual presentations for Kenyon & Kenyon.  Thank you, sir.

12   Another important person.

13          Now, there may be times where additional counsel --

14   and there may be other counsel from each of these parties in the

15   courtroom, and I have the names of a few others that are here

16   with, I think are here with Kenyon & Kenyon that may not be at

17   the counsel table.  I'll call their names.  Mr. Eric Seibert.

18   And if you would turn, Mr. Seibert is standing, you can see him

19   back there.  Thank you, sir.  Also with Kenyon & Kenyon.  And

20   Mr. Bradley Roush with Kenyon & Kenyon, and he's standing also

21   and you all can see him back there.  Thank you.  And I call

22   those names just in case they come forward to make

23   presentations.

24          And Mr. Shumadine, are you going to be expecting

25   Mr. Bryant to be here at any point?

```
 1              MR. SHUMADINE:  Yes, he will be here, because one day
 2  I have an unavoidable conflict.
 3              THE COURT:  All right.  Mr. Shumadine may not be here
 4  one day and Mr. Gary Bryant with the law firm of Willcox &
 5  Savage will be stepping in at some point also.  So I call that
 6  name for you also.
 7              Now, Ms. Hoekel, is there any other name that I need
 8  to call?
 9              MS. HOEKEL:  Yes, Your Honor.  With respect to party
10  names it's probably worth pointing out that Morpho Detection is
11  owned in part by General Electric.
12              THE COURT:  Okay.  Thank you.
13              Ms. Hoekel has reminded me, ladies and gentlemen, that
14  Smiths Detection, Incorporated is owned in part by General
15  Electric Corporation.  I expect that is Corporation.  So just so
16  you know, we'll be asking you whether you have any interest in
17  any of these parties, whether there's a reason why you shouldn't
18  serve on this jury, so we want you to know those kind of things.
19  Obviously if you have a financial interest in a party or in the
20  entity that owns part of the party, we'd want you to let us know
21  that.
22              Now Mr. Hutchins, anything, any other person I need to
23  introduce?  Anything else?
24              MR. HUTCHINS:  No, I think you covered the ground,
25  thank Your Honor.
```

```
 1              THE COURT:  Okay.  Thank you, Mr. Hutchins.

 2         Now as I've told you, we have to select a jury from

 3    your number -- obviously all of you are not going to be serving

 4    on the jury in the case -- and we'll determine who is on the

 5    jury through questions that I ask you in a few minutes.  I'm not

 6    trying to embarrass you in asking these questions, so again,

 7    tell me if you want to talk about something in private.

 8         There are no right or wrong amounts, but of course

 9    you've taken an oath, and so your answers must be truthful and

10    fulsome.  A jury in a civil case consists of six to 12 qualified

11    persons.  We will be selecting eight jurors for this trial,

12    ladies and gentlemen.  That gives us a little bit of leeway in

13    case someone becomes sick in the middle of the trial so that we

14    can make sure that we're able to continue to go forward.  So

15    we'll be selecting eight jurors from your number.  As I've told

16    you, the parties have a right to have the case tried by

17    qualified, fair and impartial jurors.  The qualified and

18    impartial jury is one that's responsible and capable and which

19    will, without fear, favor, bias, prejudice, sympathy or passion,

20    objectively hear and decide the issues to be tried and render

21    its verdict based solely on the evidence presented at this trial

22    and the law applicable to the case as given to you by the court.

23    A juror's qualifications and impartiality may not be assumed

24    without inquiry, and the inquiry which we are about to make is

25    known as the voir dire examination.  It's a time-honored process
```

1  by which the qualifications and impartiality of jurors may be

2  determined.  First we have to be sure that each of you will give

3  the parties a fair and impartial trial based only on the law and

4  the evidence pertaining to the case.  You will be asked

5  questions that are designed to determine whether there are any

6  reasons why you should not serve on this particular jury.  If

7  the court finds that it would be inappropriate for a particular

8  juror to serve on this case for a specific reason, such as a

9  juror being closely related to one of the parties, then that

10 juror would be eliminated from consideration for serving as a

11 juror in this case.  This is referred to as striking a juror for

12 cause.  If the court determines that one or more of you should

13 not serve on this jury for cause, it does not mean that you've

14 done or said something wrong or that you're less qualified to be

15 a juror than anyone else.  It simply means that, in the court's

16 opinion, circumstances exist that would make it inappropriate

17 for you to serve in this particular case.

18         After asking questions and excusing those persons whom

19 the court feels should not serve on this jury for a particular

20 reason, each party will be required to make peremptory strikes.

21 Through the use of these peremptory strikes, the parties use

22 their discretion to strike; that is, to eliminate, jurors from

23 the jury panel until we get to the number of jurors we need for

24 trial.  It's important, therefore, that your answers to the

25 questions propounded be complete and truthful.  Each of you is

```
 1  under compulsion to disclose upon a general question any and all

 2  matters which might tend to disqualify you for any reason from

 3  sitting on this case.

 4          While the sweep of the questions may be broad, it is

 5  your affirmative duty to honestly and conscientiously answer the

 6  real implications of the questions that are asked and to make

 7  your answers as full and complete as possible under the

 8  circumstances.  False or misleading answers may result in the

 9  seating of a juror who would not have been selected if all

10  answers were truthful, and thus results in a miscarriage of

11  justice.

12          Please consider each question very carefully, and do

13  not wait until after you are selected and sworn as a juror to

14  disclose something that ought to be made known at a time a

15  question is asked or when one question suggests to you some

16  other reason for disqualification.

17          While the questions that I ask will be addressed to

18  all of you collectively, they must be considered by each of you

19  as though directed to you individually.

20          I'll begin by asking two preliminary questions.

21  Please raise your hand if your answer is No to either of the

22  following questions.  If your answer is No, then raise your

23  hand.  Can each of you read, write, speak and understand the

24  English language?  If your answer is no, raise your hand.

25          I see no hands.
```

```
 1              Now, same thing with this question.  Can all of you

 2   hear and see me?  If your answer is no, please raise your hand

 3   or if you need any assistance -- Madam Clerk, would you hold up

 4   the sound modification item that we have?  I don't know the

 5   exact name of it.  But anyway, you can place that in your ears

 6   and it hangs down, and it will allow you to hear a little bit

 7   better.  So would anyone like one of these?  Any of you all like

 8   one of these?  Okay.

 9              Now that we have handled those preliminary questions,

10   if your answer is yes to any of the following questions that I

11   ask, please raise your hand.  I'll then address each of those

12   with their hands raised as we discussed before, one at a time,

13   row by row, and tell me if it's private and we'll talk about it

14   up here.

15              Have any of you acquired any information by this case

16   from the news media or from any other sources?

17              I don't know whether there's been any media about it

18   or not.  That's a typical question that I ask.  So have any of

19   you acquired any information about this case from the news media

20   or from any other sources?  If the answer is yes, please raise

21   your hand.

22              I see no hands.

23              Do any of you have any interest in the trial or

24   outcome of this case?  If so, would you please raise your hand?

25              I see no hands.
```

```
 1            If any of you previously served on a jury in a civil

 2   case -- not a criminal case, but in a civil case -- either in

 3   state or in federal court, would you please raise your hand?

 4   Land as I said, we'll go row by row.  I expect we'll have

 5   several responses on this.  Anyone that's previously served on a

 6   jury in a civil case in state or federal court, raise your hand.

 7            (No response.)

 8            THE COURT:  I think that's probably the first time

 9   I've ever had that happen.  You're having your opportunity to do

10   your civic duty this time then.

11            Now, as I previously mentioned, the attorneys for the

12   parties names were called.  We called out those names.  Do you,

13   or as far as you know, any member of your immediate family know

14   any of these attorneys or members of their immediate families?

15            And I'll use the term "immediate families" several

16   times in the next series of questions.  What I mean by that is a

17   spouse or significant other, a child, a sibling or a parent.  So

18   spouse or significant other, child, brother or sister, or your

19   parent.  I could carry it on further, but we have to limit it

20   somehow.  So that's what immediate family means.

21            So you heard all those names called previously of the

22   attorneys.  Do you or any member of your immediate family know

23   any of these attorneys or a member of their immediate families

24   as far as you know?  If so, would you please raise your hand?

25            No hands.
```

```
 1              Have any of you or any member of your immediate

 2   families ever worked for these attorneys or for the law firms

 3   that I mentioned or had any or business or legal dealings with

 4   them?  If so, please raise your hand.

 5              Okay.  We'll start up here.  Yes, sir, your number and

 6   your name?

 7              PANEL MEMBER:  Juror No. 1, Charles Banks.  I worked

 8   for Glenn Croshaw for about five years.  I believe we worked for

 9   Willcox & Savage.

10              THE COURT:  Okay.  And when you said you worked for

11   him --

12              PANEL MEMBER:  I was a -- I'm a landscaper so...

13              THE COURT:  All right.  Would -- sir, would that

14   prevent you from, if you were selected to serve as a juror in

15   this case, would it prevent you from rendering a fair and

16   impartial verdict based solely on the evidence that you heard

17   here in court?

18              PANEL MEMBER:  I don't think so.

19              THE COURT:  You think you could render a fair and

20   impartial verdict?

21              PANEL MEMBER:  Yes, sir.

22              THE COURT:  Okay.  Thank you.

23              There was another hand?  Yes, sir?

24              PANEL MEMBER:  John Parson, Juror 28.  In my previous

25   position with another company we did a lot of business with
```

```
 1   Kaufman & Canoles.

 2            THE COURT:  And did you work with them yourself?

 3            PANEL MEMBER:  Yes.

 4            THE COURT:  Okay.

 5            PANEL MEMBER:  I do not believe that the attorney that

 6   I dealt with is with the firm any longer.

 7            THE COURT:  Okay.  Do you believe that if you were

 8   selected as a juror that you could render a fair and impartial

 9   verdict based only on the evidence that you heard here in the

10   courtroom?

11            PANEL MEMBER:  Yes, sir.  I just wanted to bring that

12   to the court's attention.

13            THE COURT:  Absolutely.  And we want you all to do

14   that.  Thank you.

15            Okay.  Anyone else?

16            I see no other hands.

17            Have any of you or any member of your immediate

18   family, as far as you know, ever worked for, had any business

19   dealings of any kind with or had a financial interest in Smiths

20   Detection, Incorporated?  If so, would you please raise your

21   hand.

22            Let me ask this, sort of a follow-up to that:  Have

23   any of you as far as you know ever heard of the company Smiths

24   Detection, Incorporated, if so, would you raise your hand?

25            All right.  No hands.
```

```
 1            Same question for the other party:  Have any of you or

 2   any member of your immediate family ever worked for, had any

 3   business dealings of any kind with, or had a financial interest

 4   in Smiths Detection, Incorporated?  If so would you raise your

 5   hand?

 6            All right.  Yes, ma'am?

 7            PANEL MEMBER:  Rochelle Heron, Juror No. 12.  I know

 8   you mentioned that they were owned by General Electric, and my

 9   husband and I used to own the stock in General Electric.

10            THE COURT:  Okay.  You anticipated my next question,

11   but that's fine, that's what we want.  So you used to own stock

12   in General Electric?

13            PANEL MEMBER:  Yes.

14            THE COURT:  I take it then you don't now?

15            PANEL MEMBER:  Correct.

16            THE COURT:  And were you aware at the time that they

17   had a financial interest in Morpho Detection, Incorporated?

18            PANEL MEMBER:  No, I was not.

19            THE COURT:  Have you ever heard of Morpho Detection?

20            PANEL MEMBER:  No, I have not.

21            THE COURT:  Do you believe that you could render a

22   fair and impartial verdict if you were selected to serve on this

23   jury based only on the evidence that you heard here in the

24   courtroom?

25            PANEL MEMBER:  Yes.
```

```
1              THE COURT:  Anyone else need -- and I'm going to
2  follow up with respect to GE -- but anyone else need to respond
3  with respect to Morpho Detection, Incorporated?
4              All right.  I see no hands.
5              Has anyone, have any of you ever heard of Morpho
6  Detection, Incorporated?  If so, raise your hand.
7              I see no hands.
8              Now, you heard that General Electric Corporation has a
9  financial interest in Morpho Detection, Incorporated.  Have any
10 of you or anywhere member of your immediate family ever worked
11 for had any business dealings of any kind with or had a
12 financial interest in General Electric Corporation?  If so,
13 raise your hand.
14             Okay.  I see no hands.
15             I'm going to assume that some of you have heard of
16 General Electric Corporation and I won't ask that question.
17             Now ladies and gentlemen, I'm going to read a list of
18 the witnesses who may be called during this trial.  When I call
19 their names, I doubt -- some of them may be in the courtroom,
20 and if they are I'm going to ask them to stand, so that if I see
21 them standing I'll ask you to turn and look at them or wherever
22 they're sitting or standing, look at them.  So if I do call a
23 name and the person's in the courtroom, and I would ask you to
24 stand.  So I'm going to read the witness list to you and try not
25 to read any name twice, but I may.  I have a couple lists to
```

```
 1   read from, and then I'll ask you the question.  So make mental

 2   notes of these names and these people.

 3           And I should say this:  It is very important that you

 4   listen carefully to these names.  If the person's not in the

 5   courtroom and you're not sure, some of these people may not be

 6   local, but I don't want there to be any confusion, so if you

 7   think you recognize the name, we can give you more information

 8   to clarify whether that's the person with a different name -- I

 9   mean a different person with the same name.  So just let us know

10   if you have a doubt in your mind.

11           Michael Patterson.  Richard Stoddard.  Jeffrey or Jeff

12   Kinrich.  Suzanne Bell.  Have any of those people, are any of

13   those people in the courtroom?  Yes.  Okay.  You can see someone

14   behind you and someone in front of you.  Okay.  Thank you.

15           And William McGann may be someone that either

16   testifies or testifies by deposition.

17           Sometimes, ladies and gentlemen, people may be away

18   from the area, unable to make it to court, ill, a variety of

19   reasons why someone may not come, but their deposition can be

20   taken; that is, they can sit down in a room with attorneys, the

21   attorneys can each ask their questions of the person, there's a

22   court reporter just like the court reporter we have here who is

23   sitting there, there's an oath administered, the person is under

24   oath, they type down every question, every answer, it's

25   transcribed, and then it can be read back into the courtroom in
```

```
 1   the courtroom in front of you, or if it's videotaped it can be
 2   played for you.  And that may happen in this case.  So some of
 3   these names may be people like that.
 4           So I called the name William McGann.  Sabatino Nacson,
 5   N-a-c-s-o-n.  Henryk Zaleski.  Dr. Peter Harrington.
 6   Dr. Douglas Ruthven, R-u-t-h-v-e-n.  And if you will turn, Dr.
 7   Ruthven is sitting in the back of the courtroom.  And I didn't
 8   notice whether Dr. Harrington was here and stood.  No.
 9   Dr. Bonner Denton.  Dr. Richard Rapp R-a-p-p.  Dr. Reno DeBono.
10   He's standing, he's behind you there.  Thank you, sir.
11           Roland Link.  Michael Patterson, I think I called
12   that, as well as Richard Stoddard.
13           Kevin Perry.  I called the name already, Dr. William
14   McGann.  And I called the name Dr. Sabatino Nacson.
15           Anthony Jenkins and Joseph Napoli, N-a-p-o-l-i.
16           Counsel, have I missed any names?  Ms. Hoekel?
17           MS. HOEKEL:  No, Your Honor.
18           THE COURT:  Mr. Hutchins?
19           MR. HUTCHINS:  No, Your Honor.
20           THE COURT:  Okay.  Thank you.
21           Now ladies and gentlemen, do any of you know or think
22   you may know any of these prospective witnesses?  If so, would
23   you raise your hand?
24           I see no hands.
25           Now ladies and gentlemen, if you are selected as a
```

1  juror in this case you're going to be required to put aside any

2  feeling of passion or prejudice and decide this case solely on

3  the evidence introduced during the trial and the instructions

4  that the court will give you concerning the law at a later time.

5  Do any of you feel that you could not do that for any reason?

6  If so, would you please raise your hand?

7            I see no hands.

8            Now ladies and gentlemen, I'm going to read to you a

9  list of subject areas, and when I read this list, if your answer

10 is yes to the question, I'm going to ask that you raise your

11 hand.

12           Have any of you ever been educated more than the level

13 of a high school education, employed, trained or had any

14 experience in any of the following areas:  Chemistry, physics or

15 engineering?  Again, have any of you ever been educated more

16 than high school classes, employed, trained or had any

17 experience in any of the following areas:  Chemistry, physics,

18 and engineering?  If so, would you please raise your hand.

19           Starting on first row I see no hands.  I see one hand,

20 I think, of hands I see on the first row.  Yes, ma'am, right

21 here in the middle.  In the middle -- yes, ma'am, you.

22           Would you please stand and state your name?

23           PANEL MEMBER:  Bessie Durham, No. 6.  And my field is

24 math.  So I've had chemistry and physics.

25           THE COURT:  Okay.  When you say your field is math?

```
 1              PANEL MEMBER:  Math teacher.

 2              THE COURT:  You're a math teacher?

 3              PANEL MEMBER:  Yes.

 4              THE COURT:  Okay.  Thank you, ma'am.

 5              And on the end, I think?  Yes, ma'am?

 6              PANEL MEMBER:  Shelly Edwards, No. 8.  I have a

 7   computer science degree and I took physics and I had a

 8   electrical engineering type of class.

 9              THE COURT:  Okay.  Can you speak up for us?  You said

10   you're a -- you have a computer sciences degree and you took

11   what?

12              PANEL MEMBER:  I took physics and I took an electrical

13   engineering type of class.

14              THE COURT:  Okay.  And I'm sorry, where, what are you

15   working in right now?

16              PANEL MEMBER:  I'm a computer scientist software

17   developer.

18              THE COURT:  Software.  Okay.  Thank you.

19              All right.  Anyone else on the first row?

20              Second row?  Anyone there?  In the middle, yes, ma'am?

21              PANEL MEMBER:  Margaret Holland, Juror No. 13.

22   Retired registered nurse.  So I've had chemistry and some of the

23   sciences.

24              THE COURT:  Okay.  Thank you, ma'am.

25              Next to you?  Yes, sir?
```

```
 1              PANEL MEMBER:  Fred Hughes, Juror No. 14, college

 2   courses, chemistry, physics, but I don't use it in my practice

 3   now other than analyzing companies.

 4              THE COURT:  Okay.  And what is your practice now?

 5              PANEL MEMBER:  Financial adviser.

 6              THE COURT:  Okay.  Thank you.

 7              Anyone else on that row?

 8              Okay.  Third row back?  Yes, sir?

 9              PANEL MEMBER:  Stephen Laukaitis, Juror No. 19.  I

10   have a mechanical engineering degree, BS.

11              THE COURT:  And I know a lot of us do things that

12   don't have to do with our college degrees, but what is your

13   current work?

14              PANEL MEMBER:  I'm a defense contractor.  I'm a

15   systems engineering designer right now.

16              THE COURT:  Okay.  Thank you, sir.

17              And anyone else on that row?

18              Okay.  The next row back?  Third in, I think I see a

19   hand?  Yes, sir?

20              PANEL MEMBER:  John Parsons, No. 28 Bachelor of

21   science in mechanical engineering.

22              THE COURT:  And again remind us of the work?

23              PANEL MEMBER:  The work that I do now, I do

24   engineering work to support metal work, metal fabrication mostly

25   in support of DOD, Navy.
```

Paul L. McManus, RMR, FCRR Official Court Reporter

```
 1              THE COURT:  Thank you, sir.

 2              Yes, sir?

 3              PANEL MEMBER:  No. 31, Harold Seigle.  Have a master's

 4    degree in education, and I am currently employed as a science

 5    teacher for Chesapeake public schools.

 6              THE COURT:  Thank you, sir.

 7              Anyone else need to respond to that question?  Okay.

 8              Ladies and gentlemen, have any of you, any immediate

 9    family member as I previously defined that, ever had -- so any

10    of you or any immediate family as far as you know ever had a

11    negative experience with the Transportation Security

12    Administration also known as TSA?  Now, I told you earlier that

13    this case involves a patent and a claim involving patent,

14    alleged patent infringement.  The technology that the patent

15    deals with also has some relation to the Transportation Security

16    Administration in that there are detection machines that use or

17    may use the technology covered by the patent.  And you, I think,

18    are going to hear evidence that the Transportation Security

19    Administration utilizes some of these detection machines that

20    are used to detect things like explosives or narcotics, drugs.

21    And so that's the reason that we ask this question because

22    you'll hear much -- some or much discussion about the

23    Transportation Security Administration.

24              Have any of you, any immediate family member, as far

25    as you know, ever had a negative experience with the
```

```
 1  Transportation Security Administration?  And when I say that, I
 2  don't mean that you're standing in line and you just wish the
 3  line would go faster.  We've all been there.  We've all been
 4  there, not wanted to take off the shoes or the belt or whatever
 5  it is.  But something that rises above that level.  If so, would
 6  you please raise your hand?
 7            Okay.  I see no hands.
 8            Have you or any member of your immediate family as far
 9  as you know ever owned a patent?  Have any of you or any member
10  of your immediate family as far as you know ever owned a patent?
11  All right.  I see one hand on the fourth row, I think.  Yes,
12  sir?
13            PANEL MEMBER:  John Parsons, Juror 28.  My father owns
14  several patents, and I believe I failed to notify you earlier he
15  was an engineer for General Electric at the Portsmouth facility.
16            THE COURT:  And he's no longer with General Electric?
17            PANEL MEMBER:  He's 75 now.  No, sir.
18            THE COURT:  And can you, if you know, tell us a little
19  bit about the patents that your father owned?
20            PANEL MEMBER:  One of ones that I remember
21  specifically is if you go back to the old TV sets where they
22  first came up with remote controls, he owns a patent for one of
23  the mechanisms on that.  If you recall way back then you would
24  hit the remote control and the dial would go ka-chunk, ka-chunk,
25  ka-chunk?
```

```
 1              THE COURT:  Yes, sir.

 2              PANEL MEMBER:  That was his patent.

 3              THE COURT:  Okay.  Do you have any, currently, any

 4  financial interest in any of the patents?

 5              PANEL MEMBER:  No, sir.

 6              THE COURT:  Okay.  All right.  Thank you, sir.

 7              Any other hands?  Okay.

 8              Next question:  Have any of you or any immediate

 9  family member as I've defined it previously as far as you know

10  ever applied for a patent or consulted with an attorney about

11  obtaining a patent?  If so, would you raise your hand?  Yes,

12  ma'am?

13              PANEL MEMBER:  Jennifer Freeland, Juror No. 10.

14  [Inaudible].

15              THE COURT:  I'm sorry, we missed that first part.

16              PANEL MEMBER:  My father did consult with an attorney

17  about obtaining a patent.

18              THE COURT:  Were you involved in that process at all?

19              PANEL MEMBER:  No, sir.

20              THE COURT:  Do you know, do you know what the patent

21  involved?  I'm not asking you what it was, but do you know what

22  it was about?

23              PANEL MEMBER:  Yes.

24              THE COURT:  Are you comfortable sharing that in the

25  open courtroom?
```

```
 1              PANEL MEMBER:  Yes.

 2              THE COURT:  Okay.  Go ahead.

 3              PANEL MEMBER:  It was a mobile dike system in order to

 4   prevent flooding.

 5              THE COURT:  A mobile dike system.  All right.

 6              Do you know whether a patent was awarded?

 7              PANEL MEMBER:  No, sir.

 8              THE COURT:  You don't know, or it was not awarded?

 9              PANEL MEMBER:  He didn't pursue it any further.

10              THE COURT:  Okay.  Did that leave in any way any

11   particular good or bad feeling in you about the process of

12   seeking a patent?

13              PANEL MEMBER:  No, sir.

14              THE COURT:  Or about patents in general?

15              PANEL MEMBER:  No, sir.

16              THE COURT:  Okay.  Thank you.

17              Anyone else?

18              Do any of you have any strong opinions about a patent

19   granting exclusive rights to the inventors or their employer?

20   Do any of you have any strong opinions about a patent granting

21   exclusive rights to the inventors or their employer?  If so, you

22   can raise your hand.

23              All right.

24              Do any of you use any explosives or narcotics

25   detection equipment at work?  I'm going to broaden that,
```

51

```
 1   actually.  Have any of you ever used any explosives or narcotics
 2   detection equipment at work or in any other way?  If so, would
 3   you raise your hand?
 4             I see no hands.
 5             Now, some of these may be terms of art, but if you're
 6   not familiar with them that will probably answer the question.
 7             Do any of you use any regenerative or other air drying
 8   systems at work?  Do any of you use any regenerative or other
 9   air drying systems at work?  If so, would you raise your hand.
10             I see one hand on the fourth row.  Yes, sir?
11             PANEL MEMBER:  John Parsons, Juror 28.  We use an air
12   drying system in our CNC machinery to provide dry air to the
13   machines.
14             THE COURT:  And you said CNC?
15             MS. HOEKEL:  Yeah.  Computer Numerical Control.
16   Compressed air is what operates some of the mechanisms in the
17   machines, and they have to have air drying systems so that it
18   avoids corrosion.
19             THE COURT:  Okay.  Thank you, sir.
20             Is there anyone else?
21             Madam Clerk?
22             (Court and courtroom deputy conferred.)
23             THE COURT:  Have any of you or any member of your
24   immediate family as far as you know ever worked for a company
25   that sought to take actions to protect any intellectual property
```

1    rights such as patent, trademark, copyright or trade secret

2    against another individual or company?  If so, would you please

3    raise your hand?  Other than the people that have already told

4    us.

5            Yes, sir?  It's better if there's any doubt to go

6    ahead and --

7            PANEL MEMBER:  Worked with -- I'm Fred Hughes, Juror

8    No. 14.  I worked for Bank of America, Merrill Lynch and Wells

9    Fargo, all of which have patents.

10           THE COURT:  Okay.  As far as you know were they, are

11   you aware of any litigation or any efforts they took to protect

12   those patents?  Do you have any specific knowledge?

13           PANEL MEMBER:  I didn't follow -- no.

14           THE COURT:  Okay.  Thank you, sir.

15           Anyone else?

16           Have any of you or any member of your immediate family

17   as far as you know ever been involved in a lawsuit related to

18   intellectual property to include patent, trademark, copyright or

19   trade secret as far as you know?  If so would, you raise your

20   hand?

21           No hands.

22           Do any of you know of any reason why you think you

23   could not sit in this case and render a just, fair, honest and

24   impartial verdict?  If you think you could not do that, or you

25   have a question about that, please raise your hand.

```
 1              I see no hands.

 2              Do any of you have any special physical or emotional

 3    challenges that would make serving as a member of this jury

 4    difficult or impossible?  If so, raise your hand.

 5              Is there anyone other than those who have already told

 6    me they would like to discuss anything I've asked about in

 7    private?  If so, would you raise your hand?

 8              Okay.  All right.  Counsel, will you all come up?

 9              (At sidebar as follows:)

10              THE COURT:  I should have said representative from

11    each, I suppose.

12              There's only -- first, is there any question that I

13    did not ask that you feel there's a compelling need to ask?

14    Ms. Hoekel?

15              MS. HOEKEL:  No, Your Honor.

16              THE COURT:  Mr. Hutchins?

17              MR. HUTCHINS:  No, Your Honor.

18              THE COURT:  That's good.

19              There's only one person as far as I remember who said

20    they wanted to discuss something in private.

21              MR. NOONA:  Juror 18.

22              THE COURT:  18.  Is that consistent with your

23    recollection?

24              MS. HOEKEL:  That's correct.

25              THE COURT:  So why don't with do that?  If there's
```

1    anybody else you all want to call up, let me know.

2           All right.  So let's call up Juror 18.

3           This juror, as you all noted, some of you may be from

4    out of town, drives all the way from -- a long distance every

5    day.

6           (Panel member joined the sidebar.)

7           PANEL MEMBER:  Hi, Your Honor.  Juror 18, Michael

8    Killebrew.

9           THE COURT:  You drive from Northampton County?

10          PANEL MEMBER:  Yes, sir.

11          THE COURT:  How long did it take you to get here this

12   morning?

13          PANEL MEMBER:  It wasn't bad.  It was like less than

14   an hour.

15          THE COURT:  Now, Ms. Hoekel, Mr. Hutchins, if you all

16   want to come up closer so you can make sure you hear, that's

17   fine.

18          Now Mr. Killebrew, there was something you wanted to

19   discuss in private in response to my question about whether a

20   five-day trial would be difficult for you?

21          PANEL MEMBER:  Yes, Your Honor.  I'm still in sort of

22   a bankruptcy and I'm in a foreclosure process on my house.

23          THE COURT:  Yes, sir.

24          PANEL MEMBER:  I'm an independent contractor realtor.

25   I do work two jobs.  I'm working 70 hours a week right now,

```
 1   and -- 60 to 70 hours a week.  Just being a realtor, I mean, I

 2   had my first good appointment coming today and I had to give it

 3   up.  I mean, just, things are getting better, but it's --

 4          THE COURT:  So it would be an economic hardship for

 5   you to serve --

 6          PANEL MEMBER:  Yes, sir.

 7          THE COURT:  -- on the jury?

 8          PANEL MEMBER:  I just don't like taking about

 9   bankruptcy and --

10          THE COURT:  Sure.  I understand.

11          Let's see.  Ms. Hoekel, anything else you'd like me to

12   follow-up on?

13          MS. HOEKEL:  No, Your Honor.

14          THE COURT:  Mr. Hutchins?

15          MR. HUTCHINS:  No, Your Honor.

16          PANEL MEMBER:  If I could be called back in the spring

17   I don't know if that would be any better.

18          THE COURT:  Just wanted you to let us know if there

19   was an issue.  Thank you.

20          PANEL MEMBER:  Okay.

21          THE COURT:  You can go back.

22          (Panel member left the sidebar.)

23          THE COURT:  Ms. Hoekel, anyone you would like us to

24   call up?

25          MS. HOEKEL:  No, Your Honor.
```

```
 1              THE COURT:  Mr. Hutchins?

 2              MR. HUTCHINS:  No, Your Honor.  Thank you.

 3              MR. NOONA:  Your Honor, Mr. Noona here.  Sorry.  The

 4   only other issue that I heard that you might want to address for

 5   us is Juror -- let me find it again.  Juror No. 8 I believe who

 6   had to pick up her children at 5:30.  She's the sole --

 7              THE COURT:  Do you all want to just strike her for

 8   cause so there's not an issue about that?  To get where she --

 9              MR. NOONA:  She's not going to make 5:30 leaving here

10   at exactly 5:00 o'clock.

11              THE COURT:  I don't think she would either.  To pick

12   up her kids, and you're going to have a situation of, if we go

13   to 5:10, even if we go right to 5:00, she's going to be worrying

14   about it and not able to focus.

15              MR. NOONA:  We have no objection to that.

16              THE COURT:  Okay.

17              MR. HUTCHINS:  Could we inquire if she has alternative

18   arrangements?  I mean, did she say -- I can't remember her --

19              THE COURT:  She said that her husband -- I thought she

20   said her husband was away before the time when this trial was

21   taking place and he was not available to pick up the children.

22              MR. HUTCHINS:  Okay.  If she already said she doesn't

23   have arrangements, that's fine.

24              THE COURT:  And we have 32 jurors.  So no objection

25   then to striking her for cause?  Okay.  So that's No. 8.
```

57

```
 1              MR. NOONA:  Yes, sir.

 2              THE COURT:  No. 8.

 3              Now let me just look back through my notes.

 4              MR. NOONA:  Your Honor, there was one other that we

 5    might want to consider, and that was 23 I believe had a 87-year

 6    old sister with Alzheimer's --

 7              THE COURT:  Right.

 8              MR. NOONA:  -- who had nobody else to care for her.

 9              THE COURT:  Yes.  Was it --

10              MR. NOONA:  It was 23.

11              THE COURT:  23.

12              MR. HUTCHINS:  Robert Maher.

13              THE COURT:  Yes.

14              MR. NOONA:  We would have no objection to striking for

15    cause.

16              THE COURT:  Any objection?

17              MR. HUTCHINS:  No, Your Honor.

18              THE COURT:  Okay.  No. 23 is struck for cause.

19              MR. HUTCHINS:  Now, we also would have no objection to

20    striking Mr. Owens for cause, who is the gentleman who wrote you

21    the note and also said his restaurant is not operating while

22    he's here.

23              THE COURT:  Mr. Owens that wrote us the note his

24    restaurant is not operating.

25              MS. HOEKEL:  Right.  We have no, no objection.
```

```
 1              THE COURT:  He's number what?

 2              MS. HOEKEL:  27.

 3              MR. NOONA:  27.

 4              THE COURT:  Mr. Owens, No. 27, is struck for cause.

 5              MR. HUTCHINS:  And we would have no objection for

 6  Mr. Banks who said his business with the truck.

 7              THE COURT:  Yes.

 8              MR. HUTCHINS:  And --

 9              THE COURT:  No. 1.

10              MR. HUTCHINS:  And he's not doing any work while here.

11  So we wouldn't object to him being struck for cause.

12              MS. HOEKEL:  No objection from plaintiff, Your Honor.

13              THE COURT:  All right.  No. 1 is struck for cause.

14              I'm not suggesting this would be appropriate to

15  strike, but the gentleman who said he, I think his father had

16  the patent and he's in charge of --

17              MR. NOONA:  28.

18              THE COURT:  -- the computer programming.

19              MR. NOONA:  CNC machine yes, sir.

20              THE COURT:  Isn't he the one who said when he's away

21  nobody else can do that?

22              MR. HUTCHINS:  He says he programmed them in the

23  morning and --

24              THE COURT:  If the issue arises --

25              MR. HUTCHINS:  -- if something went wrong --
```

```
 1              MR. NOONA:  He cuts metal with the computer, so if it
 2  stops, it stops.
 3              THE COURT:  And everybody's stopped until he gets
 4  there.
 5              MR. HUTCHINS:  I would prefer he not be struck for
 6  cause.
 7              THE COURT:  I had a feeling you all might say that.  I
 8  was inquiring, I guess, whether there was a motion to strike
 9  with respect to him or a desire to inquire further.  But if you
10  all don't, that's fine with me also.  Okay.
11              MR. HUTCHINS:  Are we striking Mr. Killebrew, the
12  gentlemen who came up here, for cause?  I have no objection.
13              MS. HOEKEL:  I'm sorry, I didn't hear that.
14              (Counsel conferred.)
15              MS. HOEKEL:  I thought we already struck him.
16              THE COURT:  Yeah.  Mr. Killebrew, No. 18, is struck if
17  we weren't clear.
18              Who else do we -- anyone else?
19              MR. NOONA:  8?
20              THE COURT:  Yes, we've done 8.  We've done 8 -- No.
21  18, No. 8, 23, 27 and 1.
22              MR. SHUMADINE:  Right.
23              MR. NOONA:  Correct.
24              THE COURT:  Okay.  Well, that's good.
25              MR. NOONA:  Thank you, Your Honor.
```

```
1              THE COURT:  Okay.

2              (Sidebar concluded and proceedings resumed as

3    follows:)

4              THE COURT:  All right.  Ladies and gentlemen, that

5    should be all the questions that we have for you now.

6              Counsel are now going to be in the process of

7    selecting the jury and exercising their right to peremptory

8    challenges, as I told you earlier.  Those of you who are not

9    selected to serve on the panel should not be offended or

10   concerned about the fact that you may not be selected for the

11   jury.  The lawyers have their reasons for selecting the panel,

12   and they should, that should not concern you.

13             Now you see the clerk right now holding up a box and

14   she's shaking it.  Those -- what she's done is she's taken the

15   names, your names, and cut them up on small pieces of paper and

16   she's put them in that box, and she's now going to randomly

17   select out of that box from the names that have been shaken up,

18   names, and put them on the board.  And there's a slot for each

19   name.  Then you'll see that board being handed back and forth.

20   That's the way in which this process works; that the strikes can

21   be made by removing a slip of paper from the board and then

22   passing it over and it goes back and forth back and forth.

23             And it may be that you see that takes some time.  And

24   everyone wants to consider who is before them.  They don't know

25   which names at this point are going to be selected and put up on
```

1   that board, and so that will take a little time.  So I'm going

2   to go through some preliminary instructions with you while all

3   of that is taking place.

4           And just so you know, I would anticipate that this

5   process would be concluded before we go to lunch, and we'll see

6   whether we have time to begin with opening statements, but I

7   doubt that we'll do that before we take our lunch break.  So

8   just to give you all a head's up.  But once this process is

9   concluded, the jury names are going to be called, those people

10  selected will -- the eight people will come up here and sit in

11  the jury box, then I'll let everybody else go home and then

12  we'll probably take our lunch break after a little bit.

13          Now ladies and gentlemen, we want you to be as

14  comfortable as possible, so please let Officer Connolly know if

15  you have any problems.  We generally try to take a break

16  mid-morning break on every day of trial, a break mid-afternoon,

17  and of course a lunch break.  If you need something, please make

18  sure that you raise your hand during the trial to get the

19  attention of Officer Connolly or me or someone else.  And

20  counsel, if you all need to stand up when the board is at your

21  table, that's fine, if you need to walk over while that process

22  is going on.

23          So while the attorneys are occupied with jury

24  selection I want to tell you a little bit about the process and

25  who the players are.

```
 1              First, the courtroom deputy clerk who is sitting in
 2   front of me.  We've worked together for many years both here and
 3   in private law practice.  And she has many responsibilities.  As
 4   you can see, she oversees the mechanics of the jury selection
 5   process, the mechanics of what we do here in the courtroom.
 6   She's interfacing with the attorneys in the first instance.  And
 7   she's also responsible for scheduling the court's docket.  So
 8   you know, the court has hundreds of cases for which, you know,
 9   each judge is responsible for.  And so those cases have to be
10   scheduled for trial, motions have to be scheduled, there are
11   some basic orders that have to be entered.  The courtroom deputy
12   clerk is responsible for all of that.  She is very important
13   because she controls my schedule.  She tells me when I'm in
14   court and when I'm not in court, when I have trial and don't.
15   And so she keeps that whole process working smoothly.  She's
16   responsible for the exhibits here in court and making sure that
17   all of that paperwork is kept appropriately.  And so she's very
18   busy inside and outside of the courtroom when she's back in her
19   office, emailing attorneys and talking on the phone with
20   attorneys trying to schedule the docket of the court.
21              The court reporter sitting right here.  The court
22   reporter transcribes the proceedings and testimony; however,
23   don't think that as soon as it's typed it's spit out on the
24   other side immediately.  It takes time for the court reporter to
25   then go back and check the transcript and make sure that
```

1   everything is appropriate.  But the court reporter is

2   responsible for keeping the official record of the proceedings

3   in the case.  If, you know, for some reason a case is appealed

4   and you need to type up transcripts, things of that nature, the

5   court reporter is responsible for doing that.  If there's a

6   visual cue that's not reflected, would not be normally reflected

7   on the record, the court report is watching and will take that

8   kind of thing down.  If he can't hear, he has to hear.  So we

9   may, you know, ask people to speak up, things of that nature to

10  make sure that the record is kept appropriately.  And we have

11  also worked together for many years, including in private

12  practice.

13          Court security officer, Officer Connolly.  Officer

14  Connolly is responsible for calling witnesses when the witness

15  called in.  Sometimes the parties will make sure the witness

16  comes in, but Officer Connolly may have to go out in the hallway

17  and get the witness.  He will -- he's a particularly important

18  person to you, because he'll be the person that you're talking

19  to most.  He will escort you in and out every day during every

20  break.  He'll talk to you back in the jury room about where you

21  can get your lunch, where you can put your lunch in a

22  refrigerator, when you need to be here, how you'll get here, and

23  deal with security.  Should anyone, for example, attempt to

24  contact you or talk to you in some inappropriate manner about

25  this case, he would be the person you would tell so that he

1   could let me know immediately and we could address that.  And

2   Officer Connolly comes to us after a distinguished career as a

3   police officer here in the City of Norfolk.

4            The court's law clerk.  Every year each federal judge

5   hires a couple law clerks, and sometimes they will stay for

6   several years, sometimes longer, sometimes it's one or only

7   two years, and then they go on to private practice.  And so

8   generally the law clerks are responsible for helping the court

9   do research and writing opinions.  The court has to write a lot

10  of opinions.  We are churning out paper all the time, as the

11  attorneys will tell you.  And so the law clerks help me do that,

12  and help all, every federal judge do that.  They are generally

13  people who are at the very top of their class.  Very, very smart

14  people.  People who excel and are very hard-working.  And the

15  jobs are very competitive.  I get -- I think the first year I

16  did this I had 800 applications for two positions.  And so it's

17  a very competitive job.  And so I have one law clerk in here,

18  one law clerk back there in chambers who is busy writing

19  opinions that we are working on right now in other cases.

20  You'll see me consulting with the law clerk from time to time if

21  I need some research done or if I have a question or I need

22  something back in chambers.

23           And you know that my job, of course, is just to try to

24  resolve the questions and make sure that we have a fair process

25  for both of the parties and to maintain order in the case and

1   decide the questions of law that the attorneys raise at various

2   times.  And they have to do that to protect the interests of

3   their clients.

4          Now let's talk about your duties.  And I will tell

5   you, as soon as they're finished I'm going to stop talking.  I'm

6   just trying to fill the void here a little bit.

7          I'll tell you something about your duties as jurors if

8   you're selected and give you some preliminary instructions to

9   guide you as you listen to the evidence.  For those of you who

10  have served before this may be repetitive, and I apologize, but

11  it's important.

12         At the end of the, at the end of all the evidence, at

13  the end of the case, the conclusion of the case, I'm going to

14  read to you instructions of law that you're going to apply to

15  the case when you go back to the jury room to deliberate.  So

16  these are just some preliminary instructions.

17         It's going to be your duty to decide from the evidence

18  what the facts are.  You and you alone are judges of the facts.

19  You will hear the evidence, decide what the facts are, and then

20  apply those facts to the law that I'll give you at a later time.

21  This is how you'll reach your verdict.  In doing so, you must

22  follow the law you're given, whether you agree with it or not.

23         You must not take anything I say or do during the

24  trial as indicating what I think your verdict should be.  Don't

25  be influenced by the fact that I take notes.  I do take a lot of

1  notes.  What I write down may have nothing to do with what

2  you'll be concerned with during the trial.

3         Please ignore any facial expressions that you may

4  think that I make.  I may just have a pain in my side.

5         It's sometimes the duty of the court to admonish an

6  attorney who, out of zeal for his or her cause, does something

7  which may not be in keeping exactly with the rules of evidence

8  or procedure.  I doubt that will happen, but if it does, please

9  don't permit that to have any affect on your evaluation of the

10 merits of the plaintiff's or the defendant's case.  They have an

11 obligation to try to represent their client in an appropriate

12 manner, and it becomes my obligation sometimes to address those

13 issues.

14         You will decide what facts are from the evidence that

15 will be presented here in court.  That evidence may consist of

16 the testimony of witnesses, depositions as I explained to you

17 earlier, which is just testimony taken in front of the court

18 reporter under oath, documents and other things received into

19 evidence as exhibits, and any facts on which the attorneys agree

20 or which I may instruct you to accept.

21         The following things are not evidence and you must not

22 consider them as evidence in deciding the facts of the case:  A

23 statement or an argument of an attorney, not evidence; questions

24 and objections of the attorneys, not evidence; testimony that I

25 instruct you to disregard, not evidence; anything that you may

1  have seen or heard when the court not in session, even if what

2  you see or hear is done or said by the one of the parties or by

3  one of the witnesses, not evidence.

4        There are two kinds of evidence:  Direct and

5  circumstantial.  Direct evidence is testimony by a witness about

6  what the witness personally saw or heard or did.

7        Circumstantial evidence is evidence, indirect

8  evidence; that is, it's proof of one or more facts from which

9  you may find or infer another fact.  For example, direct

10  evidence is you walk outside and you see it raining.  Well,

11  that's direct evidence of it raining.

12        Indirect evidence that it's raining is someone walks

13  into the courtroom with a hat, an umbrella and a raincoat on and

14  there's water on all of those items and they're shaking it off.

15  That's circumstantial, indirect evidence.  You may consider both

16  direct and circumstantial evidence in deciding the case.  The

17  law permits you to give equal weight to both, but it's for you

18  to decide how much weight to give to any evidence.

19        There are rules of evidence that control what can be

20  received into evidence.  When an attorney asks a question or

21  offers an exhibit into evidence and an attorney on the other

22  side thinks it's not permitted by the rules of evidence, that

23  attorney may object.  If I overrule the objection, the question

24  may be answered or the exhibit may be received.  If I sustain

25  the objection, the question cannot be answered or the exhibit

1  cannot be received.

2        Whenever I sustain an objection to a question, you

3  should ignore the question and do not guess what the answer

4  would have been.  Furthermore, you must not be prejudiced for or

5  against an attorney or the party that the attorney represents

6  because the attorney makes an objection and I sustain or

7  overrule it.

8        Sometimes I may order that evidence be stricken from

9  the record and that you disregard or ignore the evidence.  That

10  means when you're deciding the case back in the jury room you

11  must not consider the evidence which I told you to disregard.

12        Some evidence may be admitted for a limited purpose.

13  When I instruct you that an item of evidence has been admitted

14  for a limited purpose, you must consider it only for that

15  limited purpose and no other.

16        In deciding the facts if the case, you will have to

17  decide which witnesses to believe and which to not believe.  You

18  may believe everything a witness says or only part of what a

19  witness says or nothing that a witness says.  In deciding what

20  to believe, you may consider a number of factors, including the

21  witness's ability to see or hear or know the things that the

22  witness testifies to; the quality of the witness's memory; the

23  witness's manner while testifying; any interest the witness may

24  have in the outcome of the case; any motive, bias, or prejudice

25  of the witness; any contradiction of the witness by anything the

1   witness said or wrote before trial, or by other evidence and the

2   reasonableness of the witness's testimony when considered in the

3   light of other evidence which you believe.

4        Limitations may be imposed upon the ability of a

5   witness to give an opinion.  A witness's testimony may be

6   limited to facts as to what happened or what was seen or done.

7   Where a witness has some specialized knowledge concerning a

8   particular subject matter which might assist an ordinary jury or

9   ordinary judge to understand a complicated or a technical field,

10  that witness is called an expert witness and is permitted to

11  testify in greater latitude in giving opinions.

12       If a witness testifies based upon their training,

13  qualifications and knowledge, you should endeavor to evaluate

14  the testimony of such witness just as you evaluate the testimony

15  of any other witness under the factors I've already mentioned.

16       Additionally, in the case of such a witness, you

17  should evaluate their training, qualifications and knowledge of

18  the subject matter concerning which they're testifying.

19       Furthermore, you should realize that the testimony of

20  such a witness is no more controlling than that of any other

21  witness, because it is your judgment which is the final answer

22  insofar as these questions are concerned.

23       I've told you this is a civil case, not a criminal

24  case.  The plaintiff generally has the burden of proving its

25  case by what's called a preponderance of the evidence.  That

1  means the plaintiff has to produce evidence that, considered in

2  light of all the facts, leads you to believe that what the

3  plaintiff claims is more likely true than not.  In other words,

4  if you were to put the plaintiff's and the defendant's evidence

5  on opposite sides of the scales, the plaintiffs would have to

6  make the scale tip somewhat on its side.  If the plaintiff fails

7  to meet that burden, then the court will direct you how to

8  handle that at the conclusion.  This, of course, is different

9  from the standard in a criminal case, where the burden is

10  generally proof beyond a reasonable doubt.

11          Now, we're just about there.  There are a couple other

12  things that I do need to tell you, however.

13          Some rules.  First:  During the trial, you're not to

14  discuss with each other the case or anyone else who has anything

15  to do with the case.  At the end of the case, after all the

16  testimony has been heard and all the evidence has been received,

17  I'll instruct you to retire to the jury room to begin your

18  deliberations, but until that time you are not to talk amongst

19  yourselves about the case or deliberate.  You must only do that

20  after all the evidence has been heard when you're back there all

21  together in the jury room.

22          Please also remember that you shouldn't engage any

23  court staff in any discussion of the case.  If someone should

24  try to talk to you, please report it to Officer Connolly

25  immediately.

Third, do not read any news stories, if there are any, or articles or listen to any radio or television report if there are any about the case or anyone who is in any way connected to it.

Fourth.  Very important in a case of this nature, very important:  You must not conduct any independent research about this case, the matters in the case, the individuals or corporations involved in the case.  In other words, you should not consult dictionaries, you should not consult reference materials or search the Internet, websites, blogs, or use any other electronic tools to obtain information about the case or to help you decide the case.  Do not try to find out information from any source outside the confines of this courtroom.

Fifth.  Until you retire to deliberate, you must not discuss the case with anyone, even your fellow jurors.  After you retire to deliberate you may begin discussing the case with them, but you cannot discuss the case with anyone else until you have returned a verdict and the case is at an end.

Like most of our cases, I hope you find the case interesting.  I know that many of you use cell phones, Blackberries, iPhones, the Internet, and other tools of technology, but you must not talk to anyone about this case or use these tools to communicate electronically with anyone about this case.  This includes your family and your friends.  You may tell them that you are a juror in a civil case, but do not tell

1  them anything else about the case until after you've been

2  discharged.  Once you do, so many times people will say, oh, I

3  know something about patents or I know something about this, and

4  just start volunteering something to you that may prejudice you

5  one way or another in the case.  You don't want that.  We don't

6  need that.  So don't do it.

7          Also, this is really important, it's happening a lot,

8  people who are getting on their Facebook pages and just talking

9  ad nauseam about what's gone on during their day.  And I think

10 sometimes, you know, when you do that, you're so used to telling

11 everybody what you're doing during the day without thinking, you

12 get on there and just do it.  You cannot do that in this case.

13 The attorneys, the parties, these corporations, they have

14 invested a lot of time, a lot of time -- this case has been

15 pending for a long period of time, as any case here is.  It's

16 filed, there's a lot of attorney time and effort that goes into

17 preparing to be here today, witnesses have been subpoenaed,

18 people are coming from all over the country, maybe all over the

19 world, I've carved out this time, which means another case can't

20 be done, other people are waiting for their motions to be

21 decided back in chambers.  There is an immense amount of your

22 money, your tax dollars money that's invested in what we're

23 doing right here.  And if you get on your Facebook page and

24 start talking about this case and cause us to have a problem

25 such that we cannot go forward with this trial and have to

 1   reschedule it, it is one of the most maddening things that

 2   judges have to deal with these days.  And you can imagine that

 3   there will be consequences if that happens.

 4           So I say that as nicely and as firmly as I can to

 5   remind you of the importance of not doing it.  Don't communicate

 6   about this case in any way.

 7           Sixth.  Don't make up your mind about what the verdict

 8   should be until after you've got to the jury room and I've

 9   instructed and your fellow jurors to begin deliberations.  You

10   must keep an open mind until that time.

11           If we see you, if the attorneys see you, if any of the

12   parties see you in the hallway or at lunch, they're probably

13   going to turn and shy away from you.  They're not trying to be

14   rude.  We're not trying to be rude.  But we don't want anybody

15   to accuse us of trying to influence you or interact with you or

16   curry favor with you by trying to be really nice to you,

17   anything of that nature.  So don't hold it against any of us.

18           I'm going to let you all, as I do all my jurors, take

19   notes.  So if you want to take a note, notes of the trial,

20   Officer Connolly will ask you, he'll give you a pad, he'll

21   collect the pads at the end of the day and give them back at the

22   beginning of the day, and when the trial is over he'll destroy

23   all those notes.  But if you decide to take notes you should not

24   let it distract you from what's going on in the courtroom.

25           If you choose to take notes, don't discuss them with

```
 1   anyone until the end of the case.  If you choose not to take

 2   notes, remember it is your individual responsibility to listen

 3   to the evidence carefully and to rely on your independent

 4   recollection of the evidence and not be influenced by the fact

 5   that somebody else took a note that may be different from your

 6   individual recollection.  Your individual recollection is what

 7   controls.

 8            Okay Madam Clerk, are we ready?

 9            (Court and courtroom deputy conferred.)

10            THE COURT:  All right.  Ms. Hoekel, are you satisfied

11   with the composition of the jury?

12            MS. HOEKEL:  Yes, Your Honor.

13            THE COURT:  Mr. Hutchins, are you satisfied?

14            MR. HUTCHINS:  Yes, Your Honor.

15            THE COURT:  Okay.  Now ladies and gentlemen, the clerk

16   will call the names of those jurors who were selected to serve

17   on this particular jury.  And Madam Clerk, you may do that.

18            COURTROOM DEPUTY:  We have a panel, Your Honor.

19            The following named jurors have been selected for

20   trial in this case, and as your name is called, please come

21   forward and have a seat in the jury box.

22            Karen L. Barnaby.  Joann J. Harrison.  Rochelle L.

23   Heron.  Steven J. Laukaitis.  Natonya R. Lucas.  William P.

24   Martin.  Vernon S. Richardson, III, and John R. Wangerin.

25            THE COURT:  Was that Wangerin?
```

```
 1            PANEL MEMBER:  Yes, Your Honor.

 2            THE COURT:  Wangerin.  Okay.  We'll try to get that.

 3            COURTROOM DEPUTY:  Members of the jury, please answer

 4   once again as I call your name.

 5            (Jury roll called.)

 6            COURTROOM DEPUTY:  Now members of jury, would you

 7   please stand and raise your right hand?

 8            (Panel sworn.)

 9            THE COURT:  All right.  To the rest of you who were

10   called down here today, we really appreciate you being here, and

11   your patience.  You may now stand and quietly leave the

12   courtroom.  Thank you.

13            (Venire left the courtroom.)

14            THE COURT:  All right, Counsel, Ms. Hoekel and

15   Mr. Hutchins, I think if you all would come up for a minute?

16            (At sidebar as follows:)

17            THE COURT:  You want to show the video as part of the

18   preparatory process?  My thought, it's 10 minutes to 12:00.

19   Maybe we should let the jury go, have their lunch now, or we

20   could show them the video and then let them have lunch, but they

21   might talk about it.  So maybe it's better to let them go, take

22   an hour and 10 minutes, have their lunch, come back, and then

23   do -- you want -- do you want me to show the video before you do

24   your opening statements, right?

25            MS. HOEKEL:  Yes.
```

```
 1              MR. HUTCHINS:  Yes.

 2              THE COURT:  Who is going to tee that up?

 3              MS. HOEKEL:  We can.

 4              MR. HUTCHINS:  You have a copy?

 5              MS. HOEKEL:  We have a copy on disk and I think Mr.

 6   Noona has the introduction --

 7              THE COURT:  So one of you will?

 8              MS. HOEKEL:  -- which we'll give you.

 9              THE COURT:  So do I need to -- do I need to say

10   something here to introduce it?

11              MS. HOEKEL:  I think so.

12              THE COURT:  I'll tell you what:  I'll let them go then

13   I'll ask you all to tell me about that and then we'll take our

14   lunch.

15              MS. HOEKEL:  Okay.  Thank you, Your Honor.

16              THE COURT:  Okay.

17              (Sidebar concluded and proceedings resumed as

18   follows:)

19              THE COURT:  Ladies and gentlemen, what we're going to

20   do, it's ten to 12:00.  We're going to let you all go and have

21   your lunch and ask you to be back here at, let's say 1:05 to

22   give you a little extra time.  And we are then going to probably

23   share a video with you that explains to you a little bit about

24   the process, the whole patenting process so you understand more

25   what's gone on, then we'll have opening statements.
```

```
 1              So Officer Connolly is going to take you back to the
 2   jury room, tell you how to do that.  Don't discuss the case.
 3   Don't talk to anybody about the case.  Try to just think about
 4   something else, and he'll tell you where there are places to get
 5   lunch up and down Granby Street.  Thank you.
 6              (Jury left the courtroom.)
 7              THE COURT:  Okay.  You all can be seated.
 8              Just so I don't look like I'm bumbling when we get to
 9   this part, how is it that you all now think we're going to, when
10   they come back, we'll present this introduction to the patent
11   system?  And someone has that on video, Mr. Noona?
12              MR. NOONA:  Yes, sir, Your Honor.  We have it queued
13   up and ready to play.
14              We've also handed up, with counsel's permission,
15   copies of the attachments that are referred to.  There's a
16   sample patent that's talked about in the actual video.  And
17   we're prepared to play that when Your Honor gives us the cue.
18              THE COURT:  Okay.  So you handed up one for each
19   juror?
20              MR. NOONA:  I did.  I handed up 13 or 14 copies and
21   one for Your Honor.
22              THE COURT:  Madam Clerk, where is that?
23              Officer Connolly has those right now.  So he'll hand
24   those out to the jury.  Let him know to give it to them as
25   they're coming in --
```

```
 1              MR. NOONA:  Yes, sir.

 2              THE COURT:  -- good?  And then I'll just tell them

 3     we're going to show them the video and you can queue it up.

 4              Now, you all have not set up any screens, so they will

 5     need to be watching on the screens that are in front of them.

 6              MR. NOONA:  Yes, sir.

 7              THE COURT:  And so that will mean I'll need to tell

 8     the jurors on the front to be cognizant that the ones behind

 9     them need to see.

10              And you'll want the lights up so they can see this?

11              MR. NOONA:  Yes, sir.  I think the video will play in

12     regular light.

13              THE COURT:  Okay.  Anything else right now that we

14     need to address, Mr. Hutchins?

15              MR. HUTCHINS:  Yes, Your Honor.  I did, I did have one

16     issue that I alluded to this morning.  With respect to Your

17     Honor's ruling excluding the opinions of infringement --

18     non-infringement for Dr. Harrington, and your opinion goes on to

19     say I can talk about ion-mobility spectrometers, and I wanted to

20     be clear so I don't run astray of the court's ruling that I

21     would like to have Dr. Harrington describe in detail the manner

22     in which the 500DT operates such that it should be clear, at

23     least from our point of view, that the manner in which it's

24     operating is, we will then argue, is different than what's

25     claimed without -- I would not, given your court's ruling, show
```

 1   him the patent or ask him, you know, do you have an opinion on

 2   whether the patent's infringed and he says no.  I understand

 3   that's been excluded.  But he is an expert in ion-mobility

 4   spectrometers and he has reviewed the accused product,

 5   documentation, et cetera, and so if I ask him, in describing the

 6   process and have him explain, you know, the claim -- for

 7   instance, the claim requires a continuous process.  I want to be

 8   able to ask Dr. Harrington about the process and establish it's

 9   not continuous, it's a discrete, sample-by-sample process.

10           I want Dr. Harrington to be able to talk about how the

11   machine has to be down for four hours a day under the

12   maintenance schedule and so the detector is not operating

13   nonstop or continuously.

14           I'd like Dr. Harrington to be able to talk about how,

15   in the 500DT, particles aren't detected; that vapors are

16   detected, without alluded to your court's claim construction.

17   But finally, we have non-infringement positions with respect to

18   the heater of the 500DT.  It's no secret our view is because the

19   trap in the 500DT sits on top of the desorber it doesn't have

20   the inlet for the trap and outlet that we're talking about, and

21   I would like Dr. Harrington to be able to explain here's the

22   500DT, how does the desorber operate?

23           THE COURT:  So you want to get into this claim

24   construction issue about inlet?

25           MR. HUTCHINS:  No.  No.  I just want to clarify that I

 1   can have Dr. Harrington describe the 500DT without giving an

 2   ultimate opinion that it doesn't meet any claim limitations.

 3   But he's certainly -- I mean, he's undoubtedly an expert in IMS

 4   instruments.

 5              THE COURT:  Okay.

 6              MR. HUTCHINS:  And -- I'm sorry.

 7              THE COURT:  So have you endeavored -- and again, I

 8   know this all came down quickly and you've been trying to

 9   prepare for trial.  Have you had a chance to talk with

10   Ms. Hoekel about sort of what you just told me, where we're

11   going and see if you have any issues?

12              MR. HUTCHINS:  I not.

13              THE COURT:  Okay.  Well...

14              MR. HUTCHINS:  I guess she...

15              THE COURT:  You just did, I guess.  You just gave a

16   list of what you expect to go through, right?

17              MR. HUTCHINS:  Right.  In other words, have Dr.

18   Harrington describe the facts of how the trap is on the

19   desorber.  There's no inlet in the desorber for a trap.  I mean,

20   that's a fact --

21              THE COURT:  Well...

22              MR. HUTCHINS:  -- that the device, that the detector

23   is not a continuous process, it's a discrete process.

24              THE COURT:  You're going to ask him whether there's an

25   inlet that something is inserted into --

```
 1          MR. HUTCHINS:  Sure.

 2          THE COURT:  -- that's what you're talking about?  Or

 3  an inlet -- well --

 4          MR. HUTCHINS:  I want to be able to establish through

 5  Dr. Harrington the facts of how the instrument operates, which

 6  is of course the trap is not inserted into the desorber --

 7          THE COURT:  I understand.

 8          MR. HUTCHINS:  -- you know?  And he is an expert in

 9  IMS instruments and he studied this instrument, and I want him

10  to be able to say that the trap is only on the desorber, it is

11  not inserted in the desorber.  There is no inlet in the desorber

12  for the trap.

13          THE COURT:  In yours?

14          MR. HUTCHINS:  In the 500DT.

15          THE COURT:  Go ahead.

16          MR. HUTCHINS:  And I don't want to, in front of the

17  jury, if I say, so sir, is the detector operating continuously?

18  Is the detector operating nonstop?  No, it's a discrete --

19  getting an objection that I'm asking for something that you've

20  excluded.  That's why I want the clarity.

21          THE COURT:  Sure.  Well, let's hear what Ms. Hoekel

22  thinks about that whole, what you've outlined.

23          MS. HOEKEL:  You can imagine.

24          I think that that is all claim construction.  That is

25  applying the court's claim construction to the operation of the
```

1   machine.  What it sounds to me like Smiths is intending to do is

2   saying all of the claim construction positions without then at

3   the end saying, And therefore it doesn't infringe.  What

4   Mr. Hutchins is talking about doing is applying the device to

5   the continuous limitation, to the inlet limitation, and making

6   all the non-infringement arguments, just not stating the

7   ultimate conclusion.

8           The court's order and the Federal Circuit are clear

9   that that's exactly the kind of thing that someone not of

10  ordinary skill in the art is prohibited from doing in front of

11  the jury.  They have Dr. DeBono here.  Dr. DeBono works for

12  Smiths, and Dr. DeBono, we anticipated, would be explaining to

13  the jury how the 500DT works.  He's a lay witness, but I think,

14  you know, we have to be a little careful with --

15          THE COURT:  Well now, wait a second.  Didn't you in

16  your brief -- I thought I remembered in your brief with respect

17  to Dr. Harrington you said you didn't have any objection to him

18  testifying about the technology.

19          MS. HOEKEL:  Correct, Your Honor.  He can talk --

20          THE COURT:  So what are you, what were you talking

21  about?

22          MS. HOEKEL:  He can talk about how IMS works, he can

23  talk with how particles are vaporized and put down a detection

24  tube that are ionized, the timing of the detection, the

25  detector, the molecules traveling down the detector tells the

1   device what substance is in it.  But I don't think he is

2   permitted to talk about even specifically the 500DT, the

3   elements.  Those are things that are one of ordinary skill in

4   the art.  And certainly not applying, you know, saying it

5   doesn't -- the trap isn't put in the inlet, the device goes down

6   for four hours, therefore it's not continuous, those are all

7   applications of claim construction to the facts of the device

8   that are specifically what this court's order excluded.

9           THE COURT:  Okay.  So you've obviously thought about

10  this a great deal.  How is it that you -- are you telling me

11  that you expect that that, the kind of testimony that, you know,

12  the trap is not inserted into the desorber, those kind of

13  questions, those things that Mr. Hutchins said he wanted to

14  bring out through this witness, you're telling me that you've

15  expected that would come in through Mr. DeBono?

16          MS. HOEKEL:  I expect that Mr. DeBono can talk about

17  how the operation of the machine works and he can talk about

18  what the name, what they call the names of the specific parts,

19  how it operates, where you put the trap in, how many hours it's

20  up, if they bake it out at night, all of that stuff are -- those

21  are all facts that Dr. DeBono absolutely can testify to.

22          But when we're talking about Dr. Harrington and then

23  saying, well, "it's not continuous because it comes down for

24  four hours a night," that's applying the court's claim

25  construction -- which obviously Your Honor we still have to deal

```
 1   with -- but that's applying the court's claim construction to

 2   the accused device to say that the device doesn't infringe.

 3           THE COURT:  Let's just parse it to make sure what I

 4   think I'm going to hear.  So Mr. Hutchins comes back and says

 5   all I'm going to ask him is is it continuous, I'm not going to

 6   ask him anything more --

 7           MS. HOEKEL:  Your Honor, I don't --

 8           THE COURT:  -- so what about that?

 9           MS. HOEKEL:  -- think, honestly, Dr. Harrington should

10   be allowed to talk about the 500DT in those kind of specifics.

11   What your order said was that he is allowed to talk about how

12   IMS works generally.  And I don't believe that that includes

13   things like it's not continuous because it goes down for four

14   hours.  I think those are -- what I'm hearing Mr. Hutchins

15   saying is Smiths is going to say everything that they intended

16   to say, which are all of those things that you need one of

17   ordinary skill in the art to say and just not have him answer

18   the final question of therefore it's your opinion that the 500DT

19   does to the infringe.

20           THE COURT:  All right.  I guess it's the fine line

21   that I'll have to determine.

22           Anything else you want to tell me about that?

23           MS. HOEKEL:  No, Your Honor, not at this time.

24           THE COURT:  Okay.  Mr. Hutchins, come on back up and

25   give me a final thought on it, then I'll ponder it over lunch.
```

```
 1          MR. HUTCHINS:  Sure.  The rationale behind your ruling
 2  was that in applying whether the claim construction is met or
 3  not, you look at what the claims mean to one of ordinary skill
 4  in the art.  You're not talking about what the accused product
 5  means to one of skill in the art.  The accused product is what
 6  it is.  The accused product is an IMS detector.  Dr. Harrington
 7  knows more about IMS detectors than most anyone in the country.
 8  He spent 20 years studying them.  He has studied the 500DT.  If
 9  the fact is the 500DT isn't a continuous process because it
10  acts -- it's a batch process, a sample, you pull out a sample,
11  then it sits there and waits for the next sample, then you put
12  in a sample, there's -- it has nothing to do with ordinary skill
13  or not, or what this hypothetical legal construct of a person of
14  ordinary skill in the art is to be able to say this detector is
15  not operating continuously.  There's nothing magical about that.
16  It's not.  It's not a nonstop process.
17          And also because of the bake-out and it's supposed to
18  be down for four hours a day and shut down so it can be cleaned.
19  If I say to him is there an inlet in the desorber for the trap,
20  No, the trap never goes into the desorber, that's just a fact of
21  how the 500DT operates.  I'm already -- she says, oh, well,
22  they're going to do everything they would do anyway.  Well, it's
23  not nothing that he's not going to be able to say these claims
24  aren't infringed.  So they're going to have their expert say
25  these claims are infringed, and I've got to point to the facts.
```

1  But I still got to be able to at least elicit the facts from the

2  expert when he's talking about something that is completely

3  within his expertise.

4         The attack on Dr. Harrington was he didn't have

5  three years of designing pneumatic systems.  His opinions he's

6  giving about the facts on these non-infringement arguments about

7  the desorber, nothing to do with the pneumatics.  Whether the

8  trap is or isn't in the desorber has nothing to do with the

9  pneumatics.  Whether the process is a batch process or the

10 detector's operating continuously, nothing to do with

11 pneumatics.

12         THE COURT:  Okay.

13         MR. HUTCHINS:  I'm sorry, I didn't -- I don't mean to

14 get carried away, but...

15         THE COURT:  I can tell that you feel strongly about

16 it.  I'll let you know how I feel about it when we come back

17 from lunch.

18         MR. HUTCHINS:  Thank you, Your Honor.

19         THE COURT:  All right.

20         (Recess taken from 12:07 p.m. to 1:12 p.m.)

21         THE COURT:  All right.  Is Dr. Harrington in the

22 courtroom?

23         MR. HUTCHINS:  He's at the hotel.  He can be here in

24 five minutes.

25         THE COURT:  No, that's not an issue.  I was --

1          MR. HUTCHINS:  Or if you don't want him here then the

2     good news, he's not here.

3          THE COURT:  Not an issue either, but...

4          First, you know, I don't doubt that Dr. Harrington has

5     the qualifications that he included in his affidavit that was

6     submitted along with the motion to reconsider.  I don't doubt

7     that.  It was an affidavit.  It's, it's a procedural issue, and

8     that's why I denied the motion for reconsideration on the

9     grounds stated in the opposition.  It was not clearly explained,

10    even in the errata sheet -- even if the court were to accept the

11    errata sheet, I don't think it met the qualification for person

12    of one skilled in the art.  So that's one issue, just so you,

13    you know -- I don't doubt he has this great expertise.  Again, a

14    procedural issue, and dealing -- and I viewed it from the

15    potential for an actual prejudice to the opponent and to the

16    process.

17          That has the unfortunate effect of meaning that his

18    testimony is very limited.  The danger in going down the road of

19    allowing testimony about the Itemiser that, even if you're not

20    asking, even if you try to ask a general questions, the

21    questions and the responses are tied, in many instances,

22    particularly with respect to the questions that you were telling

23    me you wanted to ask about the inlet to the desorber and

24    continuous and whether something's, whether it's operating

25    continuously without taking the four hour down time, those are

 1   things that are specific to the apparatus and method at issue.

 2   And so I think that what I'm going to do is, the best way to

 3   deal with this is he can't testify about the specific machine

 4   and how your detector works.  He just can't.  He can talk in

 5   general about the technology, as I said in the opinion, in the

 6   general field of ion-mobility spectrometers.  But talking about

 7   the machine takes us down a slippery, slippery slope that, even

 8   when you start talking about it, I think contravenes my ruling

 9   based upon the fact that he didn't, he was not a person skilled

10   in the art.  At least as of the time that the motions were filed

11   he wasn't.  He may be in reality, but we've got -- that's not

12   how the process works.  So that's my ruling.

13          Now I want to talk to you about something different.

14   The issue of the construction of the inlet to the desorber.

15   That was raised in separate motions.  You know, I want to hear

16   some discussion of that.  I don't feel that I'm at a place where

17   I can tell you -- I mean, I can tell you, but I would rather

18   have a little more discussion before I tell you what I think the

19   proper construction is on that.  So I guess there are a couple

20   ways we could do this, and I want to ask your thoughts on it.

21          One, you can have your people testify in the

22   alternative:  If it's construed this way or if it's construed

23   another way.  The Federal Circuit recently said that that was

24   fine to have the court later construe the term before the jury

25   retires.  And I would do it before you made your closing

1    arguments.  Or of course I guess I could, we could try to do

2    it -- we could try to talk about it later this afternoon when

3    the jury's gone and then -- or tomorrow morning, and then I

4    could try to construe it before testimony is presented.  I don't

5    know the order of what you all are doing.  I don't know what

6    your preferences are, if you think I'm wrong on the law, but

7    Ms. Hoekel, what's your thought on that?

8                THE HOEKEL:  I guess our preference, Your Honor, would

9    be to see if maybe we couldn't have that conversation this

10   evening with some guidance from the court before our expert

11   takes the stand sometime tomorrow afternoon.

12               THE COURT:  Tomorrow afternoon?

13               MS. HOEKEL:  That's when we anticipate her taking the

14   stand.

15               THE COURT:  Okay.  But you don't disagree that another

16   option is testifying in the alternative and then having me do it

17   later if for some reason I don't get to it?

18               MS. HOEKEL:  I do not disagree, Your Honor.

19               THE COURT:  Okay.  Mr. Hutchins?

20               MR. HUTCHINS:  I would say the same, Your Honor.  I

21   think our preference is to have the issue resolved sooner rather

22   than later.  We would be available this afternoon to do it, or

23   at any time at the court's convenience.

24               THE COURT:  Okay.  All right.

25               So I assume you all are ready then to bring the jury

 1    in and show them the video?  Mr. Noona, you've got it up?

 2              MR. NOONA:  Yes, sir.

 3              THE COURT:  Okay.  Let's bring -- where is Officer

 4    Connolly?  Let's bring the jury in.

 5              (Jury entered the courtroom.)

 6              THE COURT:  Everyone can be seated.

 7              Now ladies and gentlemen of the jury, I hope you all

 8    had a good lunch.  What we're going to do now is, as I was

 9    telling you earlier, is show you all a video.  And the video, it

10    has been agreed upon by the parties, it's something that has

11    been produced by the Federal Judicial Center, which is sort of

12    the educational arm of the Federal Courts.  The train us when we

13    become federal judges, throughout our career they help to train

14    us, provide us with additional information as the law changes,

15    and one of things they have done, as you see there, is they've

16    produced a sample patent and the video that helps explain to the

17    jurors a little bit about a patent, the patent system, and how

18    some of the terms that you're going to hear discussed work.  So

19    that's what this is all about.

20              For those of you that are on the back row, I

21    apologize, we only have the monitors on the front row.  So

22    you're welcome, once it gets started, if you want to move to see

23    better, to do that.  And you're welcome to, even if you want to

24    move down, that's fine.  So if you find that you're having any

25    trouble, just speak up, we'll stop it and let you move around,

1    okay?

2            And everybody has the sample patent.  Let's go ahead

3    and start the video.

4            (Introduction To The Patent System video played.)

5            THE COURT:  All right.  Ladies and gentlemen, that's

6    the video.  It's a little dated, as you can tell from some of

7    the clothing, perhaps.  The Patent & Trademark Office, for

8    example, is now in Alexandria.  It moved from D.C. to

9    Alexandria.  But other than that I think it's very, you know,

10   it's very well done and it's helpful to you all to understand

11   what we're going to deal with for the next several days.  And so

12   thank you for watching that.

13           Now, as I told you earlier we'll now have opening

14   statements of each of the parties, and after that we'll begin to

15   hear evidence.  And so the plaintiff will begin and then the

16   defendant will follow.

17           Mr. Brophy?

18           MR. BROPHY:  Thank Your Honor.

19           May it please the court, counsel, ladies and gentlemen

20   of the jury.  The heart of this case is really a story.  It's a

21   story about a new invention.  We all know that story, the story

22   about the light bulb going off on top of someone's head, coming

23   up with a great new idea.  They come up with a solution to a new

24   problem, and it's a solution that no one's ever thought of

25   before.  And they think at that moment to themselves, "Aha,

1    that's how I do it.  That's how I solve the problem."  Now,

2    scientists at Morpho Detection, the plaintiffs in this lawsuit,

3    they had one of those aha moments.  Back in 1998, scientists

4    working at Morpho Detection conceived of a new invention, and

5    that invention would solve a problem that it plagued their

6    industry for years and years.

7            Now, because we live in the United States and we're

8    allowed to protect our new ideas in this country, Morpho

9    scientists filed for a patent application on their new

10   invention, and shortly thereafter they released a new product

11   into the marketplace that was based on that new invention.  And

12   that product, as I said, solved a huge problem in the

13   marketplace, and it eventually became the new industry standard

14   for that product.

15           Now, the defendant in this lawsuit, Smiths Detection,

16   you'll hear, never had that aha moment.  They never had that

17   spark of invention.  Shortly after Morpho Detection released its

18   new product, Smiths found out about it and they realized that no

19   longer could they compete in the market given this new

20   technology.  Their products were outdated.  And so what did they

21   do?  They took a shortcut.  They took a shortcut they were not

22   supposed to take.  And they took Morpho's technology and they

23   used it for their own.  And that's really why we're here today.

24   We're here today because Morpho invented something new, they

25   came up with a new solution to a problem, and Smiths took it

```
 1   from them.

 2         Now, before I get too far ahead of myself I should

 3   make some introductions.  My name is Richard Brophy, and along

 4   with my colleagues Jennifer Hoekel, Jessica Mendez and Stephen

 5   Noona, we represent Morpho Detection, who is the plaintiff in

 6   this lawsuit.  You'll also -- and you've already heard about

 7   Richard Stoddard, a corporate representative.  He's an employee

 8   of Morpho Detection and he works on the products that you're

 9   going to be hearing about over the course of this trial.  And

10   you'll actually be hearing from him later on today as he

11   testifies.

12         So at the beginning of my opening I mentioned this is

13   really a story about a new invention, and I'd like to spend my

14   time with you this afternoon telling you that story, talking to

15   you about the history of the problem in the field and how

16   Morpho's scientists solved that problem, and I have a

17   presentation I'd like share with you as well.

18         The story really starts with a little bit of

19   background about Morpho Detection, who the company is, what

20   products they sell.  As you can tell from the name, Morpho

21   Detection, they sell detectors.  They sell some really big

22   detectors and they sell some really small detectors.  They sell

23   this gigantic machine called a CTX detector.  And some of you

24   may have seen these at airports.  They're used to scan checked

25   luggage before it's loaded onto aircraft and flown all over the
```

country, used to check for dangerous materials and weapons and
things like that that you shouldn't have on a passenger
airplane.

        They also smell -- sell, pardon me -- very small
detectors like this one.  This is a hand-held unit that's used
by the military and by emergency responders to detect liquids
that may have been spilled out of a truck or gases that may have
been released into the air to make sure there's nothing harmful
in those liquids or gases.

        But for purposes of today and this case, the most
important systems by far that Morpho manufactures and sells are
a category of systems called desktop trace detectors.

        Now, as the name implies, desktop detectors sit on the
desktop.  This is about the size of a suitcase.  And a desktop
detector's job is to test for dangerous chemicals and dangerous
explosives in airports, prisons, a whole number of different
places.

        Now, when I say trace detection, we're talking about
the detection of very small amounts of materials, okay?  The
numbers that we're talking about are in the billionth of a gram
range.  So extremely small amounts of these explosives or
narcotic materials.  And to give you an idea, I like to use
examples from time to time to give you an idea of how small that
is.  If you were to take a single grain of salt from your salt
shaker and cut it in a million tiny pieces, one of these

```
1   machines could detect and tell you what material that millionth
2   of a grain of salt-sized compound is.  So these systems are very
3   good at what they do.  They're very sensitive.
4           As I mentioned, they're used in a number of different
5   places, and I think probably the place we've all had the highest
6   likelihood of seeing them is in airports.  They are used by the
7   TSA, Transportation Security Administration, to screen
8   passengers before those passengers are put onto an airplane.
9           So when you were all chuckling during the jury
10  selection process, no one likes to go through TSA, but some
11  people are put through the extra unpleasant affair of being
12  pulled out of line and tested by the TSA personnel.  And they
13  will use something like this called a swab or a trap, and the
14  personnel will wipe it on a person's shirt or their hands or
15  maybe their luggage and then they will take the swab and they
16  will insert it into one of these trace detection machines.  And
17  what they're doing with these swabs and with that machine is
18  testing to see whether you have any dangerous materials on you.
19          Now, how does that work?  How does rubbing this on my
20  shirt tell me if I've been in contact with an explosive or some
21  illegal drug?  It works on the premise that small amounts of
22  those materials that I as a bad person have been touching, some
23  explosive or some illegal drug, will transfer from that
24  explosive onto my hands.
25          So we can see in this graphic here some nefarian is
```

1    handling a bomb, and a small amount of that explosive from the

2    bomb is going to transfer onto their hands.  And later on

3    they're going to rub their jacket or they're going to put

4    something in their pocket or they're going to touch their

5    briefcase, and those small amounts of dangerous materials

6    they're going to be transferred to my pants or the suitcase.

7    And as you can see, the small swab is wiped across those

8    surfaces to pick up these really small amounts of dangerous

9    chemicals for detection.

10            Now what I'm showing you now is a diagram, a very

11   simplistic diagram of the insides of one of these machines.

12   These are all the components that work together to enable the

13   system to work properly.  And you can see some individual

14   components here, and I'll talk about some of them over the

15   course of my conversations this afternoon.  But you'll also see

16   some lines that connect all of these pieces together, and those

17   are actually tubes.  And those tubes carry air inside them, and

18   air circulates within these systems, and that's really, as I'll

19   describe, the magic of how these devices work, it is how that

20   air brings in these samples and allows them to be detected.

21            So let's assume just for the sake of argument that

22   I've come in contact with TNT and I have some explosive on,

23   let's say, my jacket, okay?  If I were to wipe this swab on my

24   jacket and pick up some of that TNT material, it would be on the

25   sample trap.  You can see in the diagram I've indicated we have

1    got some TNT on this sample.  If I were to put this sample

2    inside the machine, the machine's going to start to do its

3    detection process, and the first thing it's going to do is it's

4    going to heat up this sample, okay?  It's going to do that in

5    something called a desorber.  You can see it here, it's

6    highlighted in red.  The desorber's job is to get this trap

7    very, very hot.  And the reason for that is, we need to take

8    those small amounts of TNT, those small amounts of solid

9    materials, and we need to turn them into a gas.  We need to

10   vaporize them.  This is just like when we heat water on our

11   stove to make pasta.  When you heat up the water and start to

12   boil that water, that water turns from a liquid into a gas.

13   Well, we're going the same thing here except we're turning

14   solids into gas.

15          Now, once the trap is heated up, that sample is going

16   to be sucked into the machine by a pump.  Pump is going to turn

17   on and it's going to flow air into the machine.  And that flow

18   of air is going to pull that vaporized dangerous material that

19   was on the trap into the machine.

20          Now, once it gets into the machine the real fun

21   starts.  These very small molecules which I've described are

22   shown here as small triangles and circles and squares.  Those

23   very small amounts of material, they're given a charge, a

24   positive or a negative charge.  And the reason we do that is

25   because that enables us to use a very strong electric field to

 1  propel these molecules down the length of this tube.  And you

 2  can see the tube is basically where these molecules are in right

 3  now.  And I'll see if I can identify that for you here using our

 4  machine.

 5        This here is the actual tube, okay?  And that is a

 6  very important type of detector.  That's, this is really where

 7  the actual magic happens in the machine.  That instrument, that

 8  tube is something called an ion-mobility spectrometer.  That's a

 9  pretty hefty phrase, so we're going to be using the phrase IMS

10  to describe that particular instrument.

11        The IMS works by measuring how long it takes for these

12  molecules to fire down that tube.  Now, that's why it's called a

13  ion-mobility this spectrometer.  It's detecting how quickly

14  those molecules move.  The perfect analogy for this is a track

15  race.  And what happens inside this tube is, all of those

16  charged molecules that I've been talking about are lined up at

17  the starting gate, and the starting pistol goes off and these

18  molecules start to run down the tube, okay?  And the job of the

19  IMS is to detect how long it takes for those molecules to get

20  from one end of the tube to the other.  And using that

21  information, the IMS can tell you what type of material is

22  actually in the sample, whether I have TNT on this trap.

23        So just to give you a little example of how this

24  works, as that electric field turns on and the starting gate

25  goes up, the pistol fires, these molecules will start to

1  separate inside this tube.  So you see we've got the blue

2  triangles and they're winning the race, they're the smallest

3  molecules, so they're able to travel the quickest inside of this

4  tube.  Next to them you have these orange circles.  They're

5  medium-sized molecules, so they're lumbering a little more

6  slowly down the tube.  Finally you have the blue square

7  molecules which represent larger molecules that take a long time

8  to get down the tube.

9          Now let's suppose in our example that the trap has TNT

10 on it, as I mentioned.  Let's assume that the triangles, the

11 really small molecules, let's assume those are TNT.  When those

12 TNT molecules hit the end of the tube, they're going to hit

13 something called a collector electrode.  Basically just a metal

14 plate.  And when these molecules hit that metal plate, it

15 creates a signal.  The machine detects those, those electrically

16 charged particles bumping into that metal plate, and it

17 generates a signal and puts something on the display on the far

18 right.  And I'll explain a little bit more about what that

19 display is in a minute.

20          But imagine a little time later after those molecules

21 have hit, then the circles come down and they hit the electrical

22 plate and they generate a signal.  Well, another little blip is

23 going to appear on that graph on the right.

24          And finally the slowest, these big squares are going

25 to hit the plate and they're going to generate one last signal.

1          Now, the system works by detecting these signals, and

2     they're shown on something called a plasmagram, okay?  And the

3     plasmagram's job is really identify what types of molecules we

4     found.  What types of molecules did we shoot down that tube?  It

5     works because software is programmed into these systems to know

6     to look for peaks of particular times.

7          So if you'll recall, as these molecules were bumping

8     into this collector plate, different peaks were appearing on

9     this plasmagram.  Now, these peaks relate to the different

10    molecules that hit the end of the detector.  So you remember the

11    triangles hit first.  If the system is programmed to look for

12    TNT at a specific time just before four milliseconds, which is

13    along the horizontal line in this graph, there's a peak there,

14    and so the system is going to say aha, that is TNT.  I know that

15    because I've been programmed to know that if there's a peak at

16    that time, it's a TNT peek.  That's the molecule I've got.  So

17    an alarm is going to go off, and it's going to tell someone, the

18    TSA personnel, to pull me aside and perform some further

19    screening on me to make sure I don't have any dangerous chemical

20    I'm trying to bring onto an airplane.

21         Now, while this process is going on, the detection

22    process, there is a need for dry air inside this machine.  I

23    mentioned air is kind of the magic that causes all this to work.

24    And for this IMS instrument to work properly, really to work at

25    all, it requires extremely dry air and extremely clean air

 1   inside that tube.  So for years, since the '80s, scientists have

 2   used a stream of air that they have pumped through the

 3   instrument to keep it clean and dry, okay?  So as I've

 4   identified here on this picture, there's a pump, and that pump

 5   operates to move air through the system.  And you can see it

 6   follows through all these tubes, eventually goes into the

 7   detector and then goes back to the pump and it cycles.

 8          Now, the entire time that this system is on, every

 9   time it's plugged in and the power is on, this pump is going and

10   this air is cycling through the detector to keep that detector

11   as clean and dry as possible.  This is just like when we all

12   take showers at home and you turn on the shower and your

13   bathroom starts to fog up, your mirrors fog up, you can't see

14   your reflection anymore, there's all that moisture in the air.

15   So what do you do?  You turn the switch on and the exhaust fan

16   turns on, right, and pumps all that moisture out.  The same

17   thing is going on inside the system.  It's the same exact

18   principle.

19          Now to make sure that the air that's cycling in there

20   is really, really dry, these systems incorporate something

21   called a dryer.  A drying tube.  And the job of that drying tube

22   is to suck moisture out of that air circulating inside the

23   system, okay?  So if it picks up some moisture that was inside

24   the detector, the pump is going to carry air into that drying

25   tube and that moisture is going to be absorbed into the drying

1  tube so it can't go back in that detector.

2        Now, these drying tubes for years and years have been

3  filled with a material called a molecular sieve.  A drying tube

4  looks like this, and the molecular sieve are these tiny, tiny

5  white particles you see inside.  They're made of a very special

6  material that's very effective at pulling moisture out of the

7  air.  As I mentioned, IMS needs really dry air, so these

8  molecules are very, very good at pulling moisture out of air.

9        So for years scientists would pump air into the tube

10  it would run through this material and then it would exit the

11  tube and head off to the detector.  Now, this worked really

12  well.  It kept the system dry, it kept it operating.  And

13  there's a big but though.  And the but is, eventually the

14  molecular sieve would run out of space.  It couldn't suck up any

15  more moisture.  And every few weeks an operator would have to

16  come and replace this tube.  They would have to take it out of

17  the system and put a new one in to make sure the system stayed

18  dry and kept running.

19        Now, customers didn't like this very much.  As you can

20  imagine, nobody likes to be inconvenienced by having to turn

21  things off and replace things.  We all don't like to get our oil

22  changed in our car.  Something we have to do.  But scientists

23  started working on problems -- or I'm sorry, solutions to this

24  problem, okay?  Because not only did customers not like to bring

25  their system down, there were other problems associated with

replacing these dryers.  When you open up the system and you

start disconnecting all the tubes that are connected to this

dryer, you open yourself up to risk of contaminating the system.

You're going to have the possibility that oils from your skin or

maybe dirt particles from the air are going to get into your

system and they're going to foul the detector.  And then you

have a real problem on your hands then.  The system has to be

taken out of commission for a week or a month, make sure all

that stuff is cleaned out so you can use it again.

        The other big problem is cost.  This molecular sieve

was expensive, and every few weeks operators would have to spend

100 bucks to put a new drying tube into their system.

        Now, maybe if you ran a lab and you had one of these

systems in the corner and didn't use it very often that wasn't a

big deal.  But think about TSA.  They use thousands and

thousands of these machines.  And replacing on a weekly or

monthly basis all of these drying tubes that cost added up

really fast.

        So starting in the early '90s, scientists were looking

for a solution to this problem.  They were looking for ways to

stop having to throw away these drying tubes, to solve that

problem, get rid of all these issues I just mentioned.  And in

the early '90s as scientists were coming up with proposed

solutions, they would file applications, patent applications on

those new ideas they came up with, those new possible solutions.

1   And so I'd like talk to you a little bit about those.

2        The first of them was filed by a gentlemen named

3   Robert Bradshaw.  He filed a patent application in 1991 on his

4   proposed solution.  And here's what he did.  He said, well, the

5   problem here, I'm getting too much moisture into my detector.

6   When I take in my sample, when I take in those real small

7   amounts of molecules, too much water is coming with it.  So what

8   I'm going to do is I'm going to make a really small hole to take

9   that sample in through, and what that's going to do is limit the

10  amount of moisture I can take into my system.

11       So if you see here in this diagram I've taken from the

12  face of the patent, there's a reference numeral, and those are

13  the numbers we use to refer to the different parts or components

14  on these patents.  And if you see right here, there's a

15  highlighted No. 30, okay?  That's a reference to a numeral that

16  will point to this really small pinhole that you see.  That's

17  where he took the sample in.

18       Now, sure enough, this solved the moisture problem

19  because there wasn't anything going into the system.  Barely any

20  sample was taken in, so there wasn't ever a problem with

21  moisture inside the machine.  Didn't ever have to replace the

22  dryer.  But solving that problem created a completely different

23  problem, and that was the machine couldn't detect anything.

24  Because if you're not taking in a big-enough sample, you're not

25  taking in enough of these very small trace amounts of material

1   to make the system work.  And so if I were to rub this on my

2   shirt and put it into his machine, you may not find TNT even

3   though there's TNT on the swab.  And over the course of this

4   trial you're going to see this really wasn't the solution to the

5   problem.  This didn't solve that drying problem.  And so it

6   wasn't ever adopted.  It wasn't used, it wasn't commercialized.

7        Now a few years later another group of scientists

8   filed an application on their proposed solution.  This time it

9   was scientists from the defendant in this case, Smiths

10  Detection.  Now at the time they were called Barringer Research,

11  but they were, ultimately their name changed and they became

12  Smiths Detection.  Now, their idea was a little bit different.

13  They said, well, why don't we do this:  Why don't we take some

14  of the duty off of that dryer, why don't I pre-dry the air a

15  little bit so that the molecular sieve lasts longer?

16       And so in 1993 they submitted this patent -- and this

17  diagram is a little bit confusion if you're not reading through

18  the entire patent -- but this section down here they

19  incorporated something called a chiller.  And the job of that

20  chiller was, as I mentioned, to pre-dry the air so that there

21  was less responsibility, less duty on that dryer, the molecular

22  sieve dryer to keep the air dry.

23       So the example I like to give for the chiller is a

24  cold glass of iced tea.  If you take your cold glass of iced tea

25  and you put it out in the middle of the high summer on a table,

1   water is going to start to bead up on the surface of that iced

2   tea glass and it's going to start to drip onto the ground, that

3   principle, that air passing by something cold, the cold surface

4   will draw the moisture out of the air, is exactly what Smiths'

5   proposed solution was, we'll use that to pre-dry the air.  And

6   then we'll send it into a drying tube, the regular drying tube

7   we've always the used.  So basically I'll just mention this

8   again, the outside air would come in, it would go through a

9   cold-air condenser, that condenser would pre-dry the air --

10  wouldn't get it dry enough, but it would take out as much as it

11  could, then send it to the drying tube to finish the job before

12  it would go into the detector.

13          Now, this didn't really fix the problem either.

14  Because although it took -- it minimized the amount of time it

15  would take, or minimize the amount of replacement you would have

16  to use for the dryer, you would still have to replace it.  So in

17  the patent they say, This two-stage drying process results in

18  several weeks of IMS operation before the drying material

19  requires replacement.

20          So this patent didn't really solve the problem either.

21  Maybe you had to replace it less often, but I still had to

22  replace the drying tube.  You still have the risk of

23  contaminating your detector.  You still had the cost of

24  replacing those desiccant material, that molecular sieve

25  material.  So that didn't work either.

1    Over the course of this trial you're going to hear

2  that for this entire time period from the early '90s all the way

3  up to the end of 1997, nobody had a good solution.  Everyone was

4  still making detectors that used these disposable drying tubes.

5  You'll hear that Smiths actually came out with new machines in

6  this time period, and even though they came out with new

7  machines, guess what, they still put the old drying tubes in

8  there.  Couldn't solve the problem.  Nobody could.

9    Then in 1998, as I alluded to earlier, something

10  really important happened.  Morpho scientists had that aha

11  moment, they had that light bulb go on, and they came up with a

12  solution to this problem.  Now, they filed an application to

13  protect their idea.  And this is the patent that issued from

14  that idea.  And here's how they solved the problem.  They took

15  that single drying tube and got rid of it, and instead they put

16  two drying tubes in its place.  They also put in valves and

17  heaters and a timer.  We'll take a closer look at this.  This is

18  the system they put into their IMS detector.  And just like the

19  old systems, they still had a pump, and that pump would still

20  circulate air inside the IMS detector, inside the system we

21  talked about, but they used a valve to divert the air from that

22  pump to only one of the dryers.  And that dryer would take

23  moisture out of the air and then send that air off to the

24  detector to keep the detector nice and dry.  But they took a

25  little bit of that air and they diverted it backwards through

1    the other dryer.  Now, the reason they did that is because they

2    were recharging that second dryer.  They used a heater to heat

3    it up, to heat up that molecular sieve, and they blew air, hot

4    air through that drying tower, and they, by doing that, got rid

5    of all the moisture inside that drying tower.  They recharged

6    it.  They regenerated it.

7            Now, they needed a timer too, and they put the timer

8    in there so that, after a given period of time, that valve would

9    switch, and instead it would push air into that second drying

10   tower, the one that we had just recharged.  So that second dryer

11   took over the duty of keeping the detector nice and dry while

12   the first tower which had already sucked up moisture and was

13   becoming saturated, getting full of water, it would purge out

14   that moisture and regenerate it.  That was their idea:  To use

15   this type of regenerative drying system inside a trace detector

16   to solve that problem of throwing away the drying towers.

17           Now, a little while after they came up with this idea

18   they released a new product.  They released something they

19   called the Itemiser 3, which is a desktop trace detector, looks

20   a lot like the one that I showed you at the beginning of this

21   presentation.  And for the first time, that system was a

22   commercialized trace detector that had a regenerative drying

23   system in it.  First of its kind.

24           Now obviously customers loved this.  It solved all

25   those problems.  No longer did you have down time.  You didn't

1    have to turn the system off, wait for it to cool down, pull the

2    drying tube out, put a new one in, turn it back on, wait for it

3    to come up to temperature again.  You never had a risk of

4    contamination because you weren't unplugging the tubes inside

5    the machine, and you didn't have to pay for those darned

6    molecular sieves anymore.

7            Now, shortly after Morpho released that product and

8    customers began to really like it, Smiths found out about it.

9    And Smiths had a big problem on their hands, because they had

10   never come up with a solution.  All their products still had

11   that old drying tube in it.  The one customers now figured out

12   they don't want anymore.  So what did Smiths do?  Well, Smiths

13   tried to scramble and develop its own.

14           We're going to show you documents in this case that

15   Smiths knew about the Itemiser 3 and knew about its regenerative

16   tower system.  "Present competitive considerations.  Itemiser 3

17   uses as regenerative Drierite system."  We're going to show you

18   that at the same time that Smiths heard about the Itemiser 3,

19   their present direction was to maintain their existing Drierite

20   system, that existing old throw-away dryer design.  And we're

21   going to show you that they found out they weren't going to be

22   able to compete anymore with that old system.  "Our present

23   proposed design and direction will not meet customer needs.  The

24   cost of consumables are just too high.  No one's going to buy

25   our product."

1    We're going to show you that Smiths' own internal

2    documents state that from a competitive point of view, there was

3    a strong need to remove Drierite.  "Regenerative air

4    purification is necessary.  We're not going to be able to

5    compete unless we have a regenerative drying system."

6         You're going to hear the testimony from Smiths'

7    research and development scientists, and they're going to tell

8    you that they never even thought of trying regenerative drying

9    until they heard about the Itemiser 3.  "In the early 2000s when

10   you began development of that regenerative system, were you

11   aware of the competitive system from Morpho?  Yes.  We were

12   aware of the Itemiser 3.  We were not the first to think about

13   it."

14        You're going to see documents from Smiths that show

15   that even by the end of 2003, years and years after Morpho came

16   up with the idea and two years after we released the Itemiser 3

17   product, you're going to find out that internally at Smiths they

18   were telling their scientists to go outside the company, ask

19   other companies and people they knew about how to solve this

20   problem because we can't figure out how to make it work.  "Ted's

21   going to contact John Brockenshire at Graseby to see what they

22   use.  Our own regenerative air purification unit still needs

23   development and consumes lots of power."

24        You're going to see that by the end of 2003 Smiths

25   still didn't have a solution.  They still couldn't get it to

1    work.  You're going to see documents showing that as of

2    September 2003, they still considered regenerative air

3    purification a gap in their technology.  They couldn't compete.

4    They can't solve the problem.

5         Now, right after this, right at the beginning of 2004

6    two extremely important things happened in this case.  No. 1,

7    the Patent Office for the first time published Morpho

8    Detection's patent application so that the public, the world,

9    could see what they had invented and how they had done it.

10        Second, Smiths bought a Morpho Itemiser 3.  They

11   bought the product that Morpho came out with.  They bought the

12   invention.  And they took it apart.  They figured out how it

13   worked.

14        September -- I'm sorry, February 4th, 2004.

15   "Congratulations on the purchase of your Itemiser 3, Smiths

16   Detection."  And do you know what?  Shortly after that, after

17   our patent issued and after they bought our product, Smiths

18   miraculously came up with all the problems I've been talking

19   about?  Suddenly they had a design that worked.

20        October 2004.  Now Smiths has a working prototype.

21   Shortly after that, Smiths releases a product called the

22   IonScanDT.  That's the system we are accusing infringement in

23   this case.  That's the system that contains Morpho Detection's

24   regenerative technology, the IonScan 500DT.  Smiths advertises

25   it as having a regenerative drying system.  They tout the

1   advantages of Morpho's invention in their product literature.

2   And do you know what?  The system they came out with has two

3   drying tubes.  It has valves, it has heaters and it has a timer.

4   And do you know what?  That timer even switches at the exact

5   same time as the Morpho design.  Every four hours those two

6   towers switch back and forth, just like in the Itemiser 3.

7           Now, at the close of our case you're going to hear

8   from an expert.  Her name is Suzanne Bell.  She's a professor of

9   chemistry.  And she's going to sit right there and we're going

10  to talk through Smiths documents.  We're going to show you

11  schematics and technical manuals for their 500DT and she's going

12  to explain to you why that product satisfies each and every

13  claim limitation of the claims we're asserting in this case.

14          You're also going to hear from an economist, Jeff

15  Kinrich.  He's going to explain to you how Morpho has been

16  injured when Smiths took that shortcut, when they took the

17  technology and used it for themselves.  He's going to explain to

18  you what Morpho's technology is worth and why it's fair to give

19  Morpho money for the use of that technology.

20          Now, I'm going to be done speaking in a minute.  I

21  promise it's going to be in just a minute, but Smiths' counsel

22  is going to come up after me and he's going to try to tell you

23  that the things I'm saying aren't true.  Smiths is going to try

24  to tell you that Morpho shouldn't be paid for this invention,

25  shouldn't be paid for the fact that they took Morpho's

1   technology because they're going to say Morpho shouldn't have

2   been given a patent.  They're going to say the patent's invalid.

3   You see, after we filed this lawsuit, Smiths scrambled off to

4   the Patent Office and they started searching through all the

5   patents they could find, and they found pieces of our system in

6   the prior art.  They found dryers and they found IMS detectors,

7   and they're going to tell you that our patent is obvious because

8   if you take those pieces and you combine them, you're going to

9   create this Frankenstein invention.  And they're going to say

10  that someone back in 1998 would have immediately thought it

11  would have been common sense to take these pieces and put them

12  together and to develop the invention that Morpho did.

13          There are a couple problems with that argument though.

14  No. 1, when Smiths went to the Patent Office to do its search to

15  find all these pieces, they had this in their hand.  They had

16  Morpho's patent.  They had the instruction manual.  They had the

17  shopping list.  And they searched and they found all the

18  ingredients.  But the law says it's not good enough to find all

19  the parts.  The law says you have to pay attention to the story.

20  You have to look at what was going on back in 1998 when

21  scientists came up with this invention.  Look at what other

22  people were doing.  Whether they could solve the problem.  And

23  that's why I spent this time with you today, is to explain the

24  story so you understand this isn't an obvious invention.  This

25  isn't a common-sense combination of parts.  Morpho was entitled

1    to an invention.

2         Now, the second problem with their argument is -- and

3    we heard about this in the video -- Smiths is going to have to

4    overcome a presumption.  It's called the presumption of

5    validity.  It's the presumption that our patent is valid,

6    because when Morpho scientists submitted their application to

7    the Patent Office, engineers with technical backgrounds looked

8    at this patent, and those patent examiners have a wealth of

9    knowledge about the patent law, and they concluded that our

10   patent is valid and our patent is issuable, and that's why they

11   gave us a patent in the first place.

12        So because of that presumption of validity, Smiths is

13   going to have to show you clear and convincing evidence that the

14   patent's invalid.  That's far and above beyond the burden that

15   we need to satisfy to prove infringement.  They have to prove it

16   was highly probable that the patent is invalid.  And they're not

17   going to be able to do it.

18        Now, over the course of the case I think probably the

19   most important thing for you to do is to think about this one

20   question.  As Smiths is telling you how obvious the patent is

21   and that you should look at all these pieces of prior art, think

22   to yourself, if it was so obvious, if it was such common sense

23   to put these things together, why didn't Smiths do it?  Why did

24   it take them from the early '90s all the way until 2005, 2006,

25   to come up with a working solution?  Why did they not even think

```
 1   of using regenerative drying in their trace detector until they

 2   heard about our product?  Until they heard Morpho was doing it?

 3   Until they heard about Morpho's aha moment?

 4          So with that, I'll step down.  And I thank you very

 5   much for your time and for your time throughout the week.  We

 6   very much appreciate you being here and listening to our case.

 7   Thank you.

 8          THE COURT:  All right.  Thank you, Mr. Brophy.

 9          Mr. Hutchins?

10          MR. HUTCHINS:  Thank you, Your Honor.

11          May it please the court, ladies and gentlemen of the

12   jury.  My name is John Hutchins.  I'm with the law firm named

13   Kenyon & Kenyon.  I'm very pleased to be here representing

14   Smiths Detection in this case and defend them against these

15   charges.  Some of the people you'll be hearing from on our

16   staff, Ms. Huiya Wu, one of the partners at my firm, she's a

17   chemical engineer; I'm an electrical engineer; my partner, Mr.

18   Colbert; our local counsel, Mr. Shumadine; from Smiths

19   Detection, Mr. Grebasch, he's the intellectual property counsel,

20   we are all pleased to be here to defend against these charges.

21          First though let me say thank you very sincerely.  I

22   know it takes time from your schedules to come here and spend

23   this week with us.  The best part of the American legal system

24   is the jury trial.  It wouldn't work without you bringing your

25   common sense, your impartially, to help us resolve these
```

1    disputes.

2        I hope you took seriously the judge's instruction

3    about waiting until the end of the case before coming to

4    judgment, withholding judgment, because I am going to be

5    explaining some facts to you.  He says I'm going to tell you the

6    patent's no good.  I'm going to show you the patent's no good.

7    I'm going to be telling you about some facts, showing you some

8    things that are very different from what Morpho's counsel told

9    you.  Because when all is said and done, the evidence is not

10   going to support the story you heard.  It's going to support the

11   facts in evidence I am going to show you which will explain why

12   Morpho's invention was no invention at all.

13       So what will the evidence show?  I have on this simple

14   slide here we have two main defenses.  The first is that

15   Morpho's patent is invalid.  You will hear evidence about how

16   these drying systems, you heard but how instead of having one

17   dryer in the device they would have a backup and then they would

18   just alternate between the two.  You switch from one to the

19   other then they regenerate or dried out first one, and then you

20   switch back and forth.  That's really what they're saying their

21   idea was, having two dryers instead of one.  Fine.  Well-enough.

22   Sounds like a good idea to me.  It is a good idea.

23       But here's the rub:  These types of drying systems

24   were known for decades.  They were the common, usual, ordinary

25   way to produce a continuous stream of dry air if that's what you

1  wanted.  And I will show that to you in just a second.

2       But you will see that all Morpho did was take known

3  systems, these known dryers, and plug them in for their known

4  purpose.  They were using them exactly as the prior art --

5  that's what came before the patent -- they were using them

6  exactly as prior art told them to.  Following someone else's

7  instructions is not invention.

8       Now, Morpho's counsel started by saying Smiths took

9  something from Morpho.  It was never Morpho's to begin with.  If

10  anyone's taking anything, it's Morpho taking from the public

11  domain an idea that has been around for a very long time, and

12  now claiming no one else in the country can do this.  This is

13  ours.  And that's not allowed by the patent system either.

14       You will also learn that none of these dryers, these

15  two-dryer systems that operate exactly -- I will show you --

16  operate exactly as Morpho's dryer does, none of those were

17  before the Patent Office.  So you will learn that if the

18  patent -- and you saw the video about how something, you saw

19  that stack of files, that actually is true, they have a lot of

20  work to do -- sometimes the Patent Office doesn't have all the

21  information and they didn't here.  You will learn that if the

22  Patent Office knew what you will see at this trial, what you

23  will see in just two, three minutes, this patent would never

24  have issued.

25       Our second defense relates to the detector part of

1  this.  So these dryers are used with detectors.  As you heard,

2  there's lots of different types of detectors.  You will learn

3  and I'll explain that the 500DT product that's accused here, for

4  several reasons is not the type of detector the patent is

5  claiming.  You may recollect from the little instructional

6  video, at the end of the patent are these numbered paragraphs

7  that are called claims.  Morpho's counsel didn't show them to

8  you, but they're very important in a patent case to look at the

9  patent.  I'll show them to you.  And to find infringement, each

10 and every one of those parts of that claim has to be in the

11 accused product.  And there are certain elements that are just

12 plain missing.  And you'll hear about that.  And for that

13 reason, the evidence will support that there was no infringement

14 here.

15        Now let me introduce you a little bit about Smiths

16 Detection.  They make threat detection equipment, of course, and

17 you'll be hearing a lot about trace narcotics, explosives.

18 Smiths Detection is the gold standard.  They have been doing

19 this for decades.  All types of detectors.  Their products are

20 used worldwide protecting the federal government building,

21 airports, ports, first responders, and most importantly, the

22 people who work in those building.  When all is said and done at

23 the end of this case, the evidence will show that we should be

24 grateful Smiths Detection is competing in this marketplace and

25 making these products.  That is a good thing.

```
1              Now let me introduce you to some of the witnesses
2    you'll be hearing from on behalf of Smiths.  We go second, so
3    Morpho's witnesses get to go first, and then we're going to go
4    second.  But when they come in a couple days I want you to see
5    them so you'll remember who they are.  First is Dr. Reno DeBono.
6    He's got a Ph.D in chemistry.  He's director of chemistry for
7    all of Smiths Detection.  He's been working with these detectors
8    with Smiths or its predecessor companies for about 19 years,
9    maybe.  Make no mistake:  Smiths is not the johnny-come-lately
10   to this market.
11             Now, Dr. DeBono will describe Smiths' history in
12   making these detectors.  He's going to describe the various
13   drying systems they had.  Smiths had tons of drying systems.
14   They had dryers everywhere.  Because as long as there's been IMS
15   detectors, there's been dryers for IMS detectors.  All the
16   various products they make leading up to the 500DT.  And he will
17   explain to you how the 500DT operates.  And after you hear his
18   testimony you will know that the type of detector the 500DT is
19   is not the type of detector the patent is claiming in the actual
20   claim language.
21             Our next witness is going to be Dr. Harrington.  He's
22   a Ph.D in analytical chemistry.  He's a professor.  He's been
23   studying IMS detectors for about 20 years.  And he's going to be
24   talking about IMS detector also and what they detect.  And from
25   his discussion you will also know that IMS detectors detect
```

1    vapors.  They detect vapors.  And that's going to be important.

2    But I'll get back to that in a second.  So put a thumbtack in

3    that one.

4            Next up you'll hear from Dr. Ruthven.  He's been

5    studying dryers and drying systems for about 40 years.  These

6    adsorption, they're called adsorption processes because the

7    materials, these dryers, they're called desiccants that sucks

8    the water out, that's an adsorptive process.  And he's going to

9    talk about the various types of dryers that Smiths had available

10   to it when it sold the 500DT, because part of Morpho's theory

11   is, well, if the 500DT didn't have this type of dryer, well,

12   there would be no 500DT.  The evidence will not support that.

13   Smiths would have been competing against Morpho regardless.

14           Now, the next witness you'll hear from, he's a great

15   guy, Dr. Denton.  He is a Ph.D in chemistry, and he's been

16   studying analytical instruments for about 30, 40 years.  He

17   builds them from scratch.  He's the only person you'll probably

18   hear from who can build one of these things from -- and I mean

19   from scratch.  He knows more about these types of detectors than

20   everybody else combined has probably forgotten -- he's forgotten

21   more than everyone else knows.  I said it backwards.  Excuse me.

22           Now he is going to testify about how these dryer

23   systems were well-known, how they were conventional, how using

24   them with lab instruments these detectors was well-known.  When

25   he is done testifying, you will hear and know how this was never

1  Morpho's idea to begin with.  It was in the public domain.  It's

2  free for everyone to use.  Morpho did nothing but take a known

3  system and use it as it was intended to be used.

4          Finally, and I'm loathe to even talk about it, we have

5  a damages expert.  The evidence will not support any damages

6  here because Smiths did nothing wrong in competing against

7  Morpho, but that said, Morpho's damages claim is grossly

8  inflated.  Goes far beyond anything they would be entitled to.

9  So Dr. Rapp will be talking about the speculative nature of

10 their damages claim.

11         But let me get back to the main event here.  I want to

12 talk a bit about the patent invalidity and invalidity of patents

13 more generally.  So as I mentioned, the invention is set forth

14 in these claims, these numbered paragraphs at the end of the

15 patent.  Now, to be valid, claims have to describe something

16 that's new and not obvious.  You saw that in the video.  And

17 obviousness is a fairly commonsensical thing, and, but sometimes

18 a person could be the first to actually do something, but it can

19 be obvious.  As a very simple example, suppose I have a

20 flashlight, a particular type of flashlight, and it takes four D

21 batteries.  And one day I decide, you know what, I'm tired of

22 buying new batteries.  I go to the store and I buy some

23 rechargeable batteries.  Rechargeable battery says can be used

24 anywhere you would use a regular battery.  So I unscrew it, get

25 rid of the old and put in my great rechargeable batteries.  What

1    a wonderful idea.  I may be the first person ever to use

2    rechargeable batteries with that particular type of flashlight.

3    Is that inventive or is that obvious?  Well, of course common

4    sense tells you that's obvious.  All I was doing was taking the

5    rechargeable batteries that someone else had thought of and

6    using them as they were expected to be used.  Said use anywhere

7    you would use regular batteries, and I did.  Sure, maybe no one

8    had used it in this particular flashlight before, but that's not

9    an invention.  And I certainly couldn't go around demanding that

10   no one else in America use rechargeable batteries with that

11   flashlight.

12          Now let's talk, though, a little bit more specifically

13   about the invention in this case, these dryer systems used with

14   detectors.  Now, you just saw this patent, this image a minute

15   ago from Morpho's counsel.  This is taken from the

16   patent-in-suit from Morpho's patent.  What you didn't see in the

17   image that you just, that Morpho's counsel showed you is what's

18   highlighted here.  Prior Art.  This picture is not showing

19   Morpho's invention.  This picture is what the patent admits was

20   prior art.  Everything you see in this picture, public domain.

21   Prior art.  Not Morpho's to take away.

22          Now, it looks like gobbledegook to you now, but this

23   is an IMS detector.  IMS detectors were known.  Morpho didn't

24   invent that.  You see a drying tube up top, that was pointed out

25   to you, because using IMS detectors with dryers was well known.

1   As I mentioned, for as long as there's been IMS there's been

2   dryers for IMS, because it was known that if you have an IMS

3   detector it's a good idea to have a source of dry air for it.

4           Similarly, at the far side you see this thing called a

5   desorber.  That's a heater.  It heats up the sample, creates

6   vapors that go into the detector.  All known.  Another patent

7   showing IMSs with dryers in the public domain, the prior art,

8   Smiths' patent that you saw.

9           Next slide, please.

10          Now, this patent talks about -- I've highlighted it --

11  and -- ion-mobility spectrometer.  It has a two-stage dryer, the

12  first dryer dries the air a bit, then that air goes into the

13  second dryer, and it says at the very bottom "and it enables an

14  extended period of use before the adsorbent material in the

15  second dryer either needs to be replaced or regenerated.

16  Morpho's counsel didn't show the "or regenerated" part.  He told

17  you the desiccant in this dryer had to be replaced.  No, it can

18  be replaced or regenerated.  What's regeneration when you're

19  talking about these dryers?  Again, instead of replacing this

20  desiccant material, instead it's drying the desiccant material

21  out.  How is that done?  You heat it and you blow air threw it,

22  because everybody knows heat and air blowing will dry something

23  out.  Just like if you dry your hair in the morning, you have

24  your hair dryer on the hot-hot setting, it will dry faster.  And

25  if you have it on the really fast setting it'll dry faster.  And

```
 1    so it was known to have regenerating dryers with IMS detectors

 2    so you didn't have to replace the desiccant all the time.  You

 3    reuse it.  It's like recycling.

 4              So what was Morpho's idea in their patent that they

 5    say is so inventive?  Well, when you have this dryer, even if

 6    you're regenerating it, while you're regenerating it you can't

 7    use the device.  That's true.  If you replace it, it takes about

 8    15 minutes to replace out the tube, but if you're regenerating

 9    it, drying it out, it takes some time and the machine can't be

10    used.  You can think of these dryers just like bath towels.  You

11    get out of the shower and you dry yourself off with the bath

12    towel, and as you get dry it gets wet, and soon it's too wet to

13    use.  So you can regenerate it.  How do you do that with a bath

14    towel?  Well, you throw in the laundry, wash it, throw it in the

15    dryer, then it's good to go.  It's a wonderful process.  Now if

16    you live by yourself that's fine.  That's just great.  You could

17    do that.  My household I wouldn't get away with that.  My wife

18    takes a shower right after I do, and the kids.  And so it would

19    be a problem that you don't have that.  "My towel is wet."

20    "Sorry, it's in the laundry."  So what's the solution?  You buy

21    a second towel, don't you?  That's the idea.  So that when your

22    wife wants to take a shower, oh, okay, here's the second towel.

23    And then when that one's out of the laundry this one goes in and

24    you have an extra towel.  That's the idea.  That's what Morpho

25    wants all the money for at the end of this trial.  Instead of
```

1  one bath towel, two.  It's a good idea.  I have more than one

2  bath towel at home.  But it's not inventive in the late '90s as

3  I'm going to show to you.

4          So enough about bath towels.  Let's talk about how

5  these regenerative dryers when you're talking about these

6  desiccant tubes actually work.  This is your dual-bed, there's

7  two of them, dual-bed regenerative dryer.  What happens?  Well,

8  you've got wet air coming in, and that's shown with the little

9  blue arrows.  The wet air goes through one of dryers and it's

10 dried out.  So we have that shown with gray arrows coming out as

11 dry air.  The dry air goes on, it's called the dry gas outlet.

12 The dry air goes on to whatever you want to send the dry air to.

13 Some of that dry air is rerouted up through that top dryer to

14 get it ready to go when it's needed later.  It's drying out,

15 it's removing any moisture in that top dryer and so you see wet

16 air coming out of that.

17          Eventually that bottom dryer is going to get too wet

18 to use again, just like your bath towel.  So you switch the

19 valve and go to your backup dryer which has been dried out.  So

20 now you're still getting your flow of dry air, and some of that

21 dry air is being rerouted back into the lower dryer, and that

22 was the wet dryer that you just switched from, so now it gets

23 dried out.  And that's the regeneration, and you just alternate

24 one to the other to the other.

25          Now, here is what is fatal to Morpho's case:  This is

 1  not a picture from Morpho's patent.  This is a picture from

 2  1970, a prior art patent.  This, make no mistake, the evidence

 3  will show, is the exact dryer Morpho is claiming as their own in

 4  the late '90s.  And what does this patent from 1970 say about

 5  this dryer?  Let's go to the next slide and see.  In 1970, mind

 6  you, here's what this patent says.  "Desiccant dryers have been

 7  marketed for many years and are in wide use throughout the

 8  world.  The usual type is made up of two desiccant beds, one of

 9  which is on the drying cycle while the other is being

10  regenerated."

11          Now think about that for a second.  The evidence will

12  show that this prior art not only describes the exact dryer from

13  Morpho's patent, it says this is the usual way of doing these

14  things.  These have been done for years even then.  It's the

15  usual way.  Morpho used the usual way.  That's the opposite of

16  invention.

17          Now, in case there's any doubt this is the same system

18  from Morpho's patent, you saw a few minutes ago the bottom part.

19  That's the drawing from Morpho's patent.  You just saw here the

20  top patent.  That's the dryer from 1970.  Let's run them and see

21  how they work.  The evidence will show that there is no

22  difference between the operation of these dryers.  Morpho used

23  an off-the-shelf drying system.  Now of course it had to be

24  optimized for their particular use.  Sure.  But look, you switch

25  from one dryer to the next.  You heat these.  You regenerate and

1   switch.

2          So I will suggest, when you look at this evidence,

3   focus on the actual claims in the patent and what's actually in

4   the prior art and maybe focus less on what the story is.

5   Because no matter what anyone says, when you see the evidence

6   about that prior art system and this system in the patent, the

7   evidence will be clear and convincing, it'll be undisputable

8   that these are the same system.

9          So you may hear an argument though, fine, these dryers

10  might have been known, but we were the first ones to use them

11  with this lab instrument.  We hooked one up to a detector.

12  That's got to be inventive.  Well, let's see what that same 1970

13  patent has to say about that.  Because this patent provides

14  instructions for use.  Just like the rechargeable batteries.

15  This patent says "The dryers in accordance with the invention

16  can be used for drying gases of all types such as for drying

17  small flows of compressed gases in instrument air for industrial

18  and laboratory purposes."

19         The prior art not only teaches the exact dryer that is

20  in Morpho's patent, it teaches that if you have a lab

21  instrument, that's what instrument air is:  Air used for

22  instruments.  You have a lab instrument that needs a dry air

23  source?  Hey, this might fit the ticket.  All Morpho did was

24  follow the instructions from the prior art.  Anyone could do

25  this.  Anyone should be free to do it now.

1          Now, I focused on this patent from 1970 showing this

2     dual-dryer system, but this is not the only patent showing this.

3     These dryer systems as that patent describes were used

4     throughout the world.  And here you will hear about various

5     other patents that all show these dual-dryer systems.  We were

6     accused of having to go out and search for the pieces of their

7     patent.  It wasn't a hard search.  The evidence will show that

8     this was in a lot of prior art.

9          So you may ask and Morpho may ask, well, if this was

10    so obvious and so known, how come the Patent Office issued the

11    patent?  Because they weren't told about these dual-dryer

12    systems.  How do we know?  Because the face of the patent -- you

13    may remember from that little video the face of the patent

14    contains a listing of all the documents the examiner -- the guy

15    who looked at the patent and issued it -- he had in front of him

16    or her.  And that list is shown here.  You can, you'll see it

17    when you get the patent.  That list is shown here on the left of

18    that slide, and you see a list of references.  And it's pretty

19    long.  On the right side is the list of documents I just showed

20    you talking about these dual-dryer systems, and the one I was

21    talking about in particular is '631.  '631, that patent ending

22    in '631, nowhere on this list.  None of these patents is on that

23    list.  And you can look it up for yourself.  Of course the

24    Patent Office issued this.  They weren't told.  They didn't have

25    the information they needed.

```
 1              Now, the lead inventor whose name is on the top of

 2    Morpho's patent, Mr. Jenkins, he knew about these dual-dryer

 3    regenerative systems.  He called them pressure swing or pressure

 4    drop systems.  And he admits it's his fault they weren't told

 5    they didn't, he didn't tell them at the Patent Office because he

 6    says now, oh, I didn't think it was relevant.  But you judge.

 7    Let's watch what we had to say.

 8              (Deposition video clip played.)

 9              MR. HUTCHINS:  Now, you will judge when you see the

10    evidence of those systems that I just showed you, and how

11    they're the exact same system -- how they're the exact same

12    drying system and you will get to decide whether those were

13    relevant and whether the Patent Office ever should have issued

14    this.

15              So now we come to the final question that Morpho

16    raised.  Well, if this was so obvious, why were we the first

17    ones to have this idea in 1998?  But they weren't the first ones

18    to have this.  Go back to the previous slide.  They weren't the

19    first ones to have this idea.  I just showed you the prior art

20    that disclosed the dryer and also taught to use the dryer with

21    lab instruments.  They had the idea of having these dryers

22    hooked up to detectors.  Not Morpho.

23              So when Morpho says, well, if it was so obvious how

24    come we were the first to have this idea in 1998, the evidence

25    will show that's a delusion, a fiction, a figment.  They were
```

1   not the first to have this idea.  You just saw the art.  That

2   idea was already in the public domain.  They're simply now

3   trying to co-opt it for themselves years after the fact.  They

4   say, oh, but Smiths took the idea from us.  Smiths has been

5   making these detectors for decades.  Their detectors are the

6   finest instruments in the world.  Did Smiths need to get the

7   idea of using two dryers instead of one dryer from Morpho?

8   Given how these systems were known all over?  Of course not.

9   Smiths didn't need the idea, this concept that's talked about in

10  the patent of having two dryers instead of one.  They didn't

11  need to get that idea from Morpho.  And Dr. Nacson, one of the

12  many honest, hard-working scientists at Smiths who was building

13  this product was asked directly, "Were you aware of regenerative

14  dryer systems in the prior art that used two dryers?"  "Yes."

15  "So it's clear, do you attribute the idea of using a

16  regenerative dryer system using two dryers to Morpho?"  "No,

17  it's prior art."

18          And of course it is.  I just showed you the art.

19          Did Smiths build its own system?  Of course they did.

20  Dr. Nacson was asked, "In fact, you had to design your own

21  regenerative system to get the quality of air you needed for IMS

22  detection, correct?"  "That's correct."  Smiths designed its own

23  system.  It didn't need this idea from Morpho.

24          Now, did Smiths know of Morpho's products?  Of course

25  it did.  Does Morpho know about Smiths products?  Of course.  No

1   company would be doing its job if it didn't know what was in the

2   marketplace.  Sure, in 2004 Smiths bought an Itemiser 3.  Now,

3   do you think Morpho doesn't own any Smiths products?  And do you

4   think they didn't study the 500DT they bought to death?  Well,

5   the evidence will show they did, and they did.  And they're not

6   even being accused of doing anything wrong, because of course a

7   competitor knows what their competition is doing.  How else do

8   you build better products?

9           But lest there be any doubt that we got this notion at

10  Smiths of using two dryers from buying an Itemiser in 2004,

11  here's a document dated February 2002, years earlier, and you'll

12  see on it drying tower one, drying tower two.  Two dryers in

13  parallel.

14          Oh, and one more thing:  All that talk about the story

15  of the Itemiser 3?  The evidence is not going to show that the

16  Itemiser 3 meets the patent claims.  I'll say it again.  Morpho

17  is not going to prove to you that the patent claims that we're

18  going to be talking about that they didn't show you, that those

19  specific patent claims cover their own product.  Now they're

20  going to try to compare the claims to the 500DT, and you'll see

21  them go through the elements element by element.  Dr. Bell's

22  going to try to do that.  But the Itemiser 3 they will not be

23  able to prove to you, because it's not true, that the Itemiser 3

24  falls within the scope of these claims.  It is a distraction

25  from the real issue of were these systems in the prior art.  I

1  showed you they were.  You'll see they were.  And are they being

2  used as intended to get the expected result?  I showed you they

3  were.

4        Now let me talk briefly about our second defense,

5  about how the detectors that are claimed in the 500DT, detectors

6  that are claimed in Morpho's patent are different in certain

7  respects than the 500DT.  I'll show you the patent claims in a

8  second, but this is just sort of a highlight.

9        There are two sets of claims at issue here.  One group

10 of claims is claim 20, 21 and 23.  Those are method claims, and

11 they're directed to a way of using a detector in a particular

12 way.  That's why they're called method claims, it's just a way

13 of using something.  And at the very beginning of that claim,

14 all these claims, it requires that the 500DT, it requires that

15 the detector detect particles of interest and it requires the

16 detector operate continuously.  Neither of those two things

17 happen with the 500DT.

18        And with claim 12, that's called an apparatus claim or

19 it's just directed to the detector itself instead of method of

20 using the detector, claim 12, and there's some claims that are

21 based off of that claim, 13, 14 and 17, and those all talk, when

22 they're talking about the detector part, they talk about the

23 desorber, and they require that the desorber have an inlet for

24 communicating with the trap and have an outlet.  I don't mention

25 the outlet here, but the bottom line, it requires a particular

133

1   type of desorber, that's the heater that heats the sample and

2   creates the vapors that go into the detector, that heater, it's

3   calling out a particular type of desorber, structure that our

4   product simply doesn't have.

5           Now, let's go back, though, to the method claims and

6   particles of interest and continuously.  And if you are feeling

7   at all nervous about being on a patent case maybe with the hard

8   technology, these concepts, these non-infringement arguments are

9   actually very easy and simple to understand.

10          If we could go to the next slide, please.

11          So at long last let me show you an actual patent

12  claim.  Claim 20 starts, "A method for continuously operating a

13  detector for detecting particles of interest.  So that language

14  Morpho has to prove is done with the 500DT if they want to prove

15  infringement.  So let's move and I'm going to show you some

16  things about why this doesn't happen in the 500DT.

17          Could you go to the next slide, please?

18          This is a page from the 500DT's manual.  And it says

19  "Particles collected on the sample swab are heated to vaporize

20  the compounds collected.  These liberated vapors are swept into

21  both of the IMS inlets".  That's the IMS tube that they go, the,

22  that's the inlet to the detector, and those vapors are what go

23  into the detector that Morpho's counsel was talking about with

24  the particles going through it.  Why does it matter that in the

25  500DT it detects vapors?  Well let's look at the next slide.

1            The judge is going to instruct you in this case that

2    particles of interest means solid material of interest that are

3    not vapors.  That's what the judge is going to instruct you.

4    That's the law you have to apply.  What are particles of

5    interest?  Solid material of interest, not vapors.  That's what

6    the claim requires has to be detected.  What did the 500DT

7    detect?

8            Let's go back a slide.  Vapors.  The liberated vapors

9    go into the detector.

10           What are particles of interest?  Let's go forward a

11   slide.  Not vapors.

12           You can't get much more simple than that for

13   non-infringement.

14           Now, why do I say that the detector is also not

15   operating continuously?  Well, because there's multiple types of

16   detectors.  There are detectors that will run 24/7.  They need

17   to.  Because, for instance, they're monitoring air quality in

18   buildings or submarines or nuclear plants to make sure there's

19   not -- which could happen at any time, there's not a release of

20   something really dangerous or nasty into the air.  So they're

21   continuous monitoring systems.  These detectors are sampling

22   constantly.  Nonstop sampling.  They're running continuously, as

23   you will imagine and hope that they would be if you were in a

24   building where you want to make sure nothing bad has been

25   released.

```
1              That is not the type of detector that they have

2     accused of infringement.  The type of detector they have accused

3     of infringement is the type you saw.  His swab was just a little

4     different from mine, it's the kind you see at airports.  So they

5     take the swab.  Okay.  I got my sample.  I put the sample on the

6     desorber.  It heats up.  The vapors go into the detector and the

7     detection occurs.  Either it's dangerous or safe.  I take the

8     sample out, and what does the machine do?  It sits there.  Why

9     is it not continuously operating?  Because I haven't sampled the

10    next guy coming down the line.  It goes into what's called an

11    idle mode.  Idle is just another mode for sitting around not

12    doing much.

13             Then a few steps, another passenger comes down, I

14    swipe that, his bag, I put that into the machine, it goes on the

15    desorber then the air flow starts, the particles are heated,

16    vaporized, and those vapors go in.  Those vapors are only going

17    in when there's a sample there.  And that only occurs when the

18    user puts a sample there.  That's called a discrete process or a

19    batch process.  Like do a batch of cookies, you can only do one

20    batch at a time, then you have to wait for that to be done then

21    do a second batch.  It's a discrete process.  That is the

22    opposite of continuous.  You all know what continuous means.

23             So for those reasons, the 500DT is a fundamentally

24    different type of detector than they are claiming.  It doesn't

25    detect particles and it doesn't operate continuously.
```

```
 1              I've taken a lot of time, so I want to, I want to
 2      touch briefly, briefly talk about --
 3              One other point on continuous.  Smiths doesn't even
 4      instruct its customers to use the product 24/7.  Why?  Because
 5      the product has to be cleaned each night.  What you're seeing
 6      here is a page from the technical manual of the 500DT, and it's
 7      a maintenance schedule.  And there's a list of daily maintenance
 8      that has to be done, and one of them is perform a bake-out.  And
 9      you'll hear that this daily bake-out, it's just like
10      self-cleaning your oven:  You put it on the self-cleaning mode
11      and then it takes a while and heats up and cleans out all the
12      dirt inside.  This bake-out, you're baking out all the dirt that
13      got in the IMS detector each night.  But it takes a few hours to
14      do.  And if you didn't do it, it would, the detector wouldn't
15      work properly because that gunk or dirt in there can mess up
16      your results.  So Smiths' instructs its customers not to use the
17      500DT 24/7.  It tells them that they have to turn it off for
18      four hours each night.  So for that reason too it's not
19      continuous.
20              Okay.  Now let's look at the other claim.  This one is
21      really long.  Morpho has to prove that all of this stuff, all of
22      this stuff is in the 500DT in order to find infringement.  And I
23      just want to focus on one thing, the "desorber having an inlet
24      for communicating with one of the traps to be tested," and then
25      it goes on, which also is missing is the outlet.  And our
```

```
 1   device, the 500DT is a hot-plate type detector.  It's just like
 2   a burner.  There's multiple detector -- desorbers.  Excuse me.
 3   There's multiple types of desorbers you can have.  You can have
 4   some that are like toasters or ovens where the swab goes inside
 5   the desorber much like you put bread into a toaster, and then
 6   some are like hot plates.  And you'll hear more about this
 7   during the course of the trial, but this is the desorber.  It's
 8   the heater.  It heats up and air goes through and makes the
 9   vapors.  There's no, there's no inlet for the trap.  Trap sits
10   on top.  It only ever sits on top.  The desorber is only ever
11   below the trap and completely below the trap.  And the evidence
12   is going to be very clear on this.  So if anyone suggests during
13   the trial that there's something above the trap that's part of
14   the desorber and they try to call this an outlet or an inlet,
15   it's not the desorber.  This is the desorber, the evidence will
16   show, and it doesn't have the required inlet or outlet because
17   it's just a hot plate.  Just like you can't put anything into or
18   out of your burner at home on your stove, you can't put anything
19   into or out of that desorber.  And for that reason too there's
20   no infringement.
21            Now finally if we could switch, go to the damages
22   page?  The last page.
23            Again, I'm going to talk very briefly about damages
24   because the evidence is going to show Morpho is not entitled to
25   any.  They took an old idea, used these old dryers exactly the
```

1    way they were intended to be used, and so there's no invention

2    here, and their claims don't match up with the 500DT product.

3    So since Smiths has done nothing wrong but compete honestly in

4    the marketplace you shouldn't even be talking about damages.

5    But we have to, because Morpho is claiming money.  That's why

6    they're here.

7              And so I will point out that Morpho has the burden of

8    proving damages, and they cannot be speculative, and the damages

9    can only be applied after September 2nd, 2011 because that's

10   when they first complained about the product by filing this

11   lawsuit.  And their main damages argument is, well, they would

12   have made a lot more sales if Smith hadn't been selling its

13   competing IonScan 500.  But you may recollect I mentioned

14   earlier on that there were lots of different drying systems

15   available to Smiths.  They have been making these detectors with

16   lots of different dryers.  In fact, you saw one in their patent

17   of the chiller with the regenerative dryer.  They could have

18   sold the 500DT with that.  If this really were what they were

19   using, actually were Morpho's property -- it's not, but if it

20   actually were -- they would still be competing.  Do you think --

21   Smiths has been in this marketplace selling these things for

22   20 years.  The evidence will not support an argument that -- if

23   they couldn't have that particular dryer that they would have

24   closed up shop and gone home and just let Morpho have a

25   monopoly?  Remember, you have to apply your common sense to this

1  case.

2         So the damages that Morpho is largely claiming they're

3  not entitled to, and is really based on speculation that's not

4  true.

5         But most fundamentally, most fundamentally, we'll be

6  talking again in about a week.  By then, all the evidence will

7  be in.  I am going to ask you for a finding of no infringement.

8  And that is the only finding the evidence will support.  And I'm

9  going to ask you to find that the prior art I showed you

10 describes Morpho's system.  You just saw it.  And that's the

11 only finding the evidence will support; that their idea was old,

12 and they're not entitled to reclaim it from the prior public

13 art, public domain, prior art public domain.

14        I thank you so much for your kind attention here

15 today.  I know it's been a long day, but thank you so much, and

16 I really look forward to trying this case in front of you.

17        THE COURT:  All right.  Thank you, Mr. Hutchins.

18        Ladies and gentlemen, it's 3:00 o'clock now.  It's a

19 good time, I think, for us to take our mid-afternoon break.

20 We'll do that, let you step back into the jury room, then we'll

21 come back and hear the first witness on behalf of the plaintiff.

22 You may step back into the jury room.

23        (Jury left the courtroom.)

24        (Recess taken from 3:05 p.m. to 3:29 p.m.)

25        THE COURT:  Okay.  Is there some exhibit issue that we

1    need to address before we bring the jury in?

2              MS. HOEKEL:  Yes, Your Honor.  I believe defendants

3    are objecting to my introduction of Plaintiff's Exhibit 139,

4    which is the CFR from 2002 describing some of the criteria for

5    certification of explosive trace detection.

6              THE COURT:  Was this objected to in the pretrial

7    order?

8              MS. HOEKEL:  Yes, Your Honor.

9              THE COURT:  Okay.

10             MS. WU:  Good afternoon.

11             THE COURT:  Good afternoon.

12             MS. WU:  We're objecting to PTX139 on multiple

13   grounds.  Lacks authenticity, lack of foundation, contains

14   hearsay, and is not the best evidence.

15             Regarding authenticity, the copy that I see reflects

16   some highlighting, so that does not make it appear to be an

17   accurate copy.  We don't believe there's any highlighting in the

18   original document.

19             There might be a lack of foundation.  Without hearing

20   what Mr. Stoddard has to say, there might not be any showing

21   that he has any personal knowledge about what's in this

22   document.

23             The hearsay objection relates to the fact that PTX139

24   contains out-of-court statements being offered into evidence to

25   prove the truth of the matter asserted; that is, to prove what

1  the TSA requires with respect to certifying explosive trace

2  detectors, and these out-of-court statements about what TSA

3  requires is inadmissible hearsay.

4         And if you take a look at the document itself, it does

5  mention on the second page that the TSA's complete criteria are

6  contained in the certification plan for explosive trace

7  detection equipment referred to as the Certification Plan.

8         THE COURT:  Where is that?

9         MS. WU:  It's in the first column, middle of the page

10  under the header "Release of National Security and Sensitive

11  Information."

12         THE COURT:  Okay.

13         MS. WU:  So that document would be the best evidence

14  of what the TSA requires, not this purported summary of that

15  document.

16         THE COURT:  So -- okay, I'm sorry.  Thank you.

17         Ms. Hoekel, tell me more about why the document's

18  being offered.  And Mr. Stoddard's going to testify to it, I

19  take it?

20         MS. HOEKEL:  Sure, Your Honor.  As to authenticity,

21  it's a CFR entry from July of 2002, so I think it falls under

22  the self-authentication Rule of 902.5.

23         THE COURT:  Other than the highlighting?

24         MS. HOEKEL:  Other than the highlighting, Your Honor,

25  yeah, which --

```
 1              THE COURT:  Who highlighted it?

 2              MS. HOEKEL:  You know, I don't know.

 3              THE COURT:  Why is it highlighted?

 4              MS. HOEKEL:  I think it was just someone was reading

 5    it and that's unfortunately the copy that got scanned.  We're

 6    not going to focus on the highlights or -- and I can even just

 7    publish it to the jury from sort of Page 1 just that it's there.

 8    I don't need to go into specifics, actually.  I'm not, I'm not

 9    intending on drilling down into this document in any detail

10    other than it is, it is the only public document that I believe

11    that we can discuss about TSA having certification criteria,

12    because as Ms. Wu pointed out on Page 2, there are two other

13    levels of certification data for explosive detection devices

14    that are secret and then that are security-sensitive

15    information.  So there has to be security clearances for you to

16    review those documents, and we -- I don't have them, none of

17    the -- they have not been used in this case by either party and

18    it's certainly not something I think TSA would be interested in

19    us discussing with the jury.

20              THE COURT:  So you're putting Mr. Stoddard on so that

21    he can say that there are these requirements for detection of

22    explosives?

23              MS. HOEKEL:  Mr. Stoddard is going to say generally

24    that TSA has a qualification protocol and that in that

25    qualification protocol there are certain parameters that the
```

1   devices need to meet.  He's not going to get into specifics on

2   any of those parameters, on either this document, a secret

3   document or the SSI documents, Your Honor.  He's going to say

4   things like TSA have criteria for, you know, there are criteria

5   for size and weight, there are detection limits, and he's not

6   going to say what any of those criteria are.

7           THE COURT:  Okay.  Ms. Wu?

8           MS. WU:  Regarding the certification plan, the

9   document does indicate that parts of it contain sensitive

10  security information, but there are other parts of it that do

11  not.  There's been no attempt in this case to obtain a copy of

12  that certification plan, which is the best evidence of what the

13  TSA requires.  Anything that Mr. Stoddard has to say about what

14  the TSA requires is going to be not-the-best evidence and

15  hearsay about what the TSA requires.  I don't think we --

16          THE COURT:  You don't dispute, I take it, that there's

17  a qualification protocol for the devices?

18          MS. WU:  That's right, Your Honor, I was just going to

19  say, we don't dispute there is a, there are qualification

20  criteria, but beyond that, exactly what they are we would

21  dispute because that evidence coming in would be inadmissible

22  hearsay and not the best evidence of that criteria.

23          Again, this document on its face is merely a summary,

24  doesn't really explain what that criteria is.  And so it's going

25  to be --

| | |
|---|---|
| 1 | THE COURT:  What's the prejudice to you of it coming |
| 2 | in? |
| 3 | MS. WU:  Well, in terms of their, the use or the |
| 4 | importance of this information, it goes to whether |
| 5 | non-infringing alternatives were available, and to have a |
| 6 | witness talk about what they think the TSA requirements are |
| 7 | without actually seeing them and having them in evidence, that |
| 8 | would be confusing and prejudicial. |
| 9 | THE COURT:  You don't contend that there's anything in |
| 10 | here that's inaccurate then? |
| 11 | MS. WU:  No, I mean, other than the highlighting I |
| 12 | think it's an original copy.  But in terms of, again, the |
| 13 | summary, it's unclear to us whether it's an accurate summary |
| 14 | because we haven't seen the certification plan.  No one has made |
| 15 | an attempt in this case to get a copy of that plan, so we don't |
| 16 | know whether the TSA would have released it or not. |
| 17 | Anything else? |
| 18 | MR. HUTCHINS:  Your Honor, we also dispute that there |
| 19 | are size and weight requirements, much less what they are. |
| 20 | But... |
| 21 | THE COURT:  Where does it say there are size and |
| 22 | weight requirements in here? |
| 23 | MR. HUTCHINS:  No, I'm referring to the statement that |
| 24 | the witness is going to testify that there's size and weight |
| 25 | requirements, and that's why you have the Best Evidence Rule. |

1              THE COURT:  I thought he was going to testify there

2     was a qualification protocol for the devices?  I thought that

3     was the focus of what we were going to hear.

4              Now that's -- I mean, there are two different things:

5     There's the document, and then if there's size and weight

6     requirements.  If there's an issue about that, you can

7     cross-examine him on it.  But that's not in the document.

8     Right?

9              MS. WU:  No, the size and weight requirements are not

10    in the document.

11             THE COURT:  Okay.  Two separate issues.  Thank you.

12             The objection is overruled.  The document comes in.

13             Anything else?

14             Let's bring the jury in.

15             (Jury entered the courtroom.)

16             THE COURT:  All right.  You all can be seated.

17             Ms. Hoekel, you may call your first witness.

18             MS. HOEKEL:  Thank you, Your Honor.  The plaintiff

19    calls Richard Stoddard.

20             RICHARD STODDARD, having been duly sworn, was examined

21    and testified as follows:

22                           DIRECT EXAMINATION

23    BY MS. HOEKEL:

24    Q.   Good afternoon, Mr. Stoddard.  Could you introduce yourself

25    to the jury, please?

```
 1   A.   My name is Richard Stoddard.   I work for Morpho Detection.

 2        (Microphone adjusted.)

 3   A.   Richard Stoddard.

 4   Q.   And who are you employed by, Mr. Stoddard?

 5   A.   Morpho Detection, Inc.

 6   Q.   Can you tell the jury what your current job title is?

 7   A.   My current job title is director of product management,

 8   CBRN platforms, which is Chemical, Biological, Nuclear,

 9   Radiological.

10   Q.   Is that a fairly new title for you?

11   A.   It is.  I've been in the position since January this year.

12   Q.   And what do you do in your job as director of product

13   management?

14   A.   My responsibility is to oversee all the product

15   development, new product introduction, process, schedules,

16   product requirements.  So I have a team that works for me for

17   all of the different product lines that we have, and oversee all

18   of that.

19   Q.   How long have you been with Morpho Detection?

20   A.   I began with them in June of 2002.

21   Q.   And what was your first job when you started working at

22   Morpho Detection?

23   A.   First position was as a field trainer for the field

24   deployment of the Itemiser 2 product lines to the TSA.

25   Q.   Can you tell the jury just a little bit about what the
```

1   Itemiser 2 product was?

2   A.   The Itemiser 2 product most of us would remember after 9/11

3   there was a lot of airport, TSA activity, the creation of the

4   TSA, massive deployment of explosive detection equipment, and

5   the Itemiser 2 was, at the time a company called Ion Track, they

6   had a product that was certified by TSA for that purpose of

7   explosives trace detection in the airports.

8   Q.   And how long did you work as a field service trainer for

9   the Itemiser 2?

10  A.   It was approximately three years.

11  Q.   And then what job did you move into?

12  A.   Then I moved into a product support role from a from a

13  services-type role, but product support basically like technical

14  support-type function.

15  Q.   What kind of technical support did you provide?

16  A.   For all of our trace product lines.  So we have numerous

17  different product lines, but all trace product lines I provided

18  that support for.

19  Q.   Field support?

20  A.   It was a combination of phone support, field support,

21  interaction with technology for service representation.

22  Q.   And what was your next job at Morpho?

23  A.   The next job I had in Morpho was product manager for our

24  desktop trace product lines, which was the Itemiser series of

25  products.

1   Q.    And do you remember when you first, when you became a

2   product, the product manager for desktop trace?

3   A.    It was approximately 2005.

4   Q.    And how long were you in that role as product manager?

5   A.    Up until January of this year.

6   Q.    And what were your sort of day-to-day duties as product

7   manager for trace?

8   A.    Predominantly, because it was trace desktops in particular,

9   so I looked at, as we referred to earlier, competitive

10  information.  I looked at all the different competitors that we

11  had out there.  We looked at features that customers wanted,

12  tried to get them to build them into the -- the technology group

13  to build those into future products, future enhancements, those

14  types of things.

15  Q.    In that role as product manager for roughly, what, six and

16  a half years --

17  A.    Yes.

18  Q.    -- did you have client contact?

19  A.    Yeah.  Quite frequently we did, we did customer visits.  If

20  a salesperson needed assistance, was essentially the product

21  expert in between having a technology person and a salesperson.

22  So I was the product expert who would go in the field with the

23  salespeople when needed.

24  Q.    Okay.  We'll talk about who some of those customers are

25  down the road.  But can you tell me just a little bit about the

1   history of Morpho Detection?  It's changed names several times,

2   correct?

3   A.    Several times, yes.

4   Q.    Okay.  And when you started at Morpho Detection in 2002,

5   what was the name of the company?

6   A.    Ion Track, Inc.

7   Q.    And can you tell the jury who started Ion Track?

8   A.    Gentleman by the name of Tony Jenkins.

9   Q.    And what was Mr. Jenkins' role in the Ion Track company?

10  A.    When I was hired he was the CEO of the company.

11  Q.    What were the product lines that Ion Track -- well, do you

12  know, do you recall when Ion Track was formed?

13  A.    I believe it originally started in the 1970s, if I'm

14  correct.

15  Q.    And what was the business of Ion Track from the 1970s to

16  early 2000s?

17  A.    Through all of that time to my knowledge it was always IMS,

18  ITMS-based systems.

19  Q.    In 2002 when you joined what was then Ion Track, what were

20  the product lines that Ion Track offered?

21  A.    We had, at the time I joined we had the desktop product

22  line, which was the Itemiser 2 that I mentioned, we had a

23  hand-held model which was called the Vapor Tracer, and shortly

24  after I started we introduced a portal, a walk-through human

25  detector as well referred to as Entry Scan.

1   Q.    Let's talk just very briefly about the hand-held.  I

2   believe Mr. Brophy showed the jury a picture of a current

3   hand-held product, correct?

4   A.    Correct.

5   Q.    Can you describe for the jury what a hand-held or what the

6   Vapor Trace serve device is?

7   A.    Hand-held models are typically just that:  Something you

8   can pick up in your hand, you can walk around with and they're

9   mobile.  The Itemiser that we talked about earlier, desktop

10  means literally that it sits on a desktop.  So the idea of a

11  hand-held is that it's much more portable, something you can

12  walk around with for field use, that kind of thing.

13  Q.    And who are some of the users of hand-held devices?

14  A.    Military.  A lot of government agencies who don't have the

15  finances to buy multiple instruments but need detection at

16  multiple places, so they need the ability to move an instrument

17  around.

18  Q.    And what kinds of things is the hand-held unit designed to

19  detect?

20  A.    The units of today, they detect explosives, they detect

21  narcotics, they detect what's called toxic industrial chemical.

22  There's a long list of different chemical and explosives

23  underneath those categories.

24  Q.    And you mentioned that one of the product lines of Ion

25  Track was a portal system, I think you called it, Entry Scan?

1    A.    Correct.

2    Q.    Can you describe for the jury what a portal system is in

3    this context?

4    A.    Most of us, probably about five years ago, there was a lot

5    with the TSA, prior to the big AITs, the imaging machines that

6    you have today, people used to call them puffer machines at the

7    airports.  But that's basically where a person walks into a big

8    portal, the jets would blow at you and it would dislodge

9    microscopic particles of explosives, is what we were looking for

10   at the time.

11   Q.    And where are those portal units typically used?

12   A.    Today the predominant use of them is in the nuclear

13   industries so all nuclear power plants in the United States have

14   this technology.

15   Q.    So they use it to, for visitors or employees to determine

16   if they've been around any kind of explosive material before

17   they enter the nuclear facility?

18   A.    Correct.  Every employee every day, every contractor, every

19   visitor going into a nuclear facility has to be screened.

20   Q.    And then the third line I think you already said was the

21   desktop Itemiser line of products, correct?

22   A.    Correct.

23   Q.    Do you recall when Ion Track eventually became Morpho

24   Detection, the name Morpho Detection?

25   A.    The official sale was in September 2009.

1  Q.    And who -- well, what is the business of Morpho Detection

2  today?

3  A.    Today the business, we sell, service, install numerous

4  different ones, so we have the trace detection equipment that we

5  are referring to all of today, and we also have X-ray product

6  lines, we have, as Mr. Brophy had in his opening slide, the big

7  CTX machines that are used for baggage screening, when you check

8  your bag at an airport, and we have some chemical detectors,

9  radiological detectors.

10 Q.    And who owns Morpho Detection?

11 A.    It's owned in part -- predominantly it's owned 81 percent

12 by Safran, USA, and then 19 percent of it is owned by General

13 Electric.

14            THE COURT:  Would you spell that, for the court

15 reporter, the first one?

16            MS. HOEKEL:  S-a-f-r-a-n.

17            THE COURT:  Thank you.

18 BY MS. HOEKEL:

19 Q.    And can you tell the jury a little bit about what Safran

20 USA is please?

21 A.    Safran USA is the U.S. entity that covers all of -- Safran

22 is an international company and they're into many different

23 areas, and in the United States they have some sales,

24 manufacturing, service facilities in different, in all of those

25 different businesses or those industries.  And Safran USA

1    oversees all of that in the United States.

2    Q.    What is the business of Safran?

3    A.    The global Safran?

4    Q.    Global company.

5    A.    They're into, aviation is a big market they're into.

6    They're into jet engine building, manufacturing, jet engine

7    landing gear, jet engine brake systems or aircraft braking

8    systems and landing gear.  They do some military work.  Lots of

9    different -- wiring harnesses for aircraft, that type of stuff.

10   Q.    Are there any airline companies that we would be familiar

11   with that Safran supplies parts to?

12   A.    Your typical, your Boeings, your McDonnell-Douglas, so all

13   of big airlines we fly on around the world today predominantly

14   most all them would have at least some parts that were built by

15   Safran.

16   Q.    You said that Morpho Detection was owned in part,

17   19 percent I think you said, by General Electric, correct?

18   A.    Correct.

19   Q.    And that's the General Electric Company that we're probably

20   all familiar with?

21   A.    The one that builds toasters and TVs and everything.

22   Q.    Okay.  How did General Electric come to be involved in this

23   business?

24   A.    General Electric, obviously being a large, diverse

25   corporation, they're into lots of different things, and after

1   9/11 they decided they wanted to be into the security industry,

2   so we were one of the companies that they purchased, being --

3   when I say one of, "we" being Ion Track at the time.

4   Q.   Where are the current offices of Morpho Detection?

5   A.   In the U.S. we have offices in Wilmington, Massachusetts,

6   we have offices in Newark, California, we have a couple of

7   offices in the Washington D.C. area.  We have a facility in

8   Santa Ana, California, we have numerous international offices,

9   predominantly Hamburg, Germany, we have one in Cambridge, UK.

10  Satellite offices around the world.

11  Q.   And we highlighted these just a minute ago, but the major

12  product lines I'm going to walk through just a little bit more

13  the major product lines that Morpho currently offers and

14  supports and we'll kind of take them backwards.  There's an

15  X-ray product line, you said?

16  A.   Correct.

17  Q.   And what is the, what is the X-ray product or X-ray

18  products of Morpho Detection?

19  A.   We have different size products, so X-ray is what we're all

20  familiar with when we go to a checkpoint such as the TSA, put

21  your hand carry-on bags through the X-ray machine just like we

22  did when he entered the facility here today, that type of X-ray

23  comes into numerous different physical sizes.  So we have

24  numerous physical size differences of those.

25  Q.   And who are the customers for that type of X-ray machines?

1  A.   They would be facilities just like TSA, just like the

2  facility here, any building security need that has an X-ray

3  need.  It can be for parcels, mail, different applications.

4  Q.   Private companies buy Morpho X-ray detectors or X-ray

5  machines as well?

6  A.   Yes.

7  Q.   And I think you mentioned CTX.  Can you describe to the

8  jury what CTX is, please?

9  A.   CTX, as you saw the picture earlier on, being the air

10 baggage screening systems.  It's like an MRI you would get in

11 for healthcare.  That's essentially what happens to your luggage

12 when you put your luggage into checked baggage.  So they take

13 your bag, it goes away on the belt, goes through these

14 instruments.

15 Q.   And who are some of the customers for Morpho CTX products?

16 A.   That would predominantly be the aviation industry.  As I

17 said, the big use of it is for checked baggage.  So 99 percent

18 of that customer base is going to be aviation around the world,

19 TSA being one of the big customers.

20 Q.   And then again we've talked about, we've used the phrase I

21 think a little bit, ETD.  Can you explain what ETD means?

22 A.   ETD is a term, explosive trace detector.  So that's the

23 trace being that microscopic particle that was described earlier

24 that you can't see with your eye.

25 Q.   And within trace I think you've named three, are there

```
 1  three product lines that Morpho offers in the trace area?

 2  A.   Correct.  We have hand-helds, desktops and portals,

 3  walk-through systems.

 4  Q.   Okay.  Is it your understanding that this lawsuit involves

 5  Morpho's allegations that Smiths Detection infringes one of its

 6  patents?

 7  A.   Yes.

 8  Q.   And I'm going to ask you to look at Exhibit 1, please,

 9  which for convenience sake will be on your screen.

10       If you can look at Page 1 and tell me if you've seen this

11  document before?

12  A.   Yes, I have.

13  Q.   And let's go to Page 2.

14       All right.  Go to Page 2.  Can you tell me what that

15  document is, please?

16  A.   This is the patent that we have in dispute.

17  Q.   And it's U.S. patent 6,815,670?

18  A.   Correct.

19            MS. HOEKEL:  Your Honor, I would move for the

20  admission of Plaintiff's Exhibit 1.

21            MS. WU:  No objection.

22            THE COURT:  That's admitted.

23                 (Plaintiff's Exhibit No. 1 received in

24            evidence.)

25  BY MS. HOEKEL:
```

1   Q.    And can you tell the jury please, Mr. Stoddard, when this

2   patent application was originally filed?

3   A.    October 1998.

4   Q.    And that's, that date is located about two thirds of the

5   way down the page on the left-hand side, correct?

6   A.    Correct.

7   Q.    And who owns U.S. Patent No. '670?

8   A.    Today it's Morpho Detection, Inc.

9   Q.    Okay.  And we'll get into this in a little bit, but I think

10  the patent on here says assignee is General Electric Company.

11  Do you see that?

12  A.    Yes.

13  Q.    And is it your understanding as to whether or not General

14  Electric Company, the parent, ever owned U.S. Patent '670.

15  A.    I don't believe they actually ever owned.  General Electric

16  Corporation, its subsidiaries, would have owned it.

17  Q.    We are going to now look at Plaintiff's Exhibit 6, please,

18  and if you can tell me if you recognize --

19           THE COURT:  All right.  That's not been admitted, so

20  it shouldn't be on the screen for the jurors.

21           MS. HOEKEL:  And I apologize, Your Honor, I understood

22  that --

23           THE COURT:  Or have you all --

24           MS. HOEKEL:  No, we -- can we come to sidebar just

25  briefly?

```
1              THE COURT:  Yes, come on up.

2              (Court and courtroom deputy conferred.)

3              (At sidebar as follows:)

4         MS. HOEKEL:  Your Honor, I apologize.  I think there

5  was some misunderstanding.  My understanding was that -- first,

6  there is no objection, and I think we can generally agree that

7  if there's no objection, that the exhibit could be published to

8  the jury.  But my understanding of courtroom procedure -- and I

9  apologize that I was misinformed -- was that Ms. Ward somehow

10 had it, had control over the jury box exhibit until such time as

11 you said it was admitted and it was published and I didn't have

12 to worry about that.

13             MR. HUTCHINS:  We should go over how it's going to be

14 handled.

15             THE COURT:  Let's just do that.  Let's just do that.

16 I think the typical way is that you all control that rather than

17 us every time keeping track of whatever is admitted.

18             MS. HOEKEL:  That's fine if that's how you want to do

19 it.

20             THE COURT:  So let's just do that for both of you from

21 this point forward.

22             MS. HOEKEL:  Okay.  Sorry about that, Your Honor.

23             I need to tell my tech person that as well.

24             THE COURT:  Sure.

25             MS. HOEKEL:  Thank you.
```

```
 1              (Sidebar concluded and proceedings resumed as

 2   follows:)

 3              THE COURT:  All right, ladies and gentlemen.

 4   Sometimes we have to work out the kinks and coordinate

 5   everything.  So that's done.

 6              Ms. Hoekel, you may move on.

 7              MS. HOEKEL:  Thank Your Honor.

 8   BY MS. HOEKEL:

 9   Q.   Mr. Stoddard, I'm going to ask you to look in your notebook

10   of exhibits that you have up there at Plaintiff's Exhibit 6,

11   please.

12        Do you have that in front of you?

13   A.   Yes.

14   Q.   Can you tell me what Plaintiff's Exhibit 6 is?

15   A.   It's a list of the patent assignments of the patent in

16   question.

17   Q.   Of the '670 patent?

18   A.   Correct.

19              MS. HOEKEL:  And we're going to take these

20   individually, but before I do I would like to move for the

21   admission of Plaintiff's Exhibit 6.

22              MS. WU:  No objection.

23              THE COURT:  That's admitted.

24                   (Plaintiffs Exhibit No. 6 received in

25              evidence.)
```

```
 1  BY MS. HOEKEL:

 2  Q.   So we'll go ahead and put that on the screen so the jury

 3  can follow along with us on Plaintiff's Exhibit 6.

 4       And this is the cover page you just described, correct?

 5  A.   Yes, it is.

 6  Q.   So we'll walk through these assignments individually.  If

 7  you can flip to Page 3 for me, and if you can describe what

 8  Page 3 is for the jury, please?

 9  A.   Page 3 is the patent assignment from the original four

10  inventors listed on the page here to Ion Track Instruments.

11  Q.   And what is the date on this assignment if you see it?

12  A.   That would be September '99.

13          STPHAO:  Are you going to expand this whenever you're

14  drawing his attention to something?  Because I don't --

15          MS. HOEKEL:  I can, Your Honor.

16          THE COURT:  Okay.

17          MS. HOEKEL:  So if we can expand sort of from here,

18  Jack, to the next highlight?  Thank you.

19  BY MS. HOEKEL:

20  Q.   And there are now names listed on this assignment.  Do you

21  see those names?

22  A.   Yes.

23  Q.   Are those the -- who are those four names?

24  A.   Those were the four, I would say, when I started with the

25  company Ion Track in 2002, those are probably the four core
```

1  technology people at the time.

2  Q.   And are those the four names that are listed on Exhibit 1

3  as the inventors of the '670 patent?

4  A.   Yes.

5  Q.   After Ion Track Instruments --

6          MS. HOEKEL:  Well, let's go to the next page, please.

7  BY MS. HOEKEL:

8  Q.   And can you identify Exhibit 6 Page 4 for the jury, please?

9  A.   This is the official assignment signed by the inventors

10 transferring the ownership of the patent.

11 Q.   And if we could look at the very top paragraph, please.

12 Can you tell the jury which entity the inventors assigned their

13 invention to.

14 A.   Ion Track, Inc.

15 Q.   Ion Track Instruments, Inc.?

16 A.   Instruments, Inc. yes.

17 Q.   Thank you.

18     Let's look at the next page, please.  Page 5.  And if we

19 can identify this page for the jury, please?

20 A.   This is another patent assignment from Ion Track

21 Instruments, Inc. to Ion Track Instruments, LLC due to a merger.

22 Q.   And again this conveys the '670 patent; is that correct?

23 A.   Yes.

24 Q.   And the execution date on -- or the effective date of this

25 assignment is what?

1    A.    January, 2000.

2    Q.    And is it your understanding that Ion Track Instruments,

3    Inc. became Ion Track Instruments, LLC in January 2000?

4    A.    Yes.

5    Q.    Let's look at the next page of this exhibit, please.

6              MS. HOEKEL:   And if we can blow up sort of the top

7    three paragraphs of text, please?

8    BY MS. HOEKEL:

9    Q.    And can you describe what this page is to the jury, please?

10   A.    This is the merger document of Ion Track Instruments,

11   Incorporated with Ion Track Instruments, LLC.

12   Q.    Let's skip to Page 9 of this document, please.

13         And if you can identify this document for the jury, please?

14   A.    This is a patent assignment from Ion Track Instruments, LLC

15   to GE Homeland Protection, Inc.

16   Q.    And the effective date of this assignment is what?

17   A.    December 23rd, 2003.

18   Q.    And do you recall whether GE Homeland Protection, Inc.

19   bought Ion Track Instruments in 2003?

20   A.    Yes, they did.

21   Q.    Let's look at Page 13, please.

22         And again, if you can identify this document?

23   A.    This is an assignment from GE Homeland Protection, Inc. of

24   the patent to GE Ion Track, Inc.

25   Q.    And at some point did GE Homeland Protection, Inc. change

1  their name to GE --

2  A.    To GE -- yes.  This was a name change from GE Homeland

3  Protection, Inc. to GE Ion Track, Inc.

4  Q.    And do you remember that name change occurring in 2004?

5  A.    Yes.

6  Q.    And then do you recall whether the name changed back?

7  A.    To GE -- yes, it did.  Later on it changed back to GE

8  Homeland Protection.

9  Q.    Okay.  Let's look at Page 16, please.  And again if we can

10 look at the top of this document, and if you can identify this

11 for the jury, please?

12 A.    This is an assignment due to a merger of, changing the

13 patent from GE Ion Track, Inc. back to GE Homeland Protection,

14 Inc.

15 Q.    Okay.  And do you recall this merger happening in the 2006

16 time frame?

17 A.    Yes.

18 Q.    And can you just explain very briefly to the jury what

19 happened?

20 A.    Yeah.  What happened is GE Homeland Protection, Inc. also

21 bought another company called GE Envision, Inc., and they merged

22 GE Envision, Inc. with GE Ion Track, Inc. and went back to being

23 GE Homeland Protection, Inc.

24 Q.    And this was in 2006?

25 A.    Yes, July of 2006.

1    Q.    Let's look at Page 20 of the exhibit now, please?

2          If you can yet again identify this for the jury?

3    A.    This is an assignment of the patent from General Electric

4    Company to GE Homeland Protection, Inc.

5    Q.    And again, do you know whether the GE parent ever owned the

6    patent?

7    A.    Directly no, I believe it was always owned by a subsidiary.

8    Q.    Was GE Homeland, Inc. a wholly-owned subsidiary of General

9    Electric Company?

10   A.    To the best of my knowledge.

11   Q.    Were you employed at GE Homeland Protection really

12   throughout its existence?

13   A.    I was, yes.

14   Q.    Let's look at Page 25, please.  And if you can again

15   identify this document for the jury?

16   A.    This was the patent assignment from GE Homeland Protection,

17   Inc. to Morpho Detection, Inc.

18   Q.    And what is the execution date on this?

19   A.    This was October, 2009.

20   Q.    And did, do you recall when Morpho Detection, what time

21   period Morpho Detection became Morpho Detection instead of GE

22   Homeland Protection, Inc.?

23   A.    Yes, I was there as well.  It's this time, 2009.

24   Q.    And who is it that owns the '670 patent today?

25   A.    That would be Morpho Detection, Inc.

1  Q.   Let's talk about the Itemiser 3 for a minute.  Can you

2  explain to the jury on sort of a macro level what the Itemiser 3

3  device is?

4  A.   What it is, it's a field deployable desktop unit that's

5  used, as we said, for building facilities, security, has many

6  applications.  It's used for explosives detection as well

7  narcotic detection.

8  Q.   And did the Itemiser 3 follow behind an earlier desktop

9  trace product of what I'll refer to as Morpho Detection for the

10  rest of your testimony?

11  A.   Yes.  The prior, or the predecessor product to this was the

12  Itemiser 2 product that I mentioned earlier which is when I was

13  originally hired, yeah.

14  Q.   And what were the new features on the Itemiser 3 that had

15  not been on the Itemiser 2?

16  A.   The big differences between the two products was the

17  predecessor being the Itemiser 2 product had the capability to

18  either detect explosives or narcotics, and the Itemiser 3 was

19  able to detect both in one sample.

20       And then the other ability that it had was the regenerative

21  dryer.  The predecessor product had to have the regenerative,

22  the molecular sieve had to be physically replaced on a weekly

23  basis.

24  Q.   Let's talk about the first new feature that you identified

25  then we'll spend probably most of the rest of our time on the

1    regenerative drying aspect.

2        You said that the Itemiser 3 was able to detect explosives

3    and narcotics; is that correct?

4    A.    Correct.

5    Q.    Was the Itemiser 2 capable of detecting both explosives and

6    narcotics?

7    A.    It was or versus and.  So the Itemiser 2 could do one or

8    the other, it could not do both at the same time.

9    Q.    And explain to the jury please how the Itemiser 2, how

10   that, how you had to switch between the explosive detection and

11   the narcotics detection.

12   A.    When we're talking about IMS, we talked a little bit

13   earlier, heard about how you have to charge the molecules, the

14   vapors as they're going through the detector.  They either get

15   charged positive or they get charged negative, and one of those

16   modes is for narcotics, the other is for explosives.  The

17   Itemiser 3 product was the first one that we came out with that

18   in one detector switches the polarity positive and negative,

19   whereas the older product it was one, it was either positive or

20   negative, the new product was able to switch positive and

21   negative.

22   Q.    Explain please to the jury how the Itemiser 2 was

23   physically switched from positive to negative if you wanted to

24   change what type of substance you were trying to detect.

25   A.    As far as explosives versus narcotics?

1   Q.    Yes.

2   A.    So if you had a, say you had an explosives unit, an

3   explosives-only unit, you had to actually change some of the

4   hardware and the software in order to make it into a narcotic

5   detector.  And the same for narcotic, you would have to switch

6   it back.

7   Q.    For the Itemiser 3, is there anything that has to be done

8   to the machine to allow it to detect both narcotics and

9   explosives simultaneously?

10  A.    It's really just the software setting button.  You have the

11  option to go and press a button and you say you want to look for

12  explosives only, narcotics only, or both at the same time.

13  Q.    And you said the other new feature that distinguished the

14  Itemiser 3 over the Itemiser 2 was regenerative drying?

15  A.    Correct.

16  Q.    Can you describe just on a very high level to the jury what

17  the regenerative drying system of the Itemiser 3 was, please?

18  A.    What the regenerative dryer was, inside the unit, the unit

19  drying material, that molecular sieve that we heard of earlier,

20  it actually switches back and forth every four hours.  So while

21  one dryer is being used in the system to keep the detector loop

22  dry for detection, the other one was being baked out, then every

23  four hours it would switch back and the one that was clean is

24  now being used in the detector loop and the one that was

25  previously used in the detector loop is now being baked out.

1   Q.    What was the drying system of the Itemiser 2?

2   A.    It was a molecular sieve system that required you to

3   actually shut down the instrument, disassemble pieces of it and

4   then actually physically empty this tube into the trash of the

5   molecular sieve, refill it with a new, a new consumable that you

6   had to purchase, and then put that back together, start the

7   system back up.

8   Q.    What were customer concerns with the old desiccant system

9   that you just designed with respect to the Itemiser 2, for

10  example?

11            THE COURT:  There's an objection.

12            MS. WU:  Objection, hearsay.

13            MS. HOEKEL:  I believe that Mr. Stoddard has testified

14  as to his communications with customers and the development of

15  products to address those concerns.

16            THE COURT:  Overruled.

17  A.    So especially from my training days, one of the, going into

18  the, into the product management days, the complaint that we had

19  a lot from customers was the cost of ownership.  So that was

20  everything from your maintenance that you had to do on the

21  instrument to the consumables, the swabs that we saw earlier,

22  all of those are considered consumables to the customer because

23  they have to be replaced or thrown away or replenished at some

24  point.  So the concern the customers had was the cost of

25  ownership, financial cost of ownership because that desiccant

1    material costs money.  So they looked at it as every week

2    they're emptying this tube and throwing it into the trash and

3    then having to refill it.  So that was one concern.

4        Another was that that desiccant material that they're

5    throwing away, they didn't know what was contaminated on it.  So

6    basically there's some customers had EHS, environmental health

7    concerns about what's on that desiccant material.

8        And then the other was the simple fact that we had to train

9    the customers the actual maintenance step to replace that every

10   week.

11   Q.   So did Morpho tout advantages of the regenerative drying of

12   the Itemiser 3 to its customers?

13   A.   When we released the product we touted that as a huge

14   advantage.

15   Q.   And what were the advantages -- those are the

16   disadvantages.  What were the advantages of the Itemiser 3

17   regenerative drying system?

18   A.   Because it took away the maintenance step.  You no longer

19   needed to shut the stem down to replenish or regenerate that

20   molecular sieve because it was done automatically every four

21   hours.  You didn't have the maintenance step to actually shut

22   the instrument down, it just was automatic, the customer never

23   knew it was happening.  And then you also had the cost or the

24   cost savings to the customer, cost of ownership cost savings

25   that they no longer had to buy this molecular sieve consumable

1   to replenish.

2   Q.   When was the Itemiser 3 released or made public?

3   A.   The fall of 2001.

4   Q.   How do you know that?

5   A.   In a conversation with Mike Patterson, he had been in a

6   trial --

7               MS. WU:  Objection, hearsay.

8               THE COURT:  Sustained.

9   BY MS. HOEKEL:

10  Q.   Do you know when the first sale of the Itemiser 3 was?

11  A.   It was in January in 2002.

12  Q.   And who was that first sale to?

13  A.   U.S. Customs.

14  Q.   In this time period, who were, who were the customers for

15  explosive trace detection desktop machines?

16  A.   In that time frame?  In that time frame predominant was

17  Homeland Security type or agencies.  So it was a lot of Customs

18  and Borders, Immigration, local law enforcement, a lot of

19  government, military, those types of customers who were

20  concerned after 9/11 for Homeland Security reasons.

21  Q.   If I can ask you to look in your exhibit notebook to

22  Plaintiff's Exhibit 63, please?

23       Could you identify Plaintiff's Exhibit 63?

24  A.   Yes.  It's a financial snapshot analysis of the entire

25  desktop product line.

1   Q.   And what years does this reflect sales of desktop units

2   for?

3   A.   2007 through 2012.

4   Q.   And what products are listed, for what products are sales

5   listed on Exhibit 63?

6   A.   The Itemiser 3 series, the Itemiser DX series, and the

7   Itemiser 3E, or 3 Enhanced series.

8          MS. HOEKEL:  I would move for admission of Plaintiff's

9   Exhibit 63.

10          MS. WU:  No objection.

11          THE COURT:  That's admitted.

12                  (Plaintiffs Exhibit No. 63 received in

13              evidence.)

14   BY MS. HOEKEL:

15   Q.   So let's blow up the top part of Exhibit 63 and walk

16   through this a little bit.

17       First, can you tell me, we'll start at the top here and

18   IT3E.  Can you explain to the jury what IT3E is, please?

19   A.   The Itemiser 3 Enhanced was an enhanced product to the

20   Itemiser 3 series that you see listed below.  We came out with

21   that because the Itemiser 3 series had some end-of-life piece

22   parts in it, motherboards, a couple of other items, and they

23   could no longer be bought, so we had such a high demand for the

24   product that we actually redesigned some features in it and

25   released it as an enhanced version of the Itemiser 3.

1  Q.    And then below that we see ITDX.   Do you see that?

2  A.    Yes.

3  Q.    Can you just very briefly tell the jury what ITDX is?

4  A.    The Itemiser DX was the next generation of desktops beyond

5  the Itemiser 3 series specifically designed for a higher

6  detection, higher detection limits required by a lot of

7  certifying bodies around the world.

8  Q.    And then the third item down here, this IT3, is that the

9  Itemiser 3 that we've been discussing?

10  A.    Yes.

11  Q.    And can you tell the jury how many Itemiser 3s were sold,

12  for example, in 2007?

13  A.    In 2007 there was 164.

14  Q.    And in 2009 how many were there?

15  A.    2009 was 219.

16  Q.    How many Itemiser 3s has Morpho Detection sold over the

17  life of the Itemiser 3 product?

18  A.    The Itemiser 3 by itself has over 3,000 units deployed.

19  Q.    And again, who are some of the customers that have

20  purchased the Itemiser 3?

21  A.    The Itemiser 3 was used by Customs, Borders, federal

22  prisons, state prisons, used by international aviation, used by

23  some of the federal courthouses, used by -- the list goes on.

24  Prisons.   I mentioned prisons.   Nuclear power plants use those

25  as well.

1  Q.    And do you recall the list price for an Itemiser 3?  It may

2  have varied, but do you recall generally the list price?

3  A.    It was exactly 45,200.

4  Q.    And if we look at this Exhibit 63 it looks like sales

5  dropped off after 2009, correct?

6  A.    Yes.

7  Q.    For example, in 2010 how many Itemiser 3 units were sold?

8  A.    Only 36, yes.

9  Q.    And do you know why the Itemiser 3 sales declined so

10  sharply after 2009?

11  A.    Well, part of the reason for the decline was that they

12  could no longer be made, so that's where you'll start to see the

13  Itemiser 3 kick in.  But also because we had come out with the

14  Itemiser DX product line as well.

15  Q.    And when was the Itemiser DX introduced to the market?

16  A.    2009.

17  Q.    We alluded to this a minute ago, but what were the

18  differences, what are the differences between the Itemiser DX

19  and the Itemiser 3?

20  A.    The biggest difference is its detection capability.  It's

21  ability to detect -- it's a much more sensitive instrument than

22  the Itemiser 3 series line.

23  Q.    Does the Itemiser DX include a regenerative drying system?

24  A.    Yes, it does.

25  Q.    And can you just, again, on a macro level, describe that

1  drying system?

2  A.   It works very similar to the way it works within the

3  Itemiser 3 series in that it's drying the, one canister or one

4  dryer is drying the detector loop while the other dryer is being

5  dried out and purged, and then every four hours it switches back

6  and forth.

7  Q.   Do you consider the regenerative drying system was

8  important to the success of the DX?

9  A.   Yes, I do.

10 Q.   Why is that?

11 A.   Again, cost of ownership being very critical to customers.

12 It's a constant, a constant issue that we have even today, even

13 with the regenerative drying dryer, cost of ownership is a

14 concern for all instruments going forward.  So it helped reduce

15 the cost or maintain the low cost of ownership that the Itemiser

16 3 brought to the market.

17 Q.   And who are the, some of the customers that have bought the

18 Itemiser DX to date?

19 A.   To date, the TSA, Department of State for U.S. Embassy

20 consulate security, federal prisons, state prisons,

21 international aviation, TSA.

22 Q.   And do you know how many Itemiser DXs have been sold to

23 date?

24 A.   Approximately 4,000 total to date.  Commercial and TSA.

25 Q.   And what is the list price of the DX?

1   A.    The -- 48,000.

2   Q.    Now, does that price vary?

3   A.    It varies.  It's a list price.  It varies based on customer

4   size for volume discounting.  So if you -- the more you buy, the

5   better deal you get.

6   Q.    Who is the manufacturer of the Itemiser DX?

7   A.    We manufacture it under the Morpho Detection brand name.

8   We actually have it manufactured at a contract manufacturer

9   called Cirtronics based in New Hampshire.

10  Q.    Do you know how many Itemiser DXs Cirtronics manufactures

11  every month?

12  A.    It varies every month.  What we do is a weekly running

13  estimate on our sales protections for the coming months, so we

14  vary it on a weekly basis with the contract manufacturer.

15  Q.    So it's a scalable production line?

16  A.    It's a very scalable production line.

17  Q.    Do you know what the sort of lower and upper limits of

18  those production line are?

19  A.    Obviously the lowest would be zero, but the highest, we've

20  worked with them and they have a, they have a system that's

21  scalable up to what we estimate to be about 500 units a month.

22  Q.    Let's talk about competitors.  Who are the competitors in

23  the desktop trace detection business in the United States?

24  A.    The predominant competitor today as a general statement is

25  Smiths Detection.

1  Q.    So it's just Morpho and Smiths?

2  A.    Yes.  When you -- it varies when you get -- there are some

3  small competitors when you get into the commercial noncertified

4  market.

5  Q.    Okay.  Why is it that Morpho considers that the competitive

6  landscape for desktop trace in the U.S. is really just Smith and

7  Morpho?

8  A.    A lot of weight in the United States by government agencies

9  that don't necessarily require certification -- they put a lot

10  of weight in the certification process of the TSA, and then some

11  noncommercial -- or some commercial customers who also have

12  some, they put some trust in the U.S. government that the

13  certification process validates that a product works.

14  Q.    And we'll get into TSA certification in just a moment.  But

15  if I can have you look at Plaintiff's Exhibit 142, please, in

16  your binder?

17       And if you can identify Plaintiff's Exhibit 142 please?

18  A.    Yes.  This is the listing called Qualified Products List

19  that the TSA has certified products that are available for sale

20  today.

21            MS. HOEKEL:  Your Honor, I would ask for admission of

22  Plaintiff's Exhibit 142.

23            MS. WU:  No objection.

24            THE COURT:  That's admitted.

25                      (Plaintiffs Exhibit No. 142 received in

```
 1                    evidence.)

 2   BY MS. HOEKEL:

 3   Q.    And you can --

 4         And there are how many products listed on the TSA qualified

 5   product list?

 6   A.    Two products.

 7   Q.    And that's current as of today?

 8   A.    Yes.

 9   Q.    Are there other kinds of -- well, let me ask you a

10   different question.   The Itemiser 3 is not on this list,

11   correct?

12   A.    No.

13   Q.    And why is that?

14   A.    The standards, detection standards by the government

15   changed in 2007 and required hard detection limit for the

16   substances they're looking for, and the Itemiser 3 was not able

17   to obtain those, which is why we came out with the Itemiser DX.

18   Q.    And the other Smiths product, the only other product that's

19   on this qualified product list is what?

20   A.    The Smiths IonScan 500DT.

21   Q.    And have you heard of the Smiths IonScan 400B before?

22   A.    Yes.

23   Q.    Are there Smiths IonScan 400Bs still in -- where have you

24   seen Smiths 400B?

25   A.    Predominantly they're used today I believe with the TSA
```

1    as -- it's the predecessor product to the 500DT, which was also

2    certified just like we had the Itemiser 2 as the predecessor

3    certified product to the DX.  So both of those products are

4    still in use by the TSA.

5    Q.    And, but are either of those products, the Itemiser 2 or

6    the 400B, able to be purchased new by the TSA today?

7    A.    They are not.  They don't meet the current requirements and

8    they're being life-cycled out and replaced by these products.

9    Q.    And they're not on the qualified product list?

10   A.    No, not for procurement today.

11   Q.    What is the expected lifetime for a desktop trace system in

12   the field?

13   A.    Approximately seven years.

14   Q.    And do you recall when the Itemiser DX was certified?

15   A.    2009.

16   Q.    And do you recall when the IonScan 500DT was certified?

17   A.    I don't know the exact date.  It was a few years earlier.

18   Q.    So there was some time period -- was there some time period

19   when the IonScan 500DT was the only product on TSA's qualified

20   product list?

21   A.    I believe so, yes.

22           MS. HOEKEL:  Okay.  We can take at that exhibit down.

23   BY MS. HOEKEL:

24   Q.    Let's talk a little bit about TSA's buying process.  What

25   is the current buying process that TSA employs to purchase

1   desktop trace?

2   A.   What they do currently today is they put out what's called

3   an RFP, Request For Proposal, and basically it has, the

4   requirements on it is that you be on this list, this qualified

5   product list that we just saw, and price.  So it's a competitive

6   bid for basically these two products because they're the only

7   ones on the list, and it's a price-competitive bid.

8   Q.   And do you know what the price range has been on the offers

9   to TSA for the Itemiser DX?

10  A.   Yeah.  It ranges, the way it works is when you get put on

11  this list, this QPL list that you saw, what they do is they give

12  you a, what they call an IDIQ, Indefinite Delivery/Indefinite

13  Quantity contract.

14  Q.   Can you explain what an IDIQ is, please?

15  A.   So Indefinite Delivery/Indefinite Quantity basically says

16  they will buy anywhere from one -- the contract that we

17  currently have says it will by anywhere from one to 10,000

18  units.  Doesn't commit them to buying anything more than one

19  unit.  And basically that's the unit that's used by the

20  certifying lab as they're golden unit.

21  Q.   And then does Morpho Detection set prices in response to

22  that IDIQ?

23  A.   Right.  So in the IDIQ we have to put tiers, they basically

24  define the tiers of volume, so if they were to buy, say, between

25  one and 25, I forget what the tiers actually are, but they break

 1    them out and basically we put in a maximum price that we can

 2    charge for that tier if that's what they choose to buy in future

 3    delivery orders.

 4    Q.    And again, I think I asked you this, but what is the price

 5    range within an IDIQ of what Morpho is charging for an Itemiser

 6    DX?

 7    A.    Well, I think at the low end it's very close if not

 8    slightly over the list price.  And then obviously when you get

 9    up into the thousands of units the price dramatically decreases.

10    Q.    Do you know how dramatically it decreases?

11    A.    I believe it goes down in the low 20,000 range.

12    Q.    And again, you've testified that you have to be on the QPL

13    to be able to submit a RFP response, correct?

14    A.    Correct.

15    Q.    How does a company go about getting their trace detection

16    machine on the QPL?

17    A.    It's a detailed process of there's a specification that the

18    TSA puts out, as I mentioned earlier, the one that the Itemiser

19    DX was designed to was one from 2005.

20    Q.    Can you tell us on a very high level what sorts of things

21    the TSA certification requires?

22          MS. WU:  Objection to the extent that calls for TSA

23    requirements.  Hearsay.

24          THE COURT:  You can seek to lay more of a foundation.

25    BY MS. HOEKEL:

1  Q.   Let's back up a little bit and start with the process of

2  how does the TSA tell suppliers of this device what it's looking

3  for?

4  A.   They put out what's referred to as an RFI, Request For

5  Information out, they have a fed.biz or fed.gov -- fed.biz, gov,

6  I forget exactly the website.

7            THE COURT:  All right.  Just, if you can say these

8  terms more clearly for us and slow down, just...

9  A.   There's a fedbiz.gov that has a process where they put out

10  intentions to buy.  So they will put on RFI, Request For

11  Information, out.  They're looking for people to submit

12  equipment for this particular requirement, whatever it be.

13  BY MS. HOEKEL:

14  Q.   Okay.  And is that RFI public?

15  A.   The RFI is public, but the specifications are, have

16  different classifications.

17  Q.   Okay.  So in what year -- do you recall in what year the

18  TSA put out a Request For Information that eventually you all

19  responded to with the Itemiser DX?

20  A.   I don't recall the specific RFI that went out.  I know that

21  the specification that we responded to was the 2007

22  specification.

23  Q.   Okay.  And in 2007 did Morpho Detection then begin

24  developing a device in response to that Request For Information?

25  A.   Yes.

1    Q.    Okay.  And what device was that?

2    A.    The Itemiser DX.

3    Q.    And how long did it take for Morpho Detection to have an

4    Itemiser DX device that it could submit in response to that

5    request?

6    A.    For physical device to submit was probably a one-year

7    development to design one.

8    Q.    Okay.  And then after the design was completed what was the

9    next step of getting on the TSA qualified product list?

10   A.    That's where you submit it to the lab, they begin testing,

11   and it's another, about another year's worth of testing.

12   Q.    Okay.  So you have to -- do you have to give a physical

13   device to the lab?

14   A.    Yes.

15   Q.    And do they take possession of that device?

16   A.    Yes.

17   Q.    And do they test that device?

18   A.    Yes.

19   Q.    And what are the, what kinds of, what kinds of

20   documentation does the TSA issue that guides your product

21   development.  That guided your product development of the DX?

22   A.    The specification has what they call in the specification,

23   they define what's considered a "shall", meaning the product

24   must do this, right?  That there is no -- if it does not do

25   this, it's not considered.

1   Q.   Okay.

2   A.   And then there's what's considered "shoulds", and those are

3   the things they highly recommend that you put into the product.

4   Q.   Let's look at, in your notebook at Exhibit 139, please.

5        And do you recognize Exhibit 139?

6   A.   Yes.

7   Q.   Can you tell us what Exhibit 139 is?

8   A.   It's the Federal Register definition put out by Department

9   of Transportation on the certification criteria for trace

10  detection equipment.

11  Q.   And is -- this is a Federal Register document?

12  A.   Yes.  This is a public document.

13  Q.   You're familiar with the Federal Register generally?

14  A.   Yes.

15  Q.   And are you aware that -- do you know whether it is a

16  public document?

17  A.   I believe it is, yes.

18            MS. HOEKEL:  We would move for admission of

19  Exhibit 139.

20            MS. WU:  No objection.

21            THE COURT:  It's admitted, and for the same reasons

22  stated previously.

23                    (Plaintiffs Exhibit No. 139 received in

24            evidence.)

25  BY MS. HOEKEL:

1  Q.   And do you know on a macro level what kinds of criteria are

2  described in this public CFR document?

3  A.   It discloses a few things.  One is --

4              MS. WU:  Objection, best evidence.  Actually not-best

5  evidence.

6              MS. HOEKEL:  Your Honor, I'm asking him specifically

7  about the items that are described in the CFR.

8              THE COURT:  In the CFR?

9              MS. HOEKEL:  Yes, in this document itself.

10             THE COURT:  All right.  You all come on up.

11             (At sidebar as follows:)

12             THE COURT:  So explain it to me.

13             MS. WU:  The problem is, this is just a summary.  I

14  mean, it's not a document -- like shall and should, I mean, that

15  doesn't appear anywhere here.  This is not the document he was

16  talking about that sets forth the specs that --

17             MS. HOEKEL:  I'm not talking about that document, I'm

18  asking him just on a macro level.  It's probably one question,

19  maybe two, that says what are the kinds of things that are

20  described by the TSA in this CFR.  My next question is going to

21  be are most of the criteria and the criteria you actually

22  developed the machine from in these secret documents.  That's

23  all I'm going to ask him.

24             THE COURT:  In the secret documents?

25             MS. HOEKEL:  Which are not --

```
 1              THE COURT:  That are reflected here?

 2              MS. HOEKEL:  Right.  It just says here's the rest of

 3   the criteria, in the security and sensitive information.  That's

 4   all I'm using if for, Your Honor.

 5              MS. WU:  The issue with this is no one has tried to

 6   get this document and yet -- it's under national security, but

 7   we don't know what parts of that is public and available.  No

 8   one's made the effort to get the document.  And so for that

 9   reason this cannot be the best evidence of what the TSA

10   requires.  It's fine to say that there is a process, but to go

11   beyond that, now we're getting to a slippery slope of, you know,

12   what the requirements are.  We don't know that.  We don't have

13   the proper documents.

14              MS. HOEKEL:  Just for the record, there was no best

15   evidence objection made to this exhibit in the pretrial.  But...

16              MS. WU:  The motion in limine, if you pull the MIL,

17   it's in there.  We have a copy of it.

18              THE COURT:  Which number is that?  Which number is

19   that?

20              MR. NOONA:  139.

21              MS. HOEKEL:  Your Honor, I don't care that much about

22   this document.  It's just not worth the fight.

23              THE COURT:  Okay.  You withdraw it?

24              MS. HOEKEL:  I mean, I -- you know, I think -- what's

25   the last question that was pending, please?
```

```
 1              (Pending question re-read.)

 2              MS. HOEKEL:  I'll withdraw the question.

 3              THE COURT:  Okay.  That's simple.

 4              MS. WU:  Thank you.

 5              (Sidebar concluded and proceedings resumed as

 6  follows:)

 7              THE COURT:  All right.  Ms. Hoekel, do you have any

 8  further questions?

 9              MS. HOEKEL:  I do, Your Honor.

10  BY MS. HOEKEL:

11  Q.   What -- and we can take that document down, Mr. Petracek.

12       What documents did Morpho Detection use from the TSA to

13  develop the, to meet the TSA requirements of the Itemiser DX?

14  A.   The two predominant documents we used to define the product

15  requirements were the TSA specification from 2007 which is a SSI

16  security sensitive document which refers to some classified

17  documents as well as some classified secret documents.

18  Q.   And are the detection limits, the specific compounds and to

19  what level they're supposed to be detected, for example,

20  included in that classified document?

21  A.   They are in the secret document, yes.

22  Q.   Thank you.  How many -- strike that.

23       Is it fair to say that most of the requirements for the

24  Itemiser DX are in a secret or classified document?

25  A.   They were in the -- most of the requirements would be in
```

1   the SSI document which is security sensitive information.

2   Q.    Okay.  And when was the Itemiser DX certified?

3   A.    2009.

4   Q.    And do you -- so it took how long from the TSA Request For

5   Information to certification, how long does it take the, before

6   the -- how long did it take the DX to become certified?

7   A.    That was -- so as soon as the spec came out in 2007, it

8   took those two years to 2009 before it was certified that we

9   were working on it that entire time.

10  Q.    And do you recall how expensive the certification process?

11  A.    For Morpho Detection it was approximately a million

12  dollars.

13  Q.    What kinds of -- are there certain things, are there

14  certain changes that you can make to a desktop trace that would

15  require you to resubmit the machine for certification?

16  A.    Yes.  Once your product becomes certified they do a

17  configuration audit.  Basically they go through the entire bill

18  of materials that makes the product and they determine what they

19  call CI items, or Configuration Items, and those items, any time

20  that we make a change to anything like that we have to actually

21  get permission from the TSA, the testing lab, prior to making

22  the change.

23  Q.    And then does the TSA approve that change?

24  A.    It depends on what the change is.  Sometimes it depends on

25  exactly what the change.  It could be a circuit board change, it

1  could be a smaller change that doesn't require, that doesn't

2  impact the detection side of the instrument.  Obviously there's

3  electronics that control the detection system, so a changes to

4  the electronics is less of an issue than changing something

5  within the detection system itself.

6  Q.   And what did you refer to as the kind of change that you

7  have to report to the TSA?

8  A.   It's listed as a actually what's referred to as a ECP,

9  Engineering Change Proposal.

10 Q.   And if you were to -- strike that.

11      What is a configuration item?

12 A.   A configuration item is basically those items -- come back

13 to ECPs just for a second, because a ECP, there's two

14 classifications of them.

15 Q.   ECP is?

16 A.   The Engineering Change Proposal.  Anything that's

17 considered a configuration item, the ECP is considered a

18 Class 1, which means the change cannot happen until the TSA

19 approves it.  And then there's simple change -- like we have to

20 notify them of every change, but configuration items were always

21 Class 1, which means they, it requires prior approval to

22 implementation.  And then there's Class 2, which is say we

23 change the color of the instrument, right, or changes a part

24 number --

25 Q.   You still have to notify TSA?

1   A.    We still have to notify them.

2   Q.    Is regenerative drying a configuration item for the

3   Itemiser DX?

4   A.    Yes.

5              MS. WU:  Objection, foundation.

6              MS. HOEKEL:  He just testified as to the basis of his

7   knowledge on configuration.

8              THE COURT:  Overruled.  You can cross-examine him on

9   it if you wish, Ms. Wu.

10             Go ahead.

11  BY MS. HOEKEL:

12  Q.    If Morpho Detection notifies TSA that they're going to

13  change a configuration item, what are TSA's -- what is -- TSA

14  approves or disproves?

15  A.    If we request a change to the, to a configuration item, we

16  submit the paperwork of the change with all the supporting data

17  of testing that we've done to validate that that change does not

18  impact detection of the instrument, the performance of the

19  instrument.  They have the option to accept our data or to do a

20  complete retest, a partial retest.  It's their decision.

21  Q.    Can they decide to do a recertification?

22  A.    Can they decide?  Yes, they could decide if they chose to

23  for a full-blown recertification.

24  Q.    How many DXs did you say have been sold since Morpho

25  introduced the product?

1   A.   Both the TSA certified product and the, and that, and the

2   version we've sold?  Approximately 4,000 total.

3   Q.   Does Morpho consider the DX to be a successful product?

4   A.   Yes.  One of our more successful.

5            MS. HOEKEL:  I'll pass the witness, Your Honor.

6            THE COURT:  All right.  Ms. Wu, do you have any

7   questions?

8            MS. WU:  I do, Your Honor.

9            THE COURT:  Okay.

10                         CROSS-EXAMINATION

11  BY MS. WU:

12  Q.   Good afternoon, Mr. Stoddard.

13       You mentioned was it Safran USA earlier?

14  A.   Yes.

15  Q.   Is that a U.S. subsidiary of a French company?

16  A.   Yes.  Safran is a French company.  Safran USA is the U.S.

17  entity that oversees all of their businesses in the U.S.

18  Q.   Earlier you looked at PTX1.  That was the patent?

19  A.   Okay.

20  Q.   On Page 2 you discuss that the assignee is listed as

21  General Electric Company.  Do you recall that?

22  A.   Yes.

23  Q.   Now, why is it that a company -- let me back up.

24       You testified that General Electric Company listed on the

25  face of the patent never owned the patent?

1    A.   It would have been one of the subsidiaries underneath it as

2    is, as we went through.  You can see there was GE Homeland

3    Protection, GE Ion Track.  So it moved amongst the wholly own

4    subsidiaries underneath GE.

5    Q.   Do you have a understanding why the parent never owned the

6    '670 patent as listed on the face of the patent?

7    A.   I don't know why.

8    Q.   You discussed the Itemiser 3 earlier.  Do you recall that?

9    A.   Yes.

10   Q.   Specifically the first sale of the Itemiser 3?

11   A.   Yes.

12   Q.   And you mentioned that was in January 2002?

13   A.   Yes.

14   Q.   And those were to government and military customers?

15   A.   That particular one in January 2002 is to U.S. Customs.

16   Q.   U.S. Customs.  Any other customers?

17   A.   That was the first sale.  Obviously there was other sales.

18   The first -- the question at the time was the first sale.

19   Q.   Were there any sales made in January 2002 to nongovernment

20   entities?

21   A.   I don't have the full complete list in my head to know the,

22   who those other sales would have been to.

23   Q.   There are documents that exist that show when these first

24   sales occurred?

25   A.   Yes.

1  Q.   And who they were sold to?

2  A.   There was, yes.

3  Q.   And those documents aren't with you today, correct?

4  A.   No.

5  Q.   Now if I understood your testimony correctly, Smiths

6  machine, the 500DT, was certified before Morpho's Itemiser DX?

7  A.   Yes.

8  Q.   That was by a few years?

9  A.   I believe it was a few years.

10  Q.   And with respect to the certification of the Itemiser DX,

11  if I understood correctly that took about one year for

12  certification?

13  A.   Approximately two years.  The spec came out in 2007, the

14  final certification was 2009.

15  Q.   But I thought you testified that about a year of that was

16  spent working on the design of the DX?

17  A.   Correct.  A year to create the actual product,

18  approximately another year to go through the certification

19  process.

20  Q.   Morpho's Itemiser DX is a desktop trace detection system,

21  correct?

22  A.   Yes.

23  Q.   So it's put on a desk or a cart, meant to be stationary?

24  A.   It's intended to be stationary, but it does have a handle,

25  it is portable, you can actually flip the cover down using the

1   handle like a carry case and move it to another site if you

2   needed to.

3   Q.   But in terms of Morpho's classification, it's classified as

4   a desktop, not a portable device?

5   A.   Correct.

6   Q.   As opposed to Morpho's Mobile Trace DX?  That is a portable

7   device?

8   A.   Correct.

9            MS. WU:  I have nothing else.

10           THE COURT:  All right.  Ms. Hoekel?

11           MS. HOEKEL:  No redirect, Your Honor.

12           THE COURT:  All right.  May this witness be excused?

13   Well, I guess he's not going to be -- he's going to be here with

14   us.

15           MS. HOEKEL:  Yes, Your Honor.  He'll be at counsel

16   table.

17           THE COURT:  All right Mr. Stoddard, you can step back

18   to counsel table.

19           I don't suppose you have a 10-minute witness,

20   Ms. Hoekel?

21           MS. HOEKEL:  No, Your Honor, we do not.

22           THE COURT:  Well, ladies and gentlemen, this is a good

23   time, I think, for us to break, and we'll let you leave.  We're

24   going to start again tomorrow morning at 9:30, Officer Connolly

25   will tell you when to be here and where.  Again, very important,

1   no research, don't discuss anything about the matter, don't get

2   on the Internet and look anything up.  And we thank you for your

3   attention.  Have a good evening.

4              (Jury left the courtroom.)

5              THE COURT:  All right.  You all can be seated.

6              So we need to take up this, I guess this claim

7   construction issue if you want it resolved before you put your

8   evidence on.  So Ms. Hoekel, are you going to do that?

9              MS. HOEKEL:  Your Honor, I'm going to have Mr. Brophy

10  do that.

11             THE COURT:  Mr. Brophy.  Okay.

12             MR. BROPHY:  Good afternoon, Your Honor.

13             THE COURT:  Afternoon.

14             MR. BROPHY:  So there is clearly a dispute regarding

15  what the term desorber inlet means in the '670 patent.

16             THE COURT:  Okay.  Hold on.  Let me get this language.

17             Okay.  Go ahead.

18             MR. BROPHY:  The dispute arises in claim 12.  The real

19  question here, I think, is whether the desorber -- and I'll

20  start off by saying there are really two different inlets

21  referred to in claim 12.  There's a detector inlet, which I

22  don't believe there's any dispute is the opening that receives

23  the vapors into the actual IMS chamber, and then there's the

24  desorber inlet, and that's the term that we're specifically

25  interested in here.

1        It is Morpho Detection's contention that the desorber

2   inlet is a passage through which air flows into the desorber.

3   If you look at the claim language, it specifically reads "A

4   desorber having an inlet for communicating with one of the traps

5   and an outlet communicating with the detector inlet."  And so

6   there's a certain amount of symmetry there in air coming into

7   the desorber through the inlet and then exiting the desorber

8   through the outlet, which ultimately goes into, the detector.

9   We're talking about vapors moving through this desorber to

10  ultimately deliver those vaporized samples into the detector.

11       Now, if you turn your attention to the specification,

12  and particularly column 3 at approximately line 28, there's a

13  small additional discussion regarding how this air is moved

14  around, and it says "The purging is achieved" -- and I'll get

15  into why this is important in just a moment -- "the purging is

16  achieved in the desorber by feeding dry air in a manifold above

17  and below the sample wiper or trap through a series of small

18  holes."  And it goes on to say "Alternatively the dryer may be

19  directed through a narrow slot or through other means for

20  creating an air curtain."

21       What we're talking about is different shapes,

22  different configurations that allow air to be blown against the

23  trap.  And here it's describing in the specification two

24  possibilities, you can use small holes, a series of small holes

25  that create, which broaden out that air passageway so that the

1   air is going across the inlet, it's distributed across the

2   entire width of the inlet.

3           Another way to do it is to use a narrow slot, like a

4   jet stream of sorts, that allows air to impinge on the surface

5   of the trap by squeezing that air through a narrow slotway so

6   you can create a blade of air.  And if you look at the claims of

7   the patent, specifically the dependent claims from claim 12,

8   you'll see that's consistent.  Claim 16 says "The apparatus of

9   claim 13" -- which ultimately depends from claim 12, "wherein

10  the inlet of the desorber has a plurality of small holes for

11  directing dry air from the manifold."

12          Similarly if you look at claim 19, "The apparatus of

13  claim 13 wherein the inlet to the desorber is a narrow slot."

14  Those are all different shapes that air channel can take to

15  drive air against the surface of the trap.

16          And so Your Honor, it's our position that the desorber

17  inlet is really an air channel through which air is introduced

18  into the desorber, and as the claim 12 clearly indicates,

19  ultimately communicates with trap by directing air against the

20  trap to pick up those vaporized contraband materials.

21          Happy to address any questions if you have any, Your

22  Honor.

23          THE COURT:  Just from the standpoint of any of the

24  drawings, do they help?

25          MR. BROPHY:  I'd be happy to point you to some.  If

```
 1   you take a look, for example, at figure 6 and 7 you'll see a
 2   manifold, 32 is the reference numeral, and --
 3              THE COURT:  Hold on.
 4              MR. BROPHY:  -- in this configuration, air comes
 5   through that manifold, 32, and is blasted down onto the trap.
 6   And this is a little bit difficult to see because it's a
 7   cut-away, but what you have in reality is a much larger, if you
 8   three-dimensionalize this you'll extrude it out of the page, and
 9   there will be a series of these small holes, and those small
10   holes are what shoot air against the trap to pick up those
11   vaporized materials.  And that's exactly what claim 16 is
12   referring to when it says "Wherein the inlet has a plurality of
13   small holes for directing dry air from the manifold."  And again
14   with claim 19, the same idea, except now air is being shot
15   through a narrow slot instead.
16              THE COURT:  Okay.  Thank you.
17              MR. BROPHY:  Thank you, Your Honor.
18              Who is making -- Mr. Hutchins?
19              MR. HUTCHINS:  May I hand up some slides?
20              THE COURT:  Yes, sir.
21              MR. HUTCHINS:  I'm not going to enter the
22   demilitarized zone.
23              THE COURT:  Okay.
24              MR. HUTCHINS:  So if you go to one, two, third page
25   slides Your Honor.
```

```
 1              THE COURT:  Okay, these -- I have two of the same

 2   thing?  One for the clerk?

 3              MR. HUTCHINS:  Yes.  Yes.  Yes.

 4              THE COURT:  All right.  Page 2?

 5              MR. HUTCHINS:  Yes.  The third page, it looks like

 6   this.

 7              THE COURT:  Okay.

 8              MR. HUTCHINS:  And so this is a blow-up of this figure

 9   6 and 7 that we were just looking at.  This is from Morpho's

10   brief filed way back when in this case.  They were trying to

11   describe the way the manifold blows air out from the manifold

12   and across the inlet to the desorber.  So we were talking about

13   that element.  The air flow is the air first comes into the

14   manifold, it gets blown out from the manifold, and then it goes

15   across the inlet to the desorber.  And they were, he was making

16   the point, Morpho's counsel was making the point that was just

17   made that 32 is this manifold and he was describing how the

18   manifold air goes from the manifold and then across the inlet to

19   the desorber.  And what they were, what they were looking at as

20   the inlet to the desorber is what we're saying the inlet to the

21   desorber is.  This mouth, it's called the mouth in the

22   specification of the patent, inlet doesn't actually occur in the

23   specification, the mouth of 36, which is where the trap enters.

24   They said here's the surface of the inlet to the desorber, and

25   they have that line and they talk about how the air goes across
```

1   that.  But that line and the inlet that they're saying back then

2   was the inlet is exactly what we're saying the inlet was:  This

3   mouth where the trap is inserted.  Remember, the claim term is

4   inlet to the desorber for communicating with one of the traps to

5   be tested.  This is plainly the slot where the trap is inserted

6   as you see in their blow-up of figure 7.

7            Now, if the inlet to the desorber was where air is

8   entering, was it that little circle, 32, where air is entering

9   the manifold?  Then the air is not flowing from the manifold and

10  across the inlet.  Because by the time it's left the manifold

11  it's also already passed through the inlet, because it had to

12  get through the inlet to get into the manifold under their

13  logic.  But the claim talks about the air going from the

14  manifold and across the inlet.  And the way that happens is if

15  the inlet is the inlet for the trap.

16           Now, figure 6 and 7 are the preferred embodiment, and

17  the dependent claim that says, well, where this is a narrow

18  slot, the only narrow slot here is where -- this mouth is the

19  narrow slot.  Under their construction you're really not even

20  covering this preferred embodiment that's shown in figure 6 and

21  7.  Now the language of the claim itself, though, focusing on

22  the "this is in communication with the trap" is indicating that

23  this is what receives the trap.  And that mouth, 36, receives

24  only the trap.  It's not an inlet for air.  It's an outlet for

25  air.  Air is blowing out that to keep ambient air out of the

1    device.

2           And so when they were saying air's flowing across that

3    inlet, they were pointing to the same thing we were pointing to.

4           Now, the patent that is the parent to this patent also

5    provides instruction on this, and that's on my next slide, Slide

6    4.  And there they describe how you have a desorber having an

7    inlet in the form of a narrow slot.  Here it says "dimensioned

8    for receiving one of the traps to be tested for the materials of

9    interest."  And they're clearly linking this narrow slot, this

10   notion of this narrow slot as being related to where the trap is

11   inserted.

12          Now the desorbers, the figures that they're showing

13   here, there's really no dispute that the trap is going into the

14   desorber through what the specification calls a mouth, but there

15   is no inlet described in the specification.  All that's

16   described is the mouth where the trap goes in.  So that has to

17   be based on this intrinsic evidence what the claim is talking

18   about when it says both that you have the desorber having an

19   inlet for communicating with the trap but then goes on to say

20   that the manifold is blowing air, the air is going from the

21   manifold and across the trap.  So the air leaves the manifold

22   and then goes across the trap.  If the inlet were the air inlet

23   for the desorber then the air would never go from the manifold

24   across the inlet because it's already passed through that inlet

25   when it entered the manifold.

```
 1              THE COURT:  Go back to the manifold on the drawing.

 2              MR. HUTCHINS:  Yes.  Figure 7.

 3              THE COURT:  Okay.  That's where?

 4              MR. HUTCHINS:  32.

 5              THE COURT:  Okay.

 6              MR. HUTCHINS:  So 32 is the manifold.  That has an air

 7   inlet --

 8              THE COURT:  Hmm-hmm.

 9              MR. HUTCHINS:  -- where air enters that manifold.

10   Then air leaves the manifold and it goes from the manifold and

11   it's supposed to go across the inlet at that point.

12              THE COURT:  And then where is it, on this drawing

13   where does it go?

14              MR. HUTCHINS:  Oh, on this drawing it goes out.

15              THE COURT:  To the right?

16              MR. HUTCHINS:  To the right and the left.  I mean it,

17   you know, it's blowing up.  It's coming from the top and the

18   bottom on both sides.  It's blowing into that passage.  The

19   passage that you see there horizontally is where the air is

20   blowing from the manifold.

21              And here they're making the point, well, the surface

22   of the inlet to the desorber and they're pointing to where we're

23   pointing is the inlet.  They're not pointing to the little, you

24   know, the little, the circle that's the manifold.  There is an

25   air inlet for that manifold.  Air has to enter that manifold.
```

1   But in no sense, once the air enters the manifold and then blows

2   from the manifold and then across the inlet to the desorber, if

3   the inlet to the desorber were also that inlet to the manifold,

4   that claim language in claim 12 would make no sense.   That

5   element -- it's like a snake eating its tail or something.   It

6   wouldn't work.

7            The inlet for the manifold which is also the inlet for

8   the desorber is something different than what is called the

9   inlet for the desorber for communicating with one of the traps.

10  The communication there is what you see in figure 7 where the

11  trap is inserted, it receives, it receives the trap.

12           So the bottom line is, when they're talking about an

13  inlet for the desorber for communicating with one of the traps,

14  they're talking about an inlet that receives the trap, and then

15  the follow-on, and then where it claims in the dependent claim

16  that it's, it's a narrow slot, well, that's in fact then

17  covering what you see in figure 6 and 7 as the preferred

18  embodiment, because there's that narrow slot into which you're

19  inserting the trap, which is how these terms were also used in

20  the parent application.   We cite a little case here, but I mean,

21  you're aware -- I mean, you're aware how related patents can

22  come into play in claim construction so I'm not going to talk

23  about that much.

24           But that's our basic position, that the language of

25  the claim itself, both the focus on that this is an inlet in the

1    desorber particularly for communicating with the trap, the

2    follow-on limitation in claim 12 describing how the air goes

3    from the manifold and then across the trap, we believe supports

4    only our construction.  And we think the dependent claim as well

5    as the language in the parent patent also supports it.

6           For the specification itself, inlet, the term isn't

7    used in the spec.  All we have is this term of the mouth, which

8    is what both parties were pointing to, pointing Your Honor to as

9    the inlet's the desorber when this, when we were talking about

10   other related elements during the *Markman* proceedings.

11          Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Mr. Brophy, why don't you comment and then

14   Mr. Hutchins can make a final comment.

15          MR. BROPHY:  I think what we have here is a classic

16   case of trying to import a preferred embodiment, or not even

17   that, a picture from the specification into the claims.

18   Mr. Hutchins is exactly right:  There is a term in the

19   specification that describes what that opening is to the

20   desorber that the trap goes into, and that is the mouth of the

21   desorber.  The specification explicitly calls it the mouth of

22   the desorber.  The specification is also clear that, and the

23   language specifically relates to the manner in which you can use

24   air to purge the trap to shoot air into the trap and onto the

25   trap, and it's through holes or it's through a slot.

1   Mr. Hutchins says that the only possible thing that could be a

2   narrow slot is where the trap goes, but I tend to disagree with

3   that, because if I can point you back to column 3 of the patent,

4   it explicitly says in the patent, that "alternatively the dry

5   air may be directed through a narrow slot."  That's the air

6   channel being directed through a narrow slot.

7            Now as for his snake eating its tail argument, the

8   best way I know to describe this is to imagine a funnel in your

9   head like you would use to pour oil into an engine case.  A

10  manifold can sit within that funnel.  Imagine that that funnel

11  defines the inlet to a desorber.  The air would come through the

12  bottom, the small part of the funnel, then it would come up, and

13  the manifold would force the air to spread out inside that

14  funnel so the air impinges on a maximum amount of surface area

15  of the trap to pick up the maximum amount of that entrained --

16  pardon me, evaporated sample as it possibly can.

17           So when the claim language says -- I'll just read it

18  to make sure I don't screw it up, because it is quite a

19  mouthful -- when it says "The desorber including a manifold

20  communicating with the inlet to the desorber for directing air

21  from the manifold and across the inlet," that manifold, the job

22  of that manifold is to take the air from that small part of the

23  bottom of the funnel and spread it out so it's distributed

24  across the inlet so that it communities with as much as of the

25  trap as possible.

```
 1              Now Mr. Hutchins points to the '513 patent as well and
 2   he uses claim 3, but the language of claim 3 is completely
 3   different.  Instead of the inventors choosing to use
 4   "communicating with the trap", in claim 3 they use the term
 5   "receiving one of the traps".  That's an entirely different
 6   requirement.  It's an entirely different limitation.  So he's
 7   trying to take that language from claim 3 of a different patent
 8   and read it into claim 12 which doesn't require receiving a
 9   trap, it merely requires communicating with a trap.  And the
10   reason for that change in my view is because we're talking about
11   different things here.  In this case, in claim 12 we're talking
12   about air traveling into and out of the desorber.
13              THE COURT:  All right.  Mr. Hutchins?
14              MR. HUTCHINS:  I don't think I'm importing anything
15   into the claim.  We're simply grappling with trying to
16   understand the claim term in light of -- we have to deal with --
17   we have to work with what we've got.  We've got a specification
18   that doesn't use the term inlet for the desorber.  Verbatim.  So
19   it describes the mouth of the desorber as where you put the trap
20   in.  That's the only inlet that's really described in the
21   specification.  That's all we have to work with.  So it's a fair
22   argument to say when there's an inlet, they're referring to the
23   mouth.  They say they don't say inlet in the specification, you
24   know.  They didn't say mouth in the claim.  Yeah, but they
25   didn't say inlet in the specification.  We have to try to match
```

1   them up somehow.

2           And the argument that Mr. Brophy just made about the

3   funnel really doesn't address how in figure 7 the air is not --

4   the inlet to the desorber would be the inlet to the manifold and

5   that air going from the manifold would not be going across the

6   inlet.  It would already have passed the inlet.  When you look

7   at figure 7 and the air is passing across the inlet, it's

8   passing across the inlet exactly in the manner that Morpho

9   indicated it was four or five months ago when they were, they

10  too were pointing to the mouth as the inlet.  The only

11  embodiments shown here have the trap going into an inlet in the

12  desorber.  So reading the claim in light of the specification

13  leads to that conclusion.

14          Now, again, same thing with reading that in

15  conjunction with the fact that this is specifically for

16  communicating with the trap.  You know, it suggests that.  All

17  of these things are, have to be suggested because the patent

18  itself didn't provide an explicit definition.  If it did, we

19  wouldn't be grappling with this.  But I don't think that that

20  argument regarding the manifold and how the rest of the claim

21  really doesn't make sense unless the inlet to the desorber is

22  where you put the trap, and that comes after the manifold and

23  the air flow.  So you would have air flow going from the

24  manifold across the inlet.  I submit that that still only makes

25  sense under our construction in which the inlet to the desorber

1  for communicating with one of the traps is where you, in fact,

2  put the trap.

3          THE COURT:  Okay.  Thank you.  I'll let you know

4  tomorrow morning.

5          Anything else we need to take up before we leave

6  today?

7          MS. HOEKEL:  Not from plaintiff, Your Honor.

8          THE COURT:  All right.  Thank you.

9          (Whereupon, proceedings concluded at 5:11 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           *CERTIFICATION*

2

3           *I certify that the foregoing is a true, complete and*

4     *correct transcript of Volume 1 of the proceedings held in the*

5     *above-entitled matter.*

6

7                    _____

8                       Paul L. McManus, RMR, FCRR

9                           _____

10                              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25